Exhibit A

George Melchior's Declaration

# Index

George Melchior's Declaration                          Pg 3

Exhibit A - George Melchior's Report                  Pg 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:24-cv-21185-RAR

AT LAW AND IN ADMIRALTY

CLAY CROCKETT,

     Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINE,

     Defendant.

_____/

## GEORGE MELCHIOR DECLARATION

I, George Melchior., declared under penalty of perjury that the foregoing is true and correct and state

1.     My name is George Melchior, R.A., P.E., LEED AP, WACH #183. I am sui juris, of the age of majority and fully capable of taking an oath and testifying. I have personal knowledge of each and every assertion in this Declaration.

2.     **QUALIFICATIONS**. For my analysis, I relied on my 20+ years of experience in the industry in which I am educated and licensed both as a Registered Architect (RA), and a Professional Engineer (PE). As an architect and engineer, I relied on my extensive education and experience with human factors in the built environment, including human anthropometry, sensory, and locomotion. The education of human factors in the built environment was a prominent component of the architectural core curriculum as they provide the foundation to building codes,

1

fire codes, and consensus industry standards for buildings, vessels and marine facilities. Licensed architects are required to be knowledgeable in the human sensory, anthropometry, and biomechanics as they pertain to the safe design, construction, operations and maintenance of occupied facilities. In this regard, I am certified with the National Council of Architecture Registration Boards (NCARB) in which I had to satisfy four years of training and experience requirements in architectural design including human factors as they pertain the Health, Safety and Welfare (HSW) of intended occupancy. Concurrently, I relied on my specific education and training in advanced occupational ergonomics and human factors including human anthropometry, ambulation and vision; and my continuing education as a graduate student with the University of New Hampshire School of Kinesiology.

3.      As an engineer, I am trained in mechanics of materials, material science, and analysis of structural assemblies including material properties of fabricated steel assemblies and associated mechanisms of fatigue and failure. The education of allowable stress design in the safe distribution of live loads imparted by human occupancy and interaction is prominent in the education, training and professional practice of civil and structural engineering. In this regard, I am certified with the National Council of Examination for Engineering and Surveying (NCEES), in which I completed four years of specific training and experience requirements in both architectural and engineering design including the application of human factors as they pertain the health, safety and welfare of all occupancy classifications defined in state building and fire codes.

4.      In addition to my education, training and experience as a licensed architect and licensed engineer, I also relied on my formal education and training in advanced occupational ergonomics and human factors including anthropometry, biomechanics and ergonomic design, as well as my ongoing education in biomechanics as a graduate student at the University of New

2

Hampshire Department of Kinesiology. I also relied on my training and experience as a Facilities Management Director for the Department of the Navy, where I was a Level III Certified Facilities Engineer with extensive education and experience with construction and maintenance of safe interior walking surfaces and structural assemblies across millions of square feet of buildings and facilities located throughout the northeastern U.S.; and on my training and experience as an ANSI/NFSI qualified Walkway Auditor Certificate Holder (WACH #183), where I was trained in industry-accepted means and methods of assessing the likelihood of material failures of various walking surfaces, including exterior stairways. Lastly, I relied on my specific education and experience with consensus industry design and construction codes and standards for commercial stairway systems, including common structural safety codes enacted in all states throughout the U.S.

5.      Specifically, in this matter, I relied on my education and experience with the mechanics of materials and associated applications for the structural stability and soundness of exterior stairway systems. I also relied on my education, training and experience with biomechanics and associated loading associated with human ambulation on stairway systems, as well as my education in the calculations of energy, momentum and impact stresses on humans. I then applied my experience as an architect, engineer, and facilities manager, as well as my knowledge of building codes and consensus industry standards in analyzing my observations of the stairway system and the discovery in this matter to determine the foreseeability and likelihood of a catastrophic failure of the stairway system under normal and expected service loads.

6.      **REPORT**. Attached hereto as **Exhibit A** is true and correct copy of my Report in this matter. As detailed in the Report, the portside spiral stairway between the 11th and 12th decks of the Carnival Cruise Line vessel VISTA was dangerously defective. Specifically, Carnival

Cruise Lines, through inadequate and otherwise absent maintenance of the exterior stairway, created a dangerously defective, unstable and structurally unsound stairway system. My complete opinions can be found in my Report (Exhibit A).

       7.      **THE SUBJECT STAIRCASE.** The subject staircase is 48 inches (in.) wide and had 16 steps which consisted of teak wood tread and riser boards. Because of the spiral configuration of the stairways, each wooden step tread varied in depth across its width to form a rhombus shape; known commonly as a fan step. The fan steps were 7 in. deep at the inside of the spiral radius and widened to 11 in. at the centerline of the stairway, and 15 in. at the outer circumference of the stairway. Due to the varying width, each step tread consisted of multiple teak boards that were pieced together on top of the underlying steel tread plate. The wooden tread boards were affixed to the underlying steel tread plate of each step with a series of screws aligned in two rows; each of the two rows of screws were adjacent to vertical steel bars on the underside of the tread plate, known as bracing bars. Each step in the stairway was equipped with a solid teak riser board which was affixed to the adjacent wooden tread boards, top and bottom. Specifically, the top of the riser board was affixed to the underside of the overhanging upper tread board by way of a continuous steel bracket and affixed to the tread board with a single screw at each end of the bracket. The bottom of each tread board was affixed to the lower tread board with a continuous metal angle block; the steel angle block was adhered to a notched portion of the riser board and mechanically fastened to the underlying tread board with screws.



8.      **THE RISER BOARD.** The board was 46 in. long, 4 ½ in. tall, and ⅜ in. thick – these dimensions equate to a volume of approximately 70.88 cubic inches (0.041 cubic feet). The density of teak wood, like most tropical hardwoods, is approximately 45 pounds per cubic foot. Therefore, the weight of the wooden riser board is 1.85 pounds (lbs.).

9.      **INDUSTRY STANDARDS**. Carnival failed to meet the following consensus industry codes and standards for structural stability and soundness of the portside stairway, as well as industry codes and standards for means of escape.

ASTM F1166, Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities:
- 11.2.2 Design Load—Stairways shall be built to carry five times the normal anticipated live load, but less than a 544-kg (1000-lb) moving concentrated load.
- 11.2.6 Open Riser—Risers shall be open unless screens or plate backing behind the stairs is required to protect personnel or equipment under the stairs

IMO - SOLAS, Part C, Regulation 13 – Means of Escape:
- o   1.1– Safe escape routes shall be provided
- o   1.2 – Escape routes shall be maintained in a safe condition, clear of obstacles;
- o   1.3 – Additional aids for escape shall be provided as necessary to ensure accessibility, clear marking, and adequate design for emergency situations

46 CFR 116.500; Means of Escape:
- o   … each space accessible to passengers or used by the crew on a regular basis must have at least two means of escape, one of which must not be a watertight door

5

- o Means of escape means a continuous and unobstructed way of exit travel from any point in a vessel to an embarkation station or area of refuge

IEBC, as adopted by the State of Florida as the Florida Building Code (553.73)
- o 606.2.3, Substantial Structural Damage to Gravity Load-Carrying Components: Gravity load-carrying components that have sustained substantial structural damage shall be rehabilitated to comply with the applicable provisions for dead and live loads in the IBC

IBC, as adopted by the State of Florida as the Florida Building Code (553.73)
- o 1001.3, Maintenance – Means of egress shall be maintained in accordance with the Florida Fire Code
- o 1604.2, Strength: Buildings, structures, and parts thereof shall be designed and constructed to support safely the factored loads in load combinations defined in this code without exceeding the appropriate strength limit states for the materials of construction.
- o 1607.3, Uniform and Concentrated Live Loads: The live loads used in the design of building and other structures shall be the maximum loads expected by the intended use or occupancy but shall in no case be less than the minimum uniformly distributed live loads given in Table 1607.1
  - o Table 1607.1 – Stairs and exits: 300 lbs. (concentrated); 40 pounds per square foot (psf) uniformly distributed
- o 1009.4.4, Dimensional Uniformity: Stair risers and treads shall be of uniform size and shape. The tolerance between the largest and smallest riser height and tread depth shall not exceed $3/8$ in. in any flight of stairs

ASCE 7 (as prescribed by IBC): The minimum uniformly distributed, and concentrated live load shall be as provided in Table 4.1
- o Stairs – 40 pounds per square foot (psf) o Individual stair treads shall be designed for the uniformly distributed live load or a 300 pound (lb.) concentrated load acting over an area of 4 square inches (sq.-in.), whichever produces a greater stress o Maximum Allowable Deflection – L/240 (0.30 in. in this case)

NFPA 101, Life Safety Code, as adopted by the State of Florida as the state Fire Code (633.202):
- o 4.2.2, Structural Integrity: Structural integrity shall be maintained for the time needed to evacuate, relocate, or defend in place occupants who are not intimate with the initial fire development
- o 4.6.13: Means of egress systems required by code shall be continuously maintained in a code compliant condition
- o 7.1.10, Means of Egress Reliability: Means of egress shall be continuously maintained free of all obstructions or impediments to full instant use in case of fire or other emergencies
- o 7.2.2.2, Dimensional Uniformity – Stair risers shall be of uniform size and shape; the maximum allowable variance in any riser or tread in a stairway $3/8$ in.; the maximum allowable variance in adjacent risers and treads is $3/16$ in.

6

- 7.2.2.3.4, Tread Slope – Tread slope shall not exceed 1 in 48 (2%)

International Property Maintenance Code
- 305.2, Structural Members: All structural members shall be maintained structurally sound, and be capable of supporting the imposed loads
- 305.4, Stairs and Walking Surfaces: Every stair, ramp, landing, balcony, porch, deck or other walking surface shall be maintained in sound condition and good repair
- 305.1.1, Unsafe Conditions: The following conditions shall be determined as unsafe and shall be repaired or replaced to comply with the IBC or IEBC as required for existing buildings
  - The nominal strength of any structural member is exceeded by nominal loads, the load effects or the required strength;
  - Structures or components there of have reached their limit state;
  - Structural members are incapable of supporting nominal loads and load effects;
  - Stairs, landings, balconies and all similar walking surfaces, including guards and handrails, are not structurally sound, not properly anchored or are anchored with connections not capable of supporting all nominal loads and resisting all load effects
- 306.1.1, Unsafe Conditions (Serviceability): Where any of the following conditions cause the component or system to be beyond its limit state, the component or system shall be determined as unsafe and shall be repaired or replaced to comply with the IBC as required for existing buildings –
  - Steel that has been subjected to any of the following conditions:
    - Deterioration;
    - Elastic deformation;
    - Ultimate deformation;
    - Metal fatigue; or
    - Detached, dislodged or failing connections

State of Florida Guide to Milestone Inspections (Florida Statutes, Title XXXIII, Chap., 553, Sec. 899):
- The fundamental purpose of the required milestone inspection and report is to confirm in a reasonable fashion that the building or structure under consideration is safe for continued use under present occupancy;
- Visual inspection will, in most cases, be considered adequate when executed systematically. The inspecting professional must conduct the visual examination throughout all habitable and non-habitable areas of the building, as deemed necessary, to establish compliance. Surface imperfections such as cracks, distortion, sagging, excessive deflections, significant misalignment, signs of leakage, and peeling of finishes should be viewed critically as indications of possible difficulty;

10. **CARNIVAL CREATED THE DANGEROUS CONDITION BY FAILING TO SECURE THE WOODEN RISER BOARD TO THE STAIRCASE AFTER A**

7

**VARNISHING.** Carnival created the dangerous condition by failing to secure the wooden riser board to the staircase after a varnishing. The screws did not go through the wood – there are no screw holes or evidence that the screws engaged the wooden riser board at all. See Figure 2:



Figure 2:   Composite image of the stairway with the missing riser board (top), the riser board with back side shown (middle)l and the riser board with front side showing (bottom).  The yellow circles and lines map the correlation between the bracket screws and the area of the riser board that should have been engaged by the screw – note the absence of holes in the riser board as evidence that the board was not screwed in.

11.     **10 POUNDS OF FORCE LANDED ON THE PLAINTIFF'S HEAD**. Clay Crockett was laying on the lounge chair directly next to the metal barrier on Deck 11 on board the Carnival Vista on July 14, 2023. Suddenly and without warning, a riser board became dislodged and fell out of the portside stairway system. The riser board fell from a height of approximately 90 in. above the 11th deck surface, and fell approximately 5 ft. before striking Mr. Crockett in the head. The weight of the 46 in. long board was approximately 1.85 lbs.  Using the principles of conservation of energy, the approximately velocity of the board at the point that it struck Mr. Crockett was 18 feet per second (fps). Considering mass of the board (0.06 slugs), the force of impact of the board on Mr. Crockett was approximately 10 pounds of force. Carnival's liability expert also determined that the force of impact of the board on Mr. Crockett was approximately 10 pounds of force.

8

12.     **THE SUBJECT STAIRCASE AND ITS SISTER STAIRCASE HAD NUMERIOUS OBSERVABLE DEFECTS**. During my inspection of the stairways, I observed numerous conditions of various defects in the wooden portions of the stairway system; I also observed various means of repairs conducted on the stairways. Specifically, of the 32 steps observed (16 per stairway), I observed **two broken riser boards.** See Illustration 11:



Illustration 11:  Illustration of cracked riser boards on the portside stairway – note the cracks develop at the approximate top edge of the riser block (behind the riser boards in this image).  In two instances, large portions of the riser board were missing (see thumbnail on right side of image – second step up in the image)

13.     I observed **six instances in which the tread boards were loose, broken, or otherwise deformed as a result of material failure**. See Illustrations 12:



Illustration 12:  Illustration showing exemplar of defective tread step – this defect was a common condition on both the port and starboard spiral stairway.  Displacement of the tread board, as seen in this image, will directly impact the stability of the underlying riser board

14.     Additionally, I observed approximately **29 replacement screws and 7 areas of defect to caulk and adhesion systems.** See Illustration 16:

9



Illustration 16: Illustration of exemplar caulk/sealant failure and deformation/uplifting of the teak tread board – sealant failures allow saltwater/ salt air infiltration between the teak board and the underlying steel tread plate, which promotes corrosion of the screws and accelerates failure of the tread board connections

15.    I also observed that the **stairways vibrated substantially under my use** – the magnitude of vertical displacement from the vibrations was most pronounced at the upper portion of the outboard skirt beams on both stairways (longer of the two beams).

16.    Analysis of the photographs provided by Carnival reveal that the two screws that were in place in the tread bracket did not engage the riser board (Ref. Figure 2, above). Specifically, the screws did not go through the wood – there are no screw holes or evidence that the screws engaged the wooden riser board at all.

17.    During my inspection, I observed the **same condition on at least three other riser boards on the portside stairway system**. Specifically, I observed a condition in which **the screw on both ends of the tread bracket did not engage the wooden riser board between the bracket tabs** – instead, the screw mechanically crimped the tabs of the bracket around the top of the wooden riser board. As a result of those defects, the only mechanism holding those riser boards in place were (1) the friction of the crimped tabs at the top of the board, and (2) the adhesive along the riser block tab at the bottom of the board. See Illustration 17:

10



Illustration 17:   Illustration of exemplar 'crimp' of the tread bracket around the riser board on portside stairway – the tread bracket screw did not engage (penetrate) the wooden riser board, but did engage the tread bracket tab beyond so as to crimp the bracket around the top edge of the riser board.  Of note, there are only two screws in each tread bracket – one at each end of the 4 ft. riser board.

18.     I observed that the repairs were not consistent – there were **different types and sizes of screws**; the riser board heights varied on the blocks; in several locations, **there were additional screws added to the underside of the treads**; and in one location (7th riser on port side stairway), **the riser board was replaced on the wrong side of the stop such that the stop was rendered ineffective.** See Illustrations 18 & 19:



Illustration 18:   Illustration of varying, inconsistent screw repairs to tread boards in portside stairway.  (1) shows a flat-head wood screw which is inconsistent (and mechanically different) than the round-head screws typical of the connection condition; (2) shows improvised additional screw placement unique to that tread, and each of those two screws are different from each other, and also inconsistent with the screws typical of the tread board connections; (3) shows a zinc-coated screw which is, again, inconsistent with the galvanized and/or coated screws observed elsewhere in the stairway



Illustration 19:   Illustration of exemplar riser board repair which is inconsistent with the stairway configuration. (1) shows inboard side of 7th step riser, and (2) shows outboard side of the same riser – note that the riser board was replaced onto the wrong side of the riser block such that there is no mechanism to stop the riser board from falling out of place in similar fashion to that of the riser board that struck Mr. Crockett

Pursuant to 28 U.S. Code § 1746, I, George Melchior declare under the penalty of perjury that the foregoing is true and correct.

GEORGE MELCHIOR

12

EXHIBIT "A"



# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

345 Heritage Avenue
P.O. Box 436
Portsmouth, NH 03802

Voice: 603.828.8168
gwmelchior3@gmail.com

February 23rd, 2025

Hickey Law Firm, P.A.
ATTN: Lisa C. Goodman, Esq.
12150 SW 128th Court
Suite 225
Miami, Fl 33186

Re:     _Clay Crockett v. Carnival Corporation d/b/a Carnival Cruise Line_

Attorney Goodman,

Herein is my assessment of the portside spiral stairway on the 11th deck of the Carnival Cruise Line vessel VISTA. In generating this report, I inspected the vessel on December 16th, 2023, and I reviewed the following information supplied by your office:

- Complaint
- Defendant Carnival's Answer to Plaintiff's Complaint
- Request for Inspection
- Defendant Carnival's Answers to Interrogatories
- Defendant Carnival's Supplemental Answers to Interrogatories
- Defendant Carnival's Document Production
- Plaintiff's Answers to Interrogatories
- Deposition of Clay Crockett
- CCTV footage

For my analysis, I relied on my 20+ years of experience in the industry in which I am educated and licensed both as a Registered Architect (RA), and a Professional Engineer (PE). In addition to my education and training, I maintain a private practice in architectural and engineering design which produces 12 – 15 permitted and constructed designs per year. My 20+ years of continued experience in the practice of architecture and engineering has further advanced my knowledge and training in the application of codes, standards, and current construction means and methods in the protection of the Health, Safety and Welfare (HSW) of people in the built environment.

Additionally, as an architect, I relied on my extensive education and experience with human factors in the built environment, including human anthropometry, sensory, and biomechanics. The education of human factors in the built environment was a prominent component of the architectural core curriculum as they provide the foundation to building codes, fire codes, and consensus industry standards for buildings, vessels and marine facilities. In this regard, I am certified with the National Council of Architecture Registration Boards (NCARB) in which I had to satisfy four years of training and experience requirements in architectural design including human factors as they pertain to the safety of the intended occupancy. Additionally, I relied on my education and training in advanced occupational ergonomics and human factors including anthropometry, biomechanics and ergonomic design, and my continuing education in human factors and biomechanics as a graduate student with the University of New Hampshire Department of Kinesiology.



George W. Melchior, R.A., P.E., LEED AP

As an engineer, I am trained in mechanics of materials, material science, and analysis of structural assemblies including material properties of fabricated steel assemblies and associated mechanisms of fatigue and failure. The education of allowable stress design in the safe distribution of live loads imparted by human occupancy and interaction is prominent in the education, training and professional practice of civil and structural engineering. In this regard, I am certified with the National Council of Examination for Engineering and Surveying (NCEES), in which I completed four years of specific training and experience requirements in both architectural and engineering design including the application of human factors as they pertain the health, safety and welfare of all occupancy classifications defined in state building and fire codes.

In addition to my education, training and experience as a licensed architect and licensed engineer, I also relied on my formal education and training in advanced occupational ergonomics and human factors including anthropometry, biomechanics and ergonomic design, as well as my ongoing education in biomechanics as a graduate student at the University of New Hampshire Department of Kinesiology. I also relied on my training and experience as a Facilities Management Director for the Department of the Navy, where I was a Level III Certified Facilities Engineer with extensive education and experience with construction and maintenance of safe interior walking surfaces and structural assemblies across millions of square feet of buildings and facilities located throughout the northeastern U.S.; and on my training and experience as an ANSI/NFSI qualified Walkway Auditor Certificate Holder (WACH #183), where I was trained in industry-accepted means and methods of assessing the likelihood of material failures of various walking surfaces, including exterior stairways. Lastly, I relied on my specific education and experience with consensus industry design and construction codes and standards for commercial stairway systems, including common structural safety codes enacted in all states throughout the U.S.

Specifically, in this matter, I relied on my education and experience with the mechanics of materials and associated applications for the structural stability and soundness of exterior stairway systems. I also relied on my education, training and experience with biomechanics and associated loading associated with human ambulation on stairway systems, as well as my education in the calculations of energy, momentum and impact stresses on humans. I then applied my experience as an architect, engineer, and facilities manager, as well as my knowledge of building codes and consensus industry standards in analyzing my observations of the stairway system and the discovery in this matter to determine the foreseeability and likelihood of a catastrophic failure of the stairway system under normal and expected service loads.

As detailed in this report, the portside spiral stairway between the 11th and 12th decks of the Carnival Cruise Line vessel VISTA was dangerously defective. Specifically, Carnival Cruise Lines, through inadequate and otherwise absent maintenance of the exterior stairway, created a dangerously defective, unstable and structurally unsound stairway system. Specifically, the open steel frame stairway was dangerously defective in that the mechanical connections of the wooden tread and riser system were not adequately maintained such that wooden components would become loose and displaced as a result of vibration stresses in the underlying steel frame. Excessive vibration movements, thermal movements and direct exposure to the salt air environment accelerated individual fastener and component failures in the open-air stairway system. Carnival Cruise Lines failed to mitigate the hazardous condition with an adequate maintenance and repair protocol for the defective stairway system inclusive of routine inspections and appropriate methods of repair consistent with maintenance of exposed steel structures in salt-water marine environments. Carnival otherwise failed to protect passengers from impact hazards associated with the failure and sudden release of material components from the defective stairway system, including cordoning off the deck area directly below the stairway system and warning passengers of the hazardous condition.

2



George W. Melchior, R.A., P.E., LEED AP

As a result of Carnival Cruise Line's failure to properly inspect, repair and materially maintain the stairway system, on July 14th, 2023, a wooden riser board from the portside spiral stairway catastrophically failed and dislodged from the stairway system.  The riser board fell down onto Clay Crockett who was in a sun deck chair positioned underneath the stairway in a foreseeable and expected manner.  Consequently, Mr. Crockett was violently struck by the wooden board, causing him to sustain serious injury.

## SITUATION

At all times relevant leading up to and on July 14th, 2023, the date of injury (DOI), the cruise ship VISTA was owned and operated by Carnival Corporation d/b/a Carnival Cruise Lines (hereafter referred to as *Carnival*).  At the time of his injury, Mr. Crockett was a passenger on the VISTA and sitting in a deck chair positioned underneath the portside spiral stairway on the 11th deck of the vessel during normal and expected time of use.

The VISTA is 1,055 feet (ft.) long, has 15 decks, and has an occupancy capacity of approximately 4,000 guest passengers.  The amidships portion of the 11th deck of the vessel, known as the Panorama Deck is an open-air atrium that is open to the pool deck of the Lido Deck below.  The open air atrium continues through the remaining upper deck of the vessel amidships (12th deck) such that the 11th and 12th deck are open to the Lido Deck below.  Immediately aft of the open-air atrium area is one of two stair and elevator cores on the vessel – the stair and elevator cores are primary components of the vessel means of egress, escape and disembarkation in the event of a fire or emergency.  Between the aft stair and elevator core and the amidships open-air atrium are two spiral stairways that connect the 11th deck up to the 12th deck; one spiral stairway on each side of the 11th deck (port and starboard).  Based on the configuration of the Panorama deck and the aft stair and elevator core, the spiral stairways, and the open-air portion of the 11th deck was the designated means of egress to the stair and elevator lobby, known as *common path of travel* (Ref. Illustration 1, enclosed).

According to the discovery in this matter, including the incident report, the CCTV footage, and Mr. Crockett's deposition testimony, Mr. Crockett was laying in a reclinable deck chair on the 11th deck, positioned underneath the portside spiral stairway.  Several passengers occasionally ascended the portside spiral stairway during the period of time that Mr. Crockett was in the deck chair.  As seen in the CCTV footage, during the ascent of one of the passengers up to the 12th deck, a wooden component of the stairway suddenly released from the stairway and fell down onto Mr. Crockett.  Based on the discovery produced by Carnival, the component was a wooden riser board that released from the upper portion of the stairway system (Ref. Illustrations 2 – 4, enclosed).

I inspected both the port and starboard side spiral stairways on the Panorama deck – the stairways were substantively identical in construction, configuration and condition.  During my inspection, I observed that both stairways spiraled from inboard (11th deck) to outboard (at 12th deck).  The stairways were supported by two perimeter steel stringer beams, known as *skirt beams*, which were interconnected by steel step tread plates – all connections between the tread plates and the perimeter skirt beams were welded connections (Ref. Illustrations 5 & 6, enclosed).

The stairways were 48 inches (in.) wide had 16 steps which consisted of teak wood tread and riser boards.  Because of the spiral configuration of the stairways, each wooden step tread varied in depth across its width to form a rhombus shape; known commonly as a *fan step*.  The fan steps were 7 in. deep at the inside of the spiral radius and widened to 11 in. at the centerline of the stairway, and 15 in. at the outer circumference of the stairway (Ref. Illustrations 7 & 8, enclosed).  Of note, due to the varying width, each



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

step tread consisted of multiple teak boards that were pieced together on top of the underlying steel tread plate.  The wooden tread boards were affixed to the underlying steel tread plate of each step with a series of screws aligned in two rows; each of the two rows of screws were adjacent to vertical steel bars on the underside of the tread plate, known as *bracing bars* (Ref. Illustrations 9 & 10, enclosed).

Each step in the stairways was equipped with a solid teak riser board which was affixed to the adjacent wooden tread boards, top and bottom (Ref. Figure 1, below).  Specifically, the top of the riser board was affixed to the underside of the overhanging upper tread board by way of a continuous steel bracket and affixed to the tread board with a single screw at each end of the bracket (Ref. Illustration 11, enclosed). The bottom of each tread board was affixed to the lower tread board with a continuous metal angle block; the steel angle block was adhered to a notched portion of the riser board and mechanically fastened to the underlying tread board with screws.  For the purposes of this analysis, consistent with Figure 1, the upper bracket will be referred to as a *tread bracket* and the lower block will be referred to as a *riser block*.



Figure 1:  Conceptual cross-section of a step system showing how the wooden components of the step (tread boards, riser board) were affixed to the underlying steel tread plates

The step risers were nominally 6 ¾ in. high on both stairways.  During my inspection, I observed that the riser blocks were elevated above the lower tread surface approximately ¼ in. in height such that a space existed between the bottom of the riser block and the top of the tread surface – the ¼ in. in height was achieved by installing spacer grommets on the connecting screws which held the riser block up off of the tread surface.  I also observed that the step riser height between the tread surface up to the underside of the next successive tread board was approximately 5 ½ in., and the riser board was approximately ⅜ in. thick.

4

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

During my inspection of the stairways, I observed numerous conditions of various defects in the wooden portions of the stairway system; I also observed various means of repairs conducted on the stairways. Specifically, of the 32 steps observed (16 per stairway), I observed two broken riser boards (Ref. Illustration 11, enclosed); and six instances in which the tread boards were loose, broken, or otherwise deformed as a result of material failure (Ref. Illustrations 12 – 15, enclosed).  Additionally, I observed approximately 29 replacement screws and 7 areas of defect to caulk and adhesion systems (Ref. Illustration 16, enclosed).  I also observed that the stairways vibrated substantially under my use – the magnitude of vertical displacement from the vibrations was most pronounced at the upper portion of the outboard skirt beams on both stairways (longer of the two beams).



Figure 2:  Composite image of the stairway with the missing riser board (top), the riser board with back side shown (middle)l and the riser board with front side showing (bottom).  The yellow circles and lines map the correlation between the bracket screws and the area of the riser board that should have been engaged by the screw – note the absence of holes in the riser board as evidence that the board was not screwed in.

Inspection of the incident photographs produced by Carnival (Bates 000341-000350) reveal that the teak riser board that fell on Mr. Crockett dislodged from the third step down the portside spiral staircase (in descent from the 12th deck).  As seen in the photographs, the riser board was 4 ½ in. wide and was fully intact.  Review of the photographs also reveals that both the tread bracket and the riser block that held the riser board remained fully intact (including screws) with no signs of localized damage or failure. Analysis of the photographs provided by Carnival reveal that the two screws that were in place in the tread bracket did not engage the riser board (Ref. Figure 2, above).  Specifically, the screws did not go



George W. Melchior, R.A., P.E., LEED AP

through the wood – there are no screw holes or evidence that the screws engaged the wooden riser board at all.

During my inspection, I observed the same condition on at least three other riser boards on the portside stairway system (Ref. Illustration 17, enclosed). Specifically, I observed a condition in which the screw on both ends of the tread bracket did not engage the wooden riser board between the bracket tabs – instead, the screw mechanically crimped the tabs of the bracket around the top of the wooden riser board. As a result of those defects, the only mechanism holding those riser boards in place were (1) the friction of the crimped tabs at the top of the board, and (2) the adhesive along the riser block tab at the bottom of the board.

In applying my education, training, and experience as a facilities engineer and shipboard engineer, the myriad of various repairs observed during my inspection of *both* stairways are consistent with long-standing notice of the tendency for the stairways to experience component material degradation and failure. As explained above, the majority of the defects that I observed and measured during my inspection were failures in the wooden treads – specifically, connection failures between the wood treads and the underlying steel tread plates. Because the tread boards were entirely supported by the tread boards, failures in the tread boards would sequentially result in failures in the riser board systems.

Based on the nature and volume of repairs I observed, Carnival conducted repairs on the tread board screw connection system; the tread bracket and screw system; and the riser block adhesive system. Despite the evidence of myriad defects and repairs on both stairways, review of the discovery produced in this matter reveals that Carnival did not have a process in place for inspecting the stairway systems. Additionally, despite the evidence of defects and repairs, Carnival did not have a repair procedure in place for the stairway system. Aligned with the absence of an inspection and repair protocol for the stairways, during my inspection, I observed that the repairs were not consistent – there were different types and sizes of screws; the riser board heights varied on the blocks; in several locations, there were additional screws added to the underside of the treads; and in one location (7th riser on port side stairway), the riser board was replaced on the wrong side of the stop such that the stop was rendered ineffective (Ref. Illustrations 18 & 19, enclosed).

Review of the photographs produced reveal that Carnival attempted to 'weigh' the riser board that fell on Mr. Crockett. However, as seen it the image, Carnival did not properly place the board on the scale, and calibration status of the scale used is unknown (scale appears to be a kitchen scale). The board was 46 in. long, 4 ½ in. tall, and ⅜ in. thick – these dimensions equate to a volume of approximately 70.88 cubic inches (0.041 cubic feet). The density of teak wood, like most tropical hardwoods, is approximately 45 pounds per cubic foot. Therefore, the weight of the wooden riser board was closer to 1.85 pounds (lbs.). As the method Carnival used to weigh the board was incorrect (excessive overhang of scale) and the calibration of the scale is unknown, this analysis will instead the calculated weight of the board based on the standard engineering practice for calculating weights and measures, as described above.

A portion of the area under each of the two spiral stairways were cordoned off with permanent guardrails such that passengers could only access the deck area underlying the top third of the stairways. Review of the CCTV footage produced in the matter reveal that Mr. Crockett and other passengers were in deck chairs that were positioned under the portside spiral stairway and in shade produced by the 12th deck and stairway shadow. In the CCTV footage, the riser board is seen suddenly releasing and falling down onto Mr. Crocket from the overhead portion of the stairway. Close review of the riser board in free fall reveals that the riser board fell in a generally horizontal span orientation consistent with a uniform failure and release (not a progressive collapse). The riser board fell and struck Mr. Crockett, causing Mr. Crockett to suffer severe injuries.



## GWM Consulting
George W. Melchior, R.A., P.E., LEED AP

## ANALYSIS

In this case, two breaches of the minimum standard of care more likely than not caused Mr. Crockett's injuries:  Carnival's failure to routinely inspect, repair and maintain the structural and mechanical components of the exterior, open-air stairway system; and Carnival's failure to warn and protect passengers from debris falling from the defective, unstable stairway system.

According to industry studies of structural collapses in the U.S., partial collapse of stairway systems was one of the most prevalent examples of structural system failures in occupied structures and accounted for the highest incidence of system collapses.[1]  Accordingly, stairway safety and criteria for structural soundness are prominently addressed in building codes and industry standards for the built environment. To this end, numerous consensus safety codes and standards have been developed to assist owners and operators of commercial stairway systems in maintaining stairways in a safe, structurally sound condition; and those consensus codes and standards serve as the foundation for analysis of Mr. Crockett's injuries.

### *Industry Codes and Standards*

The construction and maintenance standards of safe walking surfaces in the built environment are specified in technical detail in numerous international *consensus standards*, standards that are developed by technical experts including architects, engineers, and scientists; vetted under the rigor of industry subject matter expertise; and published by internationally recognized standards organizations, including ASTM, ANSI, ICC, NFPA, and ISO.  Consensus standards are used both as a foundation to prescriptive mandates, such as building codes and safety regulations; and to underwrite safety operating procedures in the built environment.  For example, ASTM F1166, *Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities* is an international consensus standard that provides ergonomic design criteria for the design and construction of maritime vessels; and was developed in accordance with the internationally recognized principles on standardization established by the World Trade Organization (WTO).

General maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules; and in the absence of well-developed maritime law pertaining to the 11th deck stairway system on the VISTA, this analysis will incorporate Florida state laws and codes with existing international maritime regulations.[2]  International laws for maritime vessels are administered by the International Maritime Organization (IMO) to include the Convention for the Safety of Life at Sea (SOLAS), 9174; and the International Safety Management Code (ISM).  According to the ISM, a vessel's safety management system should ensure compliance with all applicable codes, guidelines and standards recommended by the IMO, classification societies, and the maritime industry.[3]  In addition to the IMO and SOLAS, merchant vessels operating in U.S. territorial waters are also subject to U.S. Coast Guard (USCG) regulations for commercial vessels, including 46 CFR 116, *Construction and Arrangement*, and specifically the requirements for means of escape (egress).  As such, the standard of care for structural stability and safe egress onboard the VISTA is comprised of both the applicable industry codes administered by the IMO and USCG, and consensus standards and codes for structural stability, inspection and serviceability.

---

[1] *Study of Recent Building Failures in the United States*; Wardhana, K., et al; ASCE 17:3(151), 2003
[2] See Holderbaum v. Carnival Corp., 87 F. Supp. 3d 1345 (2015); US District Court, S.D. Florida (Case No. 13-24216-CIV)
[3] *International Safety Management Code (ISM)*, International Maritime Organization (IMO), Section 1.2.3.2; 2010



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

The specific consensus industry standards for structural assemblies, including the inspection and maintenance of structural assemblies are published by the American Society of Civil Engineers (ASCE), the American National Standards Institute (ANSI), and the American Society of Testing and Materials (ASTM). The primary standard for structural criteria is ASCE 7, *Minimum Design Loads for Buildings and Other Structures*. This widely adopted international consensus standard that provides structural performance criteria for the construction of stairways and associated structural systems, and was developed in accordance with internationally recognized principles on standardization. The technical criteria published in ASCE 7 is explicitly echoed and prescribed by reference in the International Building Code (IBC), as modified and adopted in every state in the U.S., including Florida; and NFPA 101, *Life Safety Code*, as adopted in 41 U.S. states and territories, including Florida.

With regards to structural inspections and condition assessments, ASCE 11, *Guideline for Structural Condition Assessment of Existing Buildings* is the predominant and widely adopted standard for inspections including non-destructive testing (NDT) and associated assessments of material condition and assembly. ASCE 11 is also adopted, by reference, in the State of Florida codes including the Florida Guidelines for Milestone Inspections – a statutory inspection requirement for occupied structures and facilities in marine environments.

Carnival, in procuring and accepting the construction of the exterior spiral stairways should have been aware of the maintenance requirements to ensure safe passenger egress was maintained at all times. Each of the two spiral stairways were part of the means of escape between the 11th and 12th decks. Additionally, because the area of the 11th deck around and under the spiral stairways was part of the escape route to the adjacent aft stair and elevator core, the deck area underneath each spiral stairway was required to be maintained in a condition safe for instant and immediate use at all times the vessel was occupied. Specifically, both the stairways and the areas underneath the stairways constituted a *common path of travel*. Egress and escape systems have three components: the exit access; the exit; and the exit discharge, or disembarkation. The *common path of travel* is the portion of the exit access that must be traversed before two separate and distinct paths of travel to two exits are available. All components of a means of egress, including common paths of travel to the stair and elevator cores, would, in addition to aforementioned standards, also have to be maintained to the prescriptive requirements of the International Building Code (IBC) and NFPA 101, as modified and adopted by the State of Florida.

In this case, Carnival failed to meet the following consensus industry codes and standards for structural stability and soundness of the portside stairway, as well as industry codes and standards for means of escape:

- ASTM F1166, *Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities*:
  - 11.2.2 Design Load—Stairways shall be built to carry five times the normal anticipated live load, but less than a 544-kg (1000-lb) moving concentrated load.
  - 11.2.6 Open Riser—Risers shall be open unless screens or plate backing behind the stairs is required to protect personnel or equipment under the stairs

- IMO - SOLAS, *Part C, Regulation 13 – Means of Escape*:
  - 1.1 – Safe escape routes shall be provided
  - 1.2 – Escape routes shall be maintained in a safe condition, clear of obstacles;
  - 1.3 – Additional aids for escape shall be provided as necessary to ensure accessibility, clear marking, and adequate design for emergency situations



George W. Melchior, R.A., P.E., LEED AP

- 46 CFR 116.500; *Means of Escape*:
  - … each space accessible to passengers or used by the crew on a regular basis must have at least two means of escape, one of which must not be a watertight door
    - *Means of escape* means a continuous and unobstructed way of exit travel from any point in a vessel to an embarkation station or area of refuge

- IEBC, as adopted by the State of Florida as the *Florida Building Code* (553.73)
  - 606.2.3, Substantial Structural Damage to Gravity Load-Carrying Components:  Gravity load-carrying components that have sustained substantial structural damage shall be rehabilitated to comply with the applicable provisions for dead and live loads in the IBC

- IBC, as adopted by the State of Florida as the *Florida Building Code* (553.73)
  - 1001.3, Maintenance – Means of egress shall be maintained in accordance with the Florida Fire Code
  - 1604.2, Strength:  Buildings, structures, and parts thereof shall be designed and constructed to support safely the factored loads in load combinations defined in this code without exceeding the appropriate strength limit states for the materials of construction.
  - 1607.3, Uniform and Concentrated Live Loads:  The live loads used in the design of building and other structures shall be the maximum loads expected by the intended use or occupancy but shall in no case be less than the minimum uniformly distributed live loads given in Table 1607.1
    - Table 1607.1 – Stairs and exits:  300 lbs. (concentrated); 40 pounds per square foot (psf) uniformly distributed
  - 1009.4.4, Dimensional Uniformity:  Stair risers and treads shall be of uniform size and shape.  The tolerance between the largest and smallest riser height and tread depth shall not exceed $\frac{3}{8}$ in. in any flight of stairs

- ASCE 7 (as prescribed by IBC): The minimum uniformly distributed, and concentrated live load shall be as provided in Table 4.1 –
  - Stairs – 40 pounds per square foot (psf)
  - Individual stair treads shall be designed for the uniformly distributed live load or a 300 pound (lb.) concentrated load acting over an area of 4 square inches (sq.-in.), whichever produces a greater stress
  - Maximum Allowable Deflection – L/240 (0.30 in. in this case)

- NFPA 101, *Life Safety Code*, as adopted by the State of Florida as the state *Fire Code* (633.202):
  - 4.2.2, Structural Integrity:  Structural integrity shall be maintained for the time needed to evacuate, relocate, or defend in place occupants who are not intimate with the initial fire development
  - 4.6.13:  Means of egress systems required by code shall be continuously maintained in a code compliant condition
  - 7.1.10, Means of Egress Reliability:  Means of egress shall be continuously maintained free of all obstructions or impediments to full instant use in case of fire or other emergencies
  - 7.2.2.2, Dimensional Uniformity –  Stair risers shall be of uniform size and shape; the maximum allowable variance in any riser or tread in a stairway $\frac{3}{8}$ in.; the maximum allowable variance in adjacent risers and treads is $\frac{3}{16}$ in.
  - 7.2.2.3.4, Tread Slope – Tread slope shall not exceed 1 in 48 (2%)

9



George W. Melchior, R.A., P.E., LEED AP

- International Property Maintenance Code
    - 305.2, Structural Members:  All structural members shall be maintained structurally sound, and be capable of supporting the imposed loads
    - 305.4, Stairs and Walking Surfaces:  Every stair, ramp, landing, balcony, porch, deck or other walking surface shall be maintained in sound condition and good repair
    - 305.1.1, Unsafe Conditions:  The following conditions shall be determined as unsafe and shall be repaired or replaced to comply with the IBC or IEBC as required for existing buildings –
        - The nominal strength of any structural member is exceeded by nominal loads, the load effects or the required strength;
        - Structures or components there of have reached their limit state;
        - Structural members are incapable of supporting nominal loads and load effects;
        - Stairs, landings, balconies and all similar walking surfaces, including guards and handrails, are not structurally sound, not properly anchored or are anchored with connections not capable of supporting all nominal loads and resisting all load effects

    - 306.1.1, Unsafe Conditions (Serviceability):  Where any of the following conditions cause the component or system to be beyond its limit state, the component or system shall be determined as unsafe and shall be repaired or replaced to comply with the IBC as required for existing buildings –
        - Steel that has been subjected to any of the following conditions:
            - Deterioration;
            - Elastic deformation;
            - Ultimate deformation;
            - Metal fatigue; or
            - Detached, dislodged or failing connections

- State of Florida Guide to Milestone Inspections (Florida Statutes, Title XXXIII, Chap., 553, Sec. 899):
    - The fundamental purpose of the required milestone inspection and report is to confirm in a reasonable fashion that the building or structure under consideration is safe for continued use under present occupancy;
    - Visual inspection will, in most cases, be considered adequate when executed systematically. The inspecting professional must conduct the visual examination throughout all habitable and non-habitable areas of the building, as deemed necessary, to establish compliance. Surface imperfections such as cracks, distortion, sagging, excessive deflections, significant misalignment, signs of leakage, and peeling of finishes should be viewed critically as indications of possible difficulty;

_Methodology_:

In this matter, a primary structural component of the stairway system failed under normal and expected use.  As such, specific structural inspections of the stairway were performed in accordance with ASCE 11, _Guideline for Structural Condition Assessment of Existing Buildings_.  This standard provides the methodology for assessing existing structural systems, and establishes the assessment procedure under accepted structural engineering standards of practice, including investigation and testing methods. Specifically, I performed a visual inspection in accordance with Section 2 and Table 3.7.8 of the



George W. Melchior, R.A., P.E., LEED AP

standard.[4]  Visual inspection of open structural systems is an inexpensive and non-destructive means of determining if a system is *structurally sound*.  Structurally sound systems are systems that are free of cracks, flaws, fissures, or variations from an accepted standard.[5]

Assessment of the defective condition requires a comprehensive systems approach.  As such, during my inspection of the stairway system, I measured the system as a whole and used statistical methods to determine the system design parameters, and then measured individual variance against both internal system parameters and industry codes and standards for individual system components.  Specifically, I measured my observations from the in-situ inspection of the stairway systems against the criteria contained in the IEBC, IPMC, and the State of Florida's Guidance on Milestone Inspections – an inspection protocol for structures in marine environments.

Analysis of the dangerously defective stairway requires an understanding of mechanics of materials used in the maintenance of the open-air, exterior steel and wood assembly.  *Mechanics of materials*, also known as strength of materials, is the behavior of solid material and assemblies subject to the stresses and strains of externally applied forces.  This analysis specifically considers the foreseeability of individual component failure in the overall structural system as a result of stress and strain from reasonably expected service loads through adequate load paths and connection methods.

The mechanical behavior of an assembly is dictated by the properties of the materials that make up that assembly, as well as the methods in which those materials are connected.  With stair assemblies, there are two behaviors that the assembly experiences under loading:  *shear* and *bending moment*.  Shear is the separation of materials under force perpendicular to the contact plane of the material, such as a weight of a person applied onto a stair tread.  If too much perpendicular load is applied, the object will separate in the direction at which the load is applied.

Bending moment is similar to torque, a force multiplied by the perpendicular distance from a working point.  Most people are familiar with torque, and moment, through the use of levers.  The longer the lever, the more torque, or moment, applied to a point.  Or, the longer the lever, the less force required to generate the same stress, or moment, at a point.  With stairways, the force applied to the tread of a step by the weight of a person standing on the tread is resolved by transferring the force to the greater structural system through bending moment to the supporting stair stringers.  In this case, the force is then resolved into the greater structural system where the stringers are connected to the structural frame above, and to the deck structure below.  The path that a force takes until resolved into the greater structure, and, ultimately, the ground, is called the *load path*.  The expected and intended loads on a stairway system, typically limited to dead load and live load, are known as the *service loads*, and the means by which the structural system establishes load paths to resolve those service loads is the structural frame.

There are two types of structural frames:  statically determinate frames, and statically indeterminate frames.  In this case, as a result of the high fixity resulting from the welded connections, each step tread system was a statically indeterminate system, meaning that both shear and bending moment stresses

---

[4]  ASCE 11, *Guideline for Structural Condition Assessment of Existing Buildings* – Tbl 3.7.8:  Visual inspections of steel are performed to evaluate surface condition; check dimensional accuracy; detect corrosion, cracks, voids, fabricating discontinuities, weld undercuts and overlaps, and other surface irregularities; and evaluate condition of connections and connectors, missing or loose bolds, and poor weld appearances

[5]  ASCE 11, *Guideline for Structural Condition Assessment of Existing Buildings* – "Soundness"; ASCE 11 defines soundness for different systems including concrete and steel.  A term of art held over from a time when systems were assessed by striking materials with a hammer and evaluating the pitch of the energy response, "soundness" addresses the system "capacity".  Capacity refers to both the "strength" and "serviceability" of a system - the two subjects of structural design, analysis and assessment



George W. Melchior, R.A., P.E., LEED AP

transferred through the fixed welded connections of the underlying steel tread plates into the adjacent steel skirt beams.  In highly rigid systems such as fully welded, statically indeterminate frames, torsion and rotation at connections as a result of moment stresses must be considered in the maintenance of the system.  Specifically, the connections must be maintained for both strength and serviceability.  *Strength* is the capacity for an element or frame to withstand the load.  *Serviceability* is the maintainability and durability under normal usage.  In indeterminate moment frames such as the stairway system, serviceability is the controlling limit state, and is assessed based on both the continuity of load path and conditions of fatigue such as excessive vibration, deflection, deformation, and localized failure such as cracking or buckling.

In assessing structural systems for soundness, both strength and serviceability must by considered.  ASCE 11 provides the hierarchy of inspection and testing in the evaluation of system strength and serviceability.  In the evaluation of all types of structural systems, including statically indeterminate welded steel frames, ASCE specifically prescribes visual inspection as the first, and most frequent inspection.  Visual inspections of steel are performed to evaluate surface condition; verify integrity of cross-sectional shape; detect corrosion, cracks, voids, fabricating discontinuities, weld undercuts and overlaps, and other surface irregularities; and evaluate condition of connections and connectors, missing or loose bolds, and poor weld appearances.  As stated in ASCE 11:

> *Common problems include discontinuities with the vertical and lateral load resisting systems, lack of ties and continuity, lack of connector elements, and nonredundant systems*

<u>Assessment</u>:

Based on the configuration of the stairway steel structural system, and the means by which the wooden tread and riser members were mechanically affixed to the steel structural system (steel tread plates), the load path for the wooden riser board at each step is as follows (Ref. Figure 1 on Page 4, herein):

- The wooden riser boards are entirely supported on the top and bottom edges (no side supports):
  - o The top edge of the riser board is affixed to the underside of the overlaying tread board via the tread bracket;
  - o The bottom edge of the riser board is affixed to the top of the underlying wooden tread board via the riser block (adhered) and the grommeted screws;

* The load path from any impact force/ vibratory stress on the riser board would travel through the tread bracket and riser block assemblies to the upper and lower tread boards, respectively

- The tread boards are affixed to the steel tread plates via two rows of four (4) screws;
- The tread boards were separated by expansion joints to accommodate the fan-step profile of the treads such that each of the two rows of screws was exclusive to one tread board;

* The load path imparted to the upper tread board via the tread bracket would transfer to the forward set of four screws, and the load path imparted to the lower tread board by the riser block would be transferred to the rear set of four screws in the underlying steel tread plate, respectively

*12*



George W. Melchior, R.A., P.E., LEED AP

- The riser boards were not affixed with mechanical connections capable of transferring moment stresses;
- The riser board connection details were inconsistent and, in some instances, discontinuous through the load path;

\* All bending and/or torsional stresses in the riser boards would have been resolved through movement and/or displacement of the riser board itself

In this case, as indicated by the horizontal profile of the riser board in free fall (seen on CCTV footage), and the image of the riser board taken by Carnival after the fall showing the board entirely intact, shear failure was not the direct cause of the catastrophic failure and release of the riser board.  However, due to the lack of moment/ torsion capacity in the riser board assemblies, the riser boards were all susceptible to movement and displacement, both horizontally and vertically.  As a result of the differential displacement of the two skirt beams, which were two different lengths as a result of the spiral configuration, each riser board was subject to frequent, cyclical movement between their riser blocks (bottom) and tread brackets (top) – this movement was greatest between the mid-span and upper connections to the 12th deck in both spiral stairways.

Due to the discontinuity of the tread boards, the lack of moment transfer and the resultant vertical movement of the riser board assemblies imparted vertical forces on the leading edge tread boards above each riser – similar to an uplift force.  Because the tread boards were only supported by one row of screws, the tread boards could become loose and pivot about the front edge of the underlying steel tread plate like a fulcrum.  It is this behavior of mechanics that explains why the majority of the defective/ failed tread boards observed during my inspection of both stairways were observed at and above the midspan of the stairways.  Additionally, the majority of past repairs that I observed in both stairways were located at or above the mid-span of the stairway systems, where vibrations were greatest.

*Explanation*:

Simply put, the wooden tread and riser members of the stairway systems were not adequately affixed to the more rigid, fully welded steel framing system.  *Mechanically fastened* connections are bolted or riveted connections and do not transfer moment into the connected member of the load path in the structural frame.  As a result, the wooden members of each stairway system would become loose, deformed and/or displaced as a result of normal and expected cyclical use of the stairway.

Additionally, each riser board was entirely supported by the adjacent wooden tread boards.  However, the tread boards were only supported by one row of four (4) screws into the underlying steel tread plate. Therefore, any movement and/or displacement of the tread boards would necessarily compromise the structural stability of the riser boards.  Because the steel would move differentially to the wood [different thermal expansion/ contraction; different degrees of material density and stiffness; different mechanical behavior (welded v. screwed)], the caulked and sealed joints between the tread boards and the steel plates would deteriorate and open such that corrosive salt air/water could infiltrate the area between the wood and steel and corrode the fastening screws.  Corrosion failures of the screws would accelerate failure and displacement of the related tread boards.

*13*



## GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

The port and starboard stairways were in disrepair during my inspections, with numerous areas of documented failure in the tread boards, tread sealants, fastening screws and riser board assemblies. Additionally, inconsistent and, in some cases, insufficient repairs were observed on individual members of each stairway. Based on the volume of repairs observed, Carnival had knowledge of the maintenance liability of the stairway systems. However, review of the discovery reveals that Carnival did not have any process or procedures for inspection and maintenance of the stairway systems – specifically, there was no preventative maintenance protocol in place for the exterior spiral stairway assemblies.

On the DOI, a riser board became dislodged and fell out of the portside stairway system. The riser board fell from a height of approximately 90 in. above the 11th deck surface, and fell approximately 5 ft. before striking Mr. Crockett. As explained herein, the weight of the 46 in. long board was approximately 1.85 lbs. Using the principles of conservation of energy, the approximately velocity of the board at the point that it struck Mr. Crockett was 18 feet per second (fps).[6] Considering mass of the board (0.06 slugs), the force of impact of the board on Mr. Crockett was approximately 5.4 – 10.8 pounds of force (lb-f).[7] As a result of the impact force from the falling riser board, Mr. Crockett sustained serious injuries.

## CONCLUSION

Inspection of the stairway system and review of the discovery in this matter revealed that the steel stairway system was structurally unsound in that the intended and expected use of the stairway exceeded the system serviceability limit state. Specifically, the cyclic loading of repeated stairway use in combination with a lack of maintenance of wood member connections to the steel structure in the load path of the structural frame allowed excessive differential movement between the wooden tread boards and riser boards and the underlying streel frame. The differential movement in turn caused failure and displacement of tread boards, which in turn, caused movement and displacement of the riser board assemblies.

Review of the imagery of the riser board that struck Mr. Crockett revealed that the riser board was not engaged by the screws of the associated tread bracket such that the top edge of the riser board could slip out of the tread bracket. As a result of the defective connection in combination with the structurally deficient stairway system, the riser board that struck Mr. Crockett had a heightened risk of becoming dislodged and falling.

Despite the structural deficiencies of the stairway system, the defective riser board condition was (1) discoverable and (2) correctable before it failed. The wooden components of the stairway system, while subject to failure as described herein, do not suddenly fail without warning. Instead, for any riser board to become displaced, first the supporting members of the load path must fail and displace – specifically, the supporting tread boards. Movement and displacement of the tread boards would occur after the mechanical fasteners (screws) relieved, withdrew or failed (stress, corrosion); a process that occurs over time based on degree of use and environmental exposure.

Based on the myriad repairs on the wooden components and associated fasteners that I observed on both spiral stairways (sample size: 32 steps), Carnival had actual knowledge of the modes of failure in the assemblies. Had Carnival developed and implemented an inspection protocol consistent with industry

---

[6] Energy is conserved – potential energy to kinetic energy. Solving for velocity, V = √(2gh)

[7] Force = dP/dt, where dP is the change in momentum (aka Impulse), equal to mass x velocity; dt is the contact time. Based on the viscoelastic properties of the human muscle and facia system, the contact time was between 0.10 and 0.20 seconds [McGinnis; *Biomechanics of Sport and Medicine*, 4th ed.; 2020]:

*14*



George W. Melchior, R.A., P.E., LEED AP

standards for structural condition assessments, such as ASCE 11; or developed an inspection protocol based on its own knowledge of the defective stairways and past repairs, Carnival would have discovered the loose and defective riser board before it fell on Mr. Crockett. Furthermore, all of the fastening systems for the wooden components of the stairway were exposed and accessible, making maintenance and/or repair of those components both feasible and relatively straightforward with standard means and methods (i.e. replacement of screws, replacement of sealants, physical grasp and shaking of individual components to ensure stability, etc.).

Instead, Carnival had no process in place for either routine inspection of the stairway structural system, or preventive maintenance of the individual components of the system. The lack of inspection and maintenance protocols for the stairways were evident during my inspection in which I observed numerous defects in the wooden tread and riser systems and, in the areas of attempted repair, I observed inconsistent repair techniques.

Through routine structural inspection, Carnival should have discovered the loose riser board on the port stairway. Upon discovery, Carnival should have replaced the board with a wider board such that the screws of the tread bracket would engage into the wood of the riser board (~ \$100). The riser height between tread supports was 5 ½ in., and the riser block was raised ¼ in. from the underlying tread surface. As such, each riser board would have to be at least 5 in. in width in order to have full engagement into the tread bracket above, while also fully adhered to the riser block below – the riser board in this case was only 4 ½ in. Again, this condition was easily discoverable through routine inspection such as the inspection I conducted on the stairway systems (IAW ASCE 11).

If Carnival was unable to keep up with the maintenance of the stairway systems, then Carnival should have cordoned off the area below the stairway so as to prevent passenger exposure to the hazards of being struck by falling components and debris. As most of the area under each stairway was already cordoned off with permanent guardrails, Carnival should have simply extended the guardrails with portable stanchions and caution tape or similar such divider system (~ \$50), and posted signs and vibrant visual cues around the underside of the stairways so as to warn passengers of the dangerously defective condition (~ \$50).

Had Carnival developed and implemented an industry standard inspection and maintenance protocol for the exterior stairway system, the hazardous condition would more likely than not have been discovered and adjudicated before the DOI, and Mr. Crockett's injuries would more likely than not have been avoided. Had Carnival cordoned off the areas under the spiral stairways, and warned passengers of the hazards of falling components and debris, Mr. Crockett's injuries would more likely than not have been avoided.



**GWM Consulting**
George W. Melchior, R.A., P.E., LEED AP

This concludes my analysis of the portside spiral stairway on the 11th deck of the Carnival Cruise Line vessel VISTA.  I certify that this disclosure accurately states the subject matter(s) on which I expect to testify, the substance of the facts and opinions to which I expect to testify, and a summary of the grounds for the opinions to which I expect to testify at trial within a reasonable degree of architectural and engineering probability.


Respectfully Submitted,


George W. Melchior, R.A., P.E., LEED AP, WACH #183

16

Case 1:24-cv-21185-RAR   Document 49-1   Entered on FLSD Docket 05/13/2025   Page 31 of 41

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 1:  Partial plan of the 11ᵗʰ deck showing loci of the portside spiral stairway (see thumbnail) – Mr. Crockett was sitting in a deck chair positioned underneath the stairway when a riser board fell onto him from above

Illustration 2:  Image of the portside spiral stairway (produced by Carnival)

Enclosure 1

*17*

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 3:  Image of the step with the missing riser board (produced by Carnival) – note the tread bracket and riser block remained in place after the release of the riser board



Illustration 4:  Image of the riser board that struck Mr. Crockett (produced by Carnival)

Enclosure 1



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP



Illustration 5:  Image of the starboard side spiral stairway (identical to port side stairway) showing configuration of skirt beams

Enclosure 1

*19*

# GWM Consulting
George W. Melchior, R.A., P.E., LEED AP



Illustration 6 Image of the starboard side spiral stairway (identical to port side stairway) showing configuration of skirt beams

Enclosure 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 7:  Illustration of the fan step configuration (typical throughout all steps in both stairways)



Illustration 8:  Illustration of the fan step configuration (typical throughout all steps in both stairways)

Enclosure 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 9:  Illustration of the tread screw configuration – each step has two rows of four screws; one row on each flange of the steel trad plate

Enclosure 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 10:  Illustration of the tread screw configuration – I observed a number of the screws had been replaced at various times preceding my inspection



Illustration 11:  Illustration of cracked riser boards on the portside stairway – note the cracks develop at the approximate top edge of the riser block (behind the riser boards in this image).  In two instances, large portions of the riser board were missing (see thumbnail on right side of image – second step up in the image)

Enclosure 1

23

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 12:  Illustration showing exemplar of defective tread step – this defect was a common condition on both the port and starboard spiral stairway.  Displacement of the tread board, as seen in this image, will directly impact the stability of the underlying riser board



Illustration 13:  Illustration showing exemplar of defective tread step – this defect was a common condition on both the port and starboard spiral stairway

Enclosure 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 14:  Illustration showing exemplar of defective tread step – this defect was a common condition on both the port and starboard spiral stairway

Illustration 15:  Illustration showing exemplar of defective tread step – this defect was a common condition on both the port and starboard spiral stairway

Enclosure 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 16: Illustration of exemplar caulk/sealant failure and deformation/uplifting of the teak tread board – sealant failures allow saltwater/ salt air infiltration between the teak board and the underlying steel tread plate, which promotes corrosion of the screws and accelerates failure of the tread board connections

Illustration 17: Illustration of exemplar 'crimp' of the tread bracket around the riser board on portside stairway – the tread bracket screw did not engage (penetrate) the wooden riser board, but did engage the tread bracket tab beyond so as to crimp the bracket around the top edge of the riser board.  Of note, there are only two screws in each tread bracket – one at each end of the 4 ft. riser board.

26

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 18:  Illustration of varying, inconsistent screw repairs to tread boards in portside stairway.  (1) shows a flat-head wood screw which is inconsistent (and mechanically different) than the round-head screws typical of the connection condition; (2) shows improvised additional screw placement unique to that tread, and each of those two screws are different from each other, and also inconsistent with the screws typical of the tread board connections; (3) shows a zinc-coated screw which is, again, inconsistent with the galvanized and/or coated screws observed elsewhere in the stairway




Illustration 19:  Illustration of exemplar riser board repair which is inconsistent with the stairway configuration. (1) shows inboard side of 7th step riser, and (2) shows outboard side of the same riser – note that the riser board was replaced onto the wrong side of the riser block such that there is no mechanism to stop the riser board from falling out of place in similar fashion to that of the riser board that struck Mr. Crockett

Enclosure 1