UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.  1:24-cv-21185-RAR

CLAY CROCKETT,

       Plaintiff,

  -vs-

CARNIVAL CORPORATION
d/b/a CARNIVAL CRUISE LINE,

       Defendant.
_____/

DEPOSITION OF CLAY CROCKETT

Pages 1-201

November 21, 2024
10:00 a.m. - 3:30 p.m.
Volume I
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131

Stenographically Reported by
Paul Cunningham, FPR
Florida Professional Reporter

Clay Crockett Volume I
November 21, 2024

Page 2

APPEARANCES:

       On behalf of the Plaintiff
       HICKEY LAW FIRM, P.A.
       BY:  LISA GOODMAN, ESQUIRE
       12150 S.W. 128th Court Suite 225
       Miami, FL 33186
       Lgoodman@hickeylawfirm.com

       On behalf of the Defendant
       GRAY ROBINSON, P.A.
       BY:  MICHAEL DRAHOS, ESQUIRE
       515 N. Flagler Drive, Suite 650
       West Palm Beach, FL 33401
       Michael.drahos@gray-robinson.com

                I N D E X
Witness                   Direct          Cross
Clay Crockett                3             175

          Exhibits Marked for I.D.

                                    Page #

Exhibit No. 1  Movement Report          81
Exhibit No. 2  Carnival Vista Room Account 93
Exhibit No. 3  Photo                    108
Exhibit No. 4  Photo                    111
Exhibit No. 5  Photo                    112
Exhibit No. 6  Medical Department Form  123
Exhibit No. 7  Case Summary             124
Exhibit No. 8  Ct of brain with contrast 150
Exhibit No. 9  Doctor's Note            151
Exhibit No. 10 Progress Note            156

Page 3

          Deposition taken before Paul Cunningham, Florida Professional Reporter and Notary Public in and for the State of Florida at Large in the above cause.

                    ******

          THE COURT REPORTER:  Raise your right hand please.

          Do you swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

          THE WITNESS:  Yes.

          Clay Crockett, having been first duly sworn, was examined and testified as follows:

               DIRECT EXAMINATION

BY MR. DRAHOS:

     Q.   Good morning.  Mr. Crockett, can you please state your name for the record?

     A.   Good morning.  Clay McAmus Crockett, Jr.

     Q.   That was actually going to be my first question, have you gone by any other names in your life other than Clay Crockett?

     A.   No, other than just what I've said, yeah.

     Q.   Have you ever done this before?

     A.   No.

     Q.   Okay.  So you've got great representation,

Page 4

I'm sure you've gone through what to expect.  But let me just lay out the ground rules so that we're both on the same page and you know what to expect and vice versa.

          So as you can see it's a formal question and answering session, that's the best way to describe it.  I try to keep it as informal as I can.  But unfortunately the way we talk has got to be a little bit different than normal conversation because everything is being recorded now by the court reporter.  So in order to make sure we have a clear transcript, as we go, you need to let me ask my full question before you go to answer.  Sometimes it can be obvious what I'm asking you're going to know.  But if we're talking at the same time, it makes it impossible for him to capture who's saying what.  Not to mention, I might end up asking you a different question and you answered the wrong one.  So we want to make sure you're answering the right question.

          If you nod your head, I'm going to know today what that means.

     A.   Okay.

     Q.   But a month from now when I read the transcript, I'm not going to remember, so I'll prompt you.  Everything has got to be out loud.

Page 5

     A.   Okay.

     Q.   So if I see you nodding your head I'm going to say, is that a yes, is that a no, to get you to say yes or no.  I'm not doing it to be obnoxious, it's just I want the record clear.

     A.   Okay.

     Q.   If I mumble through something or I use legal jargon that you're not familiar with, let me know and I'll rephrase or I'll slow down.  Otherwise if you answer I'm going to assume you understood what I was asking you.

     A.   Okay.

     Q.   By no means is this intended to be a marathon, so if at any point you need to take a break for a phone call or restroom break or whatever, let me know and we'll stop.

     A.   Okay.

     Q.   Otherwise it's kind of my style to try and get it over with.

     A.   Okay.

     Q.   But I'll typically stop at least once an hour, just to give everybody a break.  I don't think we're going to be here for many hours, but if you need to stop, I just don't want you to feel like you're a captive in here.

Clay Crockett Volume I
November 21, 2024

Page 6

A.   All right.  Thanks for that.

Q.   So we're going to spend the first little bit just kind of getting to know you a little.  It's my chance to kind of get a sense of who you are.

A.   Okay.

Q.   So why don't we just cover some background stuff first, what's your date of birth?

A.   My date of birth is April 6, 1982.

Q.   And your current address?

A.   Current address is 27 Sunnymeade Drive, Jackson, Tennessee 38305.

Q.   So where is Jackson in relation to Nashville?

A.   So it is about two hours west of Nashville and about an hour east of Memphis on I40.

Q.   Nice location, you're pretty much in striking distance of both fun towns.

A.   That's right.

Q.   How long have you lived in the Jackson area?

A.   I've lived in the Jackson area since 2001 when I came to the area to go to college.

Q.   Where did you grow up?

A.   I grew up in Corinth, Mississippi.

Q.   Could you spell it for me?

A.   C-o-r-i-n-t-h.

Page 7

Q.   Where did you go to high school?

A.   I went to Corinth High School.

Q.   Can you spell that for me?

A.   C-o-r-i-n-t-h.

Q.   Same name, okay.  What year did you graduate?

A.   I graduated in 2000.

Q.   Did you spend a majority of your upbringing in that particular area of Mississippi?

A.   I did.

Q.   And then I take it, you moved from Mississippi to Tennessee for college?

A.   That's correct.

Q.   Where did you go to school?

A.   I went to a school named Lambuth University L-a-m-b-u-t-h.

Q.   That's in Jackson?

A.   Correct.

Q.   And what did you get your degree in?

A.   I got my bachelors in business management.

Q.   What year?

A.   2004.

Q.   Okay.  And as I understand it you're a CPA; right?

A.   That's correct.

Page 8

Q.   So did you go on to further schooling from there?

A.   I did.  I got an MBA from the University of Tennessee at Martin.

Q.   UT Martin?

A.   UT Martin, yes and that was in 2007.

Q.   And then are you able to sit for the CPA with a MBA or do you need to get a degree in accounting as well?

A.   Good question.  Well, I can't speak -- it would depend on the track that somebody took, I think.

Q.   Okay.

A.   But the track that I took because I wasn't always planning to go into accounting, when I made the switch, I actually went back to school and had some additional accounting hours, so I met the requirement for the number of hours but I needed more specific classes so I took classes from Tennessee Tech.

Q.   Okay.

A.   And I didn't get another degree, it was just about five extra classes.

Q.   So when did you sit for the CPA?

A.   2012.

Page 9

Q.   Did you pass the first time?

A.   So four parts, I passed the first three on the first try and then the last one I retook and my license was issued in 2013.

Q.   Did you ever go work for any of those big accounting firms like I can't remember the names.  I know there's several.

A.   Right.  I did not work for any of the large --

Q.   Price Water?

A.   -- what they call the big four.  Right.  I didn't work for any of those.  I worked for small to what I'd call mid-sized firms.

Q.   Okay.  So before we get into the employment stuff.  Let me just kind of finish up with the background.

So you're married?

A.   I am married to Brittany.

Q.   When did you all get married?

A.   2006.

Q.   So while you were studying at the University of Tennessee?

A.   Correct.

Q.   Any other marriages in your life?

A.   No.

Clay Crockett Volume I
November 21, 2024

Page 10

Q.   What does Brittany do?
A.   She works in communications and marketing.
Q.   Also in the Tennessee area?
A.   Correct.
Q.   So how did you end up in -- well, I guess you never left Jackson after you came for school, how did that work?
A.   We did move -- we were still in the Jackson -- what I call the Jackson area.  But we did move for a period of about seven years that, you know, we were working in a different town and living in a different town right after we got married --
Q.   Okay.
A.   -- so we moved as a couple and bought the house in Brighton, Tennessee and I worked in Covington, which again small towns but fairly close to Jackson and we lived over there for about seven years and then moved back to Jackson in 2013.
Q.   All right.  So this current house that you're living on Sunnymeade Drive is that a single family home?
A.   It is.
Q.   How many bedrooms?
A.   Four.
Q.   How many bath?

Page 11

A.   Two and a half.
Q.   Is it a single story, two story?
A.   Two story.
Q.   Do you all have basements in Tennessee?
A.   I don't.
Q.   It's a two story home.  Who else lives there with you, if anyone?
A.   My wife and daughter.
Q.   Your daughter's name?
A.   Daughter is Hannah.
Q.   How old is Hannah?
A.   She is 13.
Q.   Okay.  And so how long have you lived in this particular home for?
A.   Approximately five years.  We moved in November of 2018.
Q.   Any plans to move any time soon?
A.   No.
Q.   Do you own this home or rent it?
A.   We own it.
Q.   Do you own any other properties?
A.   I do not.
Q.   How about your wife, does she own any other properties?
A.   No, she doesn't.

Page 12

Q.   Okay.  I'm kind of rounding out the personal stuff, do you have family in the Jackson area?
A.   I do.  I have my mother and my maternal grandmother.
Q.   Okay.  And do you have any family members that work in the medical industry?
A.   My mother works in mental health, so she's not a doctor or nurse but she works in mental health.
Q.   In what regard?
A.   She works for the V.A. and is on -- she works with veterans who are in crisis, so she works on the crisis hotline.
Q.   So does that mean like she takes phone calls if they're feeling suicidal or something?
A.   Correct.
Q.   She directs them to like a therapist or something like that or does she actually counsel them on the phone?
A.   She would direct them to somebody else, yes.  She would help them get setup with somebody long-term.  Their crisis line is just meant to be a short-term solution to help somebody out.
Q.   Does she have any type of formalized education in the mental health field?
A.   Yes, she's an LCSW, a licensed clinical

Page 13

social worker.
Q.   How long has she worked in that field?
A.   20 years approximately.
Q.   Okay.  So getting back to you, did you play any supports in high school?
A.   I played golf in high school, I sure did.
Q.   What's your handicap?
A.   I don't have one.
Q.   What was your handicap, in your highest best days?
A.   I'm at best bogie golfer.
Q.   You and I can play together.
A.   On a good day.  I never have gotten a handicap, though.
Q.   Okay.  So golf but no contact sports like football or even to some extent I guess basketball is a contact sport, nothing like that?
A.   No.
Q.   Have you ever been knocked out before?
A.   No.
Q.   Have you ever lost consciousness for any reason?
A.   No.
Q.   All right.  So other than a CPA, do you hold any other licenses of certifications of any sort?

Page 14

A.   No.

Q.   No medical training on your behalf, like first aide?

A.   Sure.  First aide, CPR, in the past.  It's not something that I actively use, but I have had both of those.

Q.   Okay.  And as I understand it, you're currently employed?

A.   Correct.

Q.   What do you do?

A.   I am a CFO of a regional accounting firm, ATA Advisory.  And ATAP LLC, the business is split into two operating units.  ATA PLLC is the second one.

Q.   The first one is ATA Advisory?

A.   Correct.

Q.   And the other one was ATA PLLC?

A.   Yes.

Q.   Do you draw a salary from both companies?

A.   I draw a salary from Advisory, they were -- they function almost as one but they were -- they were split at the beginning of the year.

Q.   The beginning of this year?

A.   Correct.

Q.   So is there any particular reason why

Page 15

there's two different companies now?

A.   The firm took an investment from a P.E. firm in January of this year and the P.E. was only interested in buying ownership in part of the business.

Q.   Okay.  So I take it that the P.E. was only interested in this ATA PLLC part of the company?

A.   They are interested in ATA Advisory.  So ATA Advisory does taxes and bookkeeping, advising clients on various business matters.

Q.   So your role as CFO, do you have a say in the strategic direction of the company itself --

A.   I do.

Q.   -- or are you more of a numbers guy?

A.   I'm both, but very much project driven and I have input on the direction we're going, that is part of why I was hired.

Q.   So you report directly to the CEO of the company?

A.   Yes, we call him the managing partner, but it's the equivalent of a CEO.

Q.   What's his name?

A.   John Whybrew, W-h-y-b-r-e-w.

Q.   How long have you been at this particular company?

Page 16

A.   I started there in June of this year.

Q.   Have you had any other title with that company other than CFO?

A.   No.

Q.   Where were you employed prior to ATA?

A.   Yeah, prior to ATA I was with Master Medical Equipment and its sister company, which is Renew Biomedical Services.

Q.   What was your role there?

A.   CFO.

Q.   How long were you with this company?

A.   Approximately five years.

Q.   Did you leave on good terms?

A.   I did.

Q.   So you would have left the company specifically when?  If you started in June of this year?

A.   I left also in June of this year.

Q.   And you voluntarily resigned?

A.   I did, that's correct.

Q.   So what is the difference in your role at ATA versus what you were doing at Master Med Equipment and Renew?

A.   There's a lot of similarities but the -- I guess the main difference would be that ATA has never

Page 17

had a CFO before that role was really split between various partners of the firm and obviously that was a part-time job for them because really their main focus was client service.

Q.   Okay.

A.   So because of the relationship with the P.E. and various other reasons, you know, they finally said okay, it's time to hire a CFO and really modernize the internal workings of the firm as far as software and processes.

Q.   That's I guess a good way to follow up, what specifically -- if you had to describe what you do on a day-to-day basis to your daughter at ATA, how would you describe it?

A.   To my daughter, that's a good question.  I would tell her that I work with a team of folks that help decide the future of the firm.  We -- the firm has some lofty growth goals, so I'm there to help the systems, the internal business systems support that growth and also get accurate financial information to the owners of the company.

Q.   Do you go in to work Monday to Friday 9:00 to 5:00?

A.   Plus, yes.  So --

Q.   I guess the better question is:  Do you

Clay Crockett Volume I
November 21, 2024

Page 18

actually physically go in to a brick and mortar building everyday?

A.   I do go into a brick and mortar everyday, yes, 8:00 to 5:00 with extra hours as needed.

Q.   Okay.  So when you say you have to give them accurate financial information, are you working everyday pen and paper like numbers?

A.   No.  No.

Q.   What percentage of your job requires that type of activity?

A.   I would say that's probably 20 to 25 percent of my day currently.

Q.   So 20 to 25 percent of your day is going over receipts?

A.   Yeah.  Bank statements, I'm in charge of I have team members that do accounts payable and accounts receivable, so I'm working with them to make sure our invoices are paid as timely as possible from our clients and that we are paying our vendors on a timely basis and then looking at KPI's and metrics for the firm.

Q.   What is KPI?

A.   Performance indicators, key performance indicators, so we're looking at various ratios and things to look at the health of the firm to see how

Page 19

it's doing, looking at year over year growth and how quickly we're collecting AR and how efficient we're being with what we're billing and how we're billing.

Q.   Okay.  That's 20 to 25 percent of your day, what's the remaining 75?

A.   Yeah, so currently because it's still a fairly new role, it's a lot about the internal process of the firm.  So we're looking at a number of different pieces of software that we may -- you know, we're evaluating to possibly purchase and I'm kind of the lead on some of those.  Also just fine tuning our internal processes, for example with AR, helping our accounts receivable person just be more efficient and work in a quicker way and a better way to reach out to clients and make sure we're communicating with them so we get paid.

Q.   So I heard you mention you work with a team, do you have people who directly report to you?

A.   I do.  I have two direct reports.  One for accounts receivable and one for accounts payable.

Q.   Okay.

A.   Then I have a few others that I'm not direct supervisor for but they help me -- I consider them part of my team but they have other duties as well that are not related to my team, there's two more of

Page 20

those.

One is payroll related and the other is really in the meat of getting the financials done.  Somebody that's been with the firm a long time and she helps get the financials in the right -- you know right shape to be able to share them with the partners.

Q.   Do you have an assistant or secretary?

A.   No.

Q.   So this job at ATA, would you consider it an advancement of your career versus where you're at?

A.   Yeah, I would.  I would.  It's again, somewhere that's going to grow a lot and with the involvement of the P.E. group, they're -- you know, just working with a P.E. group is certainly something that helps on a resume, you know, to say that you've worked with them, reporting to them and that kind of thing.  Yeah, it was a step forward.

Q.   Okay.  Professionally are you satisfied with where you are in your career?

A.   Yes, I am.

Q.   Okay.  In other words you're not out interviewing or considering other options at the moment?

A.   Correct.  I'm not.

Page 21

Q.   You told me you've never done this before, have you ever been involved in any litigation in any capacity prior to this?

A.   No, I have not.

Q.   Have you ever filed a workers' compensation claim?

A.   No, I have not.

Q.   Have you ever filed a disability claim, either with the United States Government or a private insurance company?

A.   No.

Q.   Have you ever been arrested?

A.   No.

Q.   I saw that you do have some degree of social media presence, what platforms do you have accounts on?

A.   I have accounts on Facebook, Instagram, X, twitter.

Q.   You're the first person that's actually called it that first.

A.   Okay.  Well, I'm trying to stay with the times.

Q.   I don't like it.  I liked Twitter better.  So X any others?

A.   Tiktok.

Clay Crockett Volume I
November 21, 2024

Page 22

Q.   Okay.

A.   That's all I recall.

Q.   No Snapchat for you?

A.   No.

Q.   Tiktok, what degree of involvement do you have on that?

A.   I've never posted anything on TikTok, I just watch -- just watch the content.

Q.   And we're still going to call it Twitter, on Twitter do you post anything?

A.   I don't.

Q.   How about Instagram?

A.   Very rarely I post on Instagram very rarely on Facebook.

Q.   So are you one of these types that post both on Facebook and Instagram at the same time or do you have separate things that you put on those?

A.   I would say they're separate, not for any particular reason but they are separate.

Q.   What would be something that would prompt you to put a post on Instagram?

A.   A family photo, you know, something for my daughter, it might be an event we might be a part of or something we went to.

Q.   How about Facebook?

Page 23

A.   Similar answer.  It would be a lot of, you know, family stuff or sometimes I share something that is funny or you know that I find interesting.

Q.   Okay.  So on your Facebook page, are there any photos from the subject cruise?

A.   Not to my knowledge.

Q.   Any posts regarding the subject cruise?

A.   Not to my knowledge.

Q.   How about Instagram?

A.   No.

Q.   So we talked about golf, any other hobbies you like to do in your free time?

A.   Yes, I'm a bit of a tinkerer, so I like to do home improvement, minor home improvement projects, I do work out in the yard.

Q.   So home improvement, give me a sense of your skill set is, I have a certain limit I can hit?

A.   We all do, right, it could be something, for example, you know, painting a room.  I believe the biggest project I ever did by myself was putting a window in where there was no widow.

Q.   Wait.  You cut out a wall and put a window in?

A.   I did.

Q.   When did you do that?

Page 24

A.   That was about -- let's see, that would have been three years ago.

Q.   That's gutsy.

A.   It was.

Q.   So painting, putting in a window, are you good at electric, plumbing?

A.   I'm limited in both of those.

Q.   Those are my limits.

A.   I get a little worried about things that may zap me.

Q.   And then you said you work out in the yard?

A.   Sure.

Q.   What are we talking about?

A.   Just mowing the grass, taking care of the flower beds, trim the bushes, taking care of the pool, we have a pool in the backyard.

Q.   I've owned two pools, a lot of work.

A.   They are indeed.

Q.   Are you still doing the landscaping for your home?

A.   Less so now.  I have somebody that mows for me now, but I take care of the other things that I mentioned.

Q.   All right.  You're trimming the hedges, you're picking the weeds, but you have somebody

Page 25

cutting the grass?

A.   That's correct.

Q.   How much property do you have?

A.   It's approximately a half acre, just a regular city size lot.

Q.   And when did this particular person or company start mowing your lawn?

A.   It would have been last summer.

Q.   Okay.  Is this a company that you use?

A.   It is.  It's a one-person company.

Q.   What's the name?

A.   Brock's Landscaping.

Q.   Okay.  Brock comes once a week?

A.   Once every two weeks.

Q.   Any particular reason why Brock started cutting your grass?

A.   After the incident, I really have problems with the heat, being out in the heat made some of the symptoms worse.  I've been more nauseous and just wasn't in a position to be able to continue to do that.

Q.   Okay.  So Brock is going to be the grass cutter for the foreseeable future?

A.   Yes.

Q.   Anybody else coming and doing anything

Page 26

around the home that previously they were not needed for prior to the incident?

A. No.

Q. Do you handle any of the cooking or cleaning or laundry?

A. I do, yeah. I do handle some laundry, some cooking, especially grilling, that's another hobby of mine. And some cleaning as well.

Q. So I think I get a good sense. Let me move into the next area so to speak and talk a little bit about your medical history before the cruise.

A. Sure.

Q. Actually let's just do it this way. We're going to cover your medical story and I'll navigate you through and tell you now I'm specifically asking before the cruise and now I want to know now.

So at the current moment, do you have a primary care physician?

A. I do. His name is Jason Myatt, M-y-a-t-t.

Q. How long has Dr. Myatt been your primary care doctor?

A. He has been my primary care doctor since we moved back to Jackson in 2018.

Q. Okay. Does Dr. Myatt work for a particular company or is it Jason Myatt, P.A.?

Page 27

A. He does work for the Jackson Clinic.

Q. I've seen that you've been there. How does that work, do you just show up to the Jackson Clinic when you're not feeling well and hopefully you get Dr. Myatt that day or do you see people at that clinic for particular types of conditions or illnesses?

A. Yeah, sure. It's a large clinic so they have many specialists if you need that, but I have a -- I'm on a routine of seeing him for routine checkups twice a year if I'm not well, I will call and make an appointment if he's available. If not, I could see one of his colleagues if his schedule wasn't going to let me get in in a reasonable amount of time.

Q. Okay.

A. They also have an urgent care walk-in clinic as part of the Jackson Clinic.

Q. It seems like a pretty convenient set up. How long has it been your practice to go see Dr. Myatt twice a year for routine checkups?

A. Since the beginning, since 2018.

Q. Would this also be the place that you would go to, like if you have the flu?

A. Generally, yes. There's a few other

Page 28

convenient care that I might go to but certainly that's the primary one.

Q. So the urgent care clinic part of the company; is it located in the same building or is it totally separate?

A. Same campus. Separate building.

Q. Have you ever had reason prior to the subject cruise to go to the urgent care clinic?

A. Sure.

Q. How many times?

A. I can't recall exactly how many times.

Q. What would be the instances for the -- or what would be the reasons for why you were going there?

A. I might have gone there for, you know, just if I wasn't well possibly flu or, you know, a sinus infection, just what I would call routine sickness.

Q. So other than having gone to the urgent care clinic for routine sickness type of situations, have you ever had reason to go to the emergency room in the last ten years?

A. In the last ten years, I have -- no, I have not been to the emergency room.

Q. Okay. So focusing back on the Jackson Clinic itself, other than Dr. Myatt, you made mention

Page 29

of the fact that they had specialist as part of the practice, have you seen specialist there in the last ten years?

A. I have, yes I have.

Q. What areas of specialty?

A. I recall seeing a specialist for cardiology, I have a family history of cardiac issues, so I'm staying on top of that getting screening for anything heart related.

Q. How often do you see a cardiologist at the Jackson Clinic?

A. I've been advised and follow the advice to go every five years.

Q. When was the last time that you saw anybody there, specifically cardiology?

A. In cardiology, I believe it was last year that I had an appointment.

Q. And was this for some type of preemptive measure or were you feeling symptomatic in some way?

A. Very much preemptive. I haven't had any cardiac symptoms.

Q. So thus far then all of your experience in the cardiac wing of the Jackson Clinic has been favorable?

A. Correct.

Clay Crockett Volume I
November 21, 2024

Page 30

Q.   Other than cardiology, have you been to see any other specialists there?

A.   After the incident, that was the first place that I went to follow up with medical care.

Q.   Okay.

A.   So I was, you know, referred -- I went to their imaging center and obviously those results would have been read, I guess by a radiologist.

Q.   Okay.  We're going to get to that in a bit, but before we do, let me go back.

A.   Sure.

Q.   Other than cardiology and -- strike that.

Let me ask it this way:  Prior to the subject cruise, other than cardiology, have you been to see any other specialists at the Jackson Clinic?

A.   Not that I recall.

Q.   Who diagnosed you with hypertension?

A.   Oh, wow, I was diagnosed with hypertension when we lived in Brighton and I don't recall the doctor's name.  He was a local general practitioner.

Q.   According to our research, it looks like you suffered from that since January of 2018?

A.   Yes, that sounds right.

Q.   That would have been some kind of diagnosis that you would have then carried over to the Jackson

Page 31

Clinic?

A.   Correct.

Q.   And is it Dr. Myatt who monitors that?

A.   That's correct.

Q.   And are you on regular medication for it?

A.   Yes, I take medication for it daily.

Q.   What do you take?

A.   I take a pill that's a combination of amlodipine and Benazepril.

Q.   Okay.  Anything else or that's it?

A.   That's it.

Q.   So they call it the silent killer right but do you have any type of symptoms that you feel if your blood pressure is really high?

A.   No, I generally don't.

Q.   In other words, do you get headaches if your blood pressure is high?

A.   No.

Q.   Have you been to see anyone prior to the subject cruise specifically related to headaches?

A.   No, I would say that I have not been to anybody specifically for headaches.

Q.   So during your routine visits with Dr. Myatt prior to the subject cruise, have there ever been occasion where you complained to him of suffering

Page 32

from chronic headaches or just an unusual amount of headaches since the last time he saw you?

A.   Not that I recall, no.

Q.   So prior to the subject cruise, had you ever complained to any healthcare providers about headaches?

A.   Not that I recall.

Q.   Ever suffer from vertigo?

A.   I remember one instance of having vertigo.

Q.   When was that?

A.   I don't remember the year, I don't.  I don't remember the year.  I do remember seeing somebody about it and being prescribed something for a short-term and it resolved.

Q.   Do you recall who you saw?

A.   I don't.

Q.   Was this before or after you became a CPA?

A.   I believe it was before.

Q.   Ever had reason prior to the subject cruise to see a neurologist?

A.   No, I have never seen a neurologist.

Q.   Other than at the Jackson Clinic, have you had reason to see a cardiologist from any other medical practice prior to the subject cruise?

A.   I did.  When we were not living in Jackson I

Page 33

did the same sort of preventative checks with a physician from the West Clinic.

Q.   Where is the West Clinic located?

A.   In Memphis, Tennessee.

Q.   So I'll give you credit if you're being that preemptive, good for you, I should probably take some advise from you.  Have you ever had any type of episode or something that gave you reason to be worried about your heart?

A.   No, I have not had any episodes whatsoever.

Q.   How about an orthopedist, have you ever had to go and see an orthopedist prior to the subject cruise for any reason?

A.   Tell me what an orthopedist does.

Q.   Bones?

A.   Yes.  I in -- during college I had an incident where my left arm was broken, so I have plates and screws that that type of doctor would have implanted.

Q.   How did that happen?

A.   I was in a motorcycle accident.

Q.   Are you still riding motorcycles?

A.   No.

Q.   Tell me a little bit about the motorcycle accident, when did it happen specifically?

Clay Crockett Volume I
November 21, 2024

Page 34

A.   It would have been in 2001.

Q.   Let me guess you were like a college kid riding around campus on motorcycles?

A.   Pretty close.  I was a college kid and was going to see a friend.

Q.   And what happened?  What caused the accident?

A.   Sure.  A dog ran out in front of me, it was actually in her driveway, so it was a low speed situation, but I swerved to not hit the dog and when I did, I stuck my left arm out and just landed with my hand planted on the ground and it broke my arm.

Q.   Did you suffer any kind of head injury?

A.   No.

Q.   Were you wearing a helmet?

A.   Yes.

Q.   Other than this motorcycle accident, have you been in any automobile accidents?

A.   I was in one other automobile accident, yes.

Q.   When was that?

A.   It would have been approximately 2003.

Q.   What were the circumstances?

A.   I was driving on the Interstate and I hydroplaned and I hit a wall.

Q.   Did you have to seek medical care?

Page 35

A.   I did not.

Q.   So who is Dr. Emily Slechticky, S-l-e-c-h-t-i-c-k-y?

A.   I don't recall Dr. Emily.

Q.   She may be a chiropractor.  Have you ever been to see a chiropractor?

A.   I have been to see a chiropractor.

Q.   When was the last time?

A.   It would have been earlier this year, maybe in January or February.

Q.   And what was the name of the practice that you went to?

A.   The Joint Chiropractic.

Q.   What were you going to the Joint Chiropractic specifically for?

A.   Low back pain.

Q.   Are you still a patient there?

A.   I am not.

Q.   What period of time were you seeking treatment from them?

A.   I would estimate two months.

Q.   Were they able to resolve your back pain?

A.   They were.

Q.   Prior to that experience, had you ever been to a chiropractor before?

Page 36

A.   I had on a few -- yes, I had been to a few chiropractors before.

Q.   For what types of conditions?

A.   Really the same thing, just lower back pain. It's come and goes at times.

Q.   Other than Joint Chiropractic, do you recall the names of other chiropractors that you've been to see in the last ten years?

A.   In the last ten years, I went to see a chiropractor named John Allen Noblin, N-o-b-l-i-n.

Q.   Okay.  Where is he located?

A.   In Covington, Tennessee.

Q.   And when would that treatment have been rendered?

A.   Approximately 2017.

Q.   Okay.

A.   Then the other one I recall is Payne Chiropractic, P-a-y-n-e.

Q.   What a convenient last name.  What's Dr. Payne's first name?

A.   I don't recall.

Q.   And what period of time was it where you went to him?

A.   I would have went there I'm going to say during 2023.

Page 37

Q.   What were the circumstances?

A.   Lower back pain.

Q.   Any other chiropractors?

A.   Not that I recall.

Q.   So we talked about ER's, right, you told me that there weren't any others that you can recall other than the urgent care clinic where you've had reason to go to an emergency room?

A.   Right, I have not been to an emergency room other than what we talked about.

Q.   Other than the repair to your arm, the surgical repair to your arm, have you had any other surgery in your lifetime?

A.   Yes, I have.  I've had two times where I had lithotripsy for kidney stones.

Q.   Okay.  Any other surgeries?

A.   No.

Q.   So other than the two lithotripsies and the repair of your arm, has there ever been any reason for you to be admitted to a hospital for any condition in the last ten years?

A.   No.

Q.   Prior to the subject cruise, have you ever had any diagnostic imaging studies done on your head or brain for any reason in your lifetime?

Clay Crockett Volume I
November 21, 2024

Page 38

A.   No.

Q.   So how about mental health, have you had reason to seek any type of mental health counseling of any sort in your lifetime prior to the subject cruise?

A.   Yes.

Q.   Let's start with present day.  Are you seeing any type of therapist of any sort present day?

A.   Yes, I am.

Q.   Who are you seeing?

A.   I am seeing Taylor O'Connor.

Q.   What type of practitioner is Taylor O'Connor?

A.   He's -- I would just say he's a therapist.

Q.   Is he a psychiatrist or a psychologist?

A.   No.

Q.   Is he a mental health counselor?  What type of therapy does he provide?

A.   Talk therapy.

Q.   When did you start seeing -- is it Dr. O'Connor or Mr. O'Connor?

A.   Mr. O'Connor.

Q.   When did you start seeing him?

A.   I started seeing him in March of this year.

Q.   How often do you --

Page 39

A.   No, I'm sorry, I started seeing him in June of this year.

Q.   How often do you see Mr. O'Connor?

A.   I see him approximately every two weeks.

Q.   Is his sessions covered by insurance?

A.   They are not.

Q.   Do you pay cash for them?

A.   I do or through my HSA, I've done both.

Q.   Do you have a pending appointment with Mr. O'Connor?

A.   No.

Q.   Is there -- is your treatment with him over?

A.   It is not over.  I just haven't scheduled the next session yet.

Q.   So are your sessions scheduled on an as needed or do you have like a regimented routine with him?  You said you see him every two weeks?

A.   Approximately every two weeks is when I see him.  Our practice has been to schedule the next session at the end of a session.

Q.   Okay.

A.   And I had to cancel a session to be in Miami this week.

Q.   Okay.  Would your session have been this week?

Page 40

A.   Yes, that's correct.

Q.   All right.  Prior to Mr. O'Connor, have you sought any other mental health counseling of any sort?

A.   I did.  Prior to him was a therapist, Dee Wright.

Q.   Is that D-e-e?

A.   It is.  W-r-i-g-h-t.

Q.   What type of a practitioner is Dee Wright?

A.   I'm not sure of her designation.  She is not a doctor.

Q.   Okay.  So is she also a therapist?

A.   Uh-huh, that's correct.

Q.   And what period of time did you see Ms. Wright?

A.   I saw Ms. Wright at the early part of 2024.

Q.   And for how many sessions did you spend with her?

A.   Approximately six.

Q.   And what was the reason for leaving her practice?

A.   Just not a good personal fit, personality.

Q.   All right.  So you decided to take your business to Mr. O'Connor, in other words?

A.   That's fair.

Page 41

Q.   Okay.

A.   Additionally, scheduling with her was really a challenge, because she only works a few days per month.

Q.   Was she also paid by cash?

A.   Correct.

Q.   Prior to Dee Wright?

A.   There have been other instances, yes.  I'm trying to recall.

Q.   I'm going to try to take you through from most recent.

A.   Understand, yeah.

Q.   So who would have been the one that you would have seen prior to Dee Wright?

A.   Prior to Dee Wright, I did some tele-health through Better Help.

Q.   Better Help?

A.   Yes.

Q.   Can you give me the time periods in which you would have been seeking treatment with him?

A.   That would have been call it the last half of 2023.

Q.   Was there a particular therapist that you would see or did you just get whoever was on the screen?

Clay Crockett Volume I
November 21, 2024

Page 42

A. I would -- I would see -- yeah, the same person every time.
Q. Who was that?
A. I don't recall her name.
Q. First name or last name?
A. No. I'm sorry I don't.
Q. What prompted you to leave that practice?
A. Getting to a point where I felt like we weren't accomplishing anything new.
Q. How many sessions in total did you spend with them?
A. Approximately 15 sessions.
Q. How frequently would you attend these sessions?
A. It was also approximately every two weeks.
Q. So you saw the same person for 15 sessions?
A. Correct.
Q. This was a male or female?
A. Female.
Q. Any other descriptor that you can provide to me, like was this an African American, white, Asian, Indian?
A. It was never over video. It was just voice only, so I never --
Q. Oh, you never see the person --

Page 43

A. -- saw the person. Yeah. It was never in person, never by video.
Q. So the name of that company is Better Help Inc. P.A.?
A. I'm not sure, Better Help is all that I know.
Q. Do you know where they're located?
A. I don't know where their headquarters is, no.
Q. How did you come to find them?
A. Through a Google search.
Q. You said Google search?
A. Yes, a Google search.
Q. Okay. Prior to Better Help?
A. The only other one that comes to mind would have been -- I can think of two others. I saw a gentleman for a few sessions in Jackson. I don't recall his name. He would also have been a therapist not a doctor.
Q. Would this individual have been paid by cash or insurance?
A. Cash.
Q. What time frame would you have seen this person?
A. I'm not sure. It would have been prior to

Page 44

2023.
Q. Would it have been in 2023?
A. Prior to 2023.
Q. Prior to 2023, so in 2022?
A. 2022 or earlier. I'm just not sure of the year.
Q. How many sessions in total, you said a few?
A. Correct.
Q. Was this by telemedicine or live?
A. Live, in person.
Q. Where was the office located?
A. In Jackson, Tennessee near Murray Guard Drive.
Q. Murray Guard Drive?
A. Uh-huh.
Q. Is that all one word or two?
A. Two words.
Q. What was the reason for leaving that practice?
A. I don't recall.
Q. So you mentioned two, who was the other?
A. The other one would have been back in college approximately 2002. The college provided a number of free sessions to any student that needed to see a therapist. I remember his first name was

Page 45

David.
Q. Okay. So I'm aware after having gone through your records that you've been diagnosed with a generalized anxiety disorder?
A. That's correct.
Q. Who made that diagnosis initially?
A. I don't recall who made that diagnosis originally.
Q. The medical records that I've seen thus far indicated that that diagnosis existed at least since the time frame of April of 2020, does that sound accurate to you?
A. Yes, it does.
Q. Was that diagnosis made prior to April of 2020 or was that the time frame in which it was initially diagnosed?
A. I'm not sure.
Q. So in other words are you saying that as you sit here today, you do not know how long you carried that diagnosis ever generalized anxiety disorder for?
A. That's correct.
Q. But at least we know it existed as of April of 2020?
A. I agree with that, yes.
Q. So my understanding is that you've been

Page 46

under medication since April of 2024 for this condition; is that true?

A. Yes, that sounds accurate.

Q. You take, I'm probably going to kill the name of it Busbar, B-u-s-b-a-r?

A. Yes.

Q. You started taking that in at least in April of 2020 as far as I'm able to glean at this point; correct?

A. Correct.

Q. Are you still taking it today?

A. Yes.

Q. Who manages that medication for you?

A. Recently that has been managed by a psychiatric nurse practitioner.

Q. What's that person's name?

A. Eric Aguilar.

Q. Where is Eric Aguilar employed?

A. He is with iMind, i-M-i-n-d, that's where Taylor O'Connor works.

Q. So does Eric Aguilar see you for different reasons than Taylor O'Connor?

A. Correct, Eric Aguilar doesn't do therapy, he does medication management.

Q. Okay. So how does that work? How does

Page 47

Eric Aguilar know what medications to manage?

A. We have one-on-one meetings to talks about my symptoms and he uses his professional knowledge to manage the medication.

Q. Is he talking to you about side effects and how you're responding to the medications specifically or is this more of a global discussion on your life as a whole with Eric Aguilar?

A. I would say it's global.

Q. Okay.

A. Global discussion.

Q. How often do you see him?

A. So I began seeing him in June of this year because I was a new patient, we were meeting once a month and I have an appointment to see him again in January of 2025.

Q. Other than Eric Aguilar are there any other practitioners you see at the company iMind?

A. Taylor O'Connor.

Q. Have you seen any other practitioners at iMind other than Eric Aguilar and Taylor O'Connor?

A. I have not.

Q. Prior to Eric Aguilar, who was managing the medicines for you?

A. My primary care physician Jason Myatt,

Page 48

M-y-a-t-t.

Q. Can you help me -- what is it, in your definition a general anxiety disorder?

A. I would describe it as excessive worrying and inability to relax at times.

Q. Okay. This medication that you're taking, what does it do for you?

A. I would say that it reduces the anxiety.

Q. So when you say excessive worrying, are there particular things that you obsess over or is it just in general you're worried about everything?

A. I would say it's in general that I worry about potentially anything.

Q. Okay. Let's use the cardiology as an example. Are you the type of person that worries everyday that you're on the verge of a heart attack?

A. No, I'm not worried about that.

Q. The worrying itself; is it worry focused on your health, other people's well-being, your financial independence, like what kind of things are you worried about?

A. It could be -- again, the name generalized, it could be lots of different things, but I think some examples could be worried about my health, my family's health, my career possibly.

Page 49

Q. Okay.

A. Those sort of things.

Q. How did it come to be that this condition was even diagnosed to begin with? Did you have some extreme episode that prompted it or was it just a culmination of symptoms that finally led you to seek help?

A. It would have been the second option that I -- it was a consistent problem that just wouldn't go away. I was just worrying a lot. I would have talked to my primary care doctor about it.

Q. Is there some kind of like treatment goal that we're seeking here? Or is it just we're going to be dependent on this medication for life? What's the end game?

A. I couldn't speak to that. That would be up to the doctor. They haven't told me how it might end up.

Q. Other than medications, have there been any other types of modalities that you tried to rid yourself of this anxiety?

A. Yes, I have -- I've tried meditation, I've tried yoga, I've tried prayer, and at certain points I've used alcohol to try to numb the anxiety.

Q. We'll get to that in a minute. Okay. So

Clay Crockett Volume I
November 21, 2024

Page 50

any other practitioners who you are currently seeing for anxiety other than Taylor O'Connor and Eric Aguilar?

A.   No others, that's correct.

Q.   Have there been any other practitioners who have prescribed any other medications for your anxiety, other than Eric Aguilar and Dr. Myatt?

A.   Not to my recollection.

Q.   As I understand it, you also were taking Effexor XR?

A.   Correct.  I have taken a few different medications along the way.

Q.   Are you still taking Effexor?

A.   Today I take two medications for -- for mental health.  I take Venlafaxine, which I believe is the generic name for Effexor.

Q.   Yeah, it is.

A.   And Wellbutrin.

Q.   So who prescribes the Effexor?

A.   Eric Aguilar prescribes both the -- I'm going to use the word on the bottle, the Venlafaxine and the Wellbutrin, the combination of them two side effects, to help with the anxiety.

Q.   According to my research so far, you've been taking Effexor since at least April of 2020 up

Page 51

through present day; correct?

A.   That's correct.

Q.   Has there been any changes to the medication itself?  In other words, the milligrams or strength of it?

A.   Yes.  I remember prior and having some discussions with Jason Myatt and we did up the dosage from 75 milligrams to taking one 75 milligram pill and then a half.  So it's one-and-a-half 75 milligram pills per day.

Q.   When do you take them?

A.   I take them in the morning.

Q.   Did you take it this morning?

A.   I did.

Q.   Does it affect your ability to testify in any way or understand my questions?

A.   No, it doesn't.

Q.   Okay.  So you can take it and go to work in other words?

A.   Correct.

Q.   And when would have been this time frame that the medication would have been changed to one-and-a-half a day?

A.   During 2023.

Q.   Before or after the cruise?

Page 52

A.   I don't recall the date.

Q.   Was there anything in particular that was going on that prompted that change?

A.   We talked about that possibly changing the dose could help it work better, so that it could relieve my anxiety more if I were to change the dosage, so he recommended, Jason Myatt recommended that I do it.

Q.   The Wellbutrin, that's a mood stabilizer; isn't it?

A.   I'm not a pharmacist.

Q.   What's your understanding of what you're taking Wellbutrin for?

A.   For anxiety.

Q.   Have you ever suffered from depression?

A.   I have.

Q.   Are you currently seeking treatment for it?

A.   It is part of what I am seeing Eric Aguilar for, yes.

Q.   Okay.  Have you ever received a formal diagnosis of depression?

A.   Yes.

Q.   When was the first time?

A.   The first time was approximately ten years ago.

Page 53

Q.   Who would have made that diagnosis?

A.   It would have been primary care physician at that time in Brighton.

Q.   And that's person's name?

A.   I don't recall his name.

Q.   Could you give me a little bit better specifics in terms of where in Brighton that person is located?

A.   I believe he's retired now.  But I believe it was actually called the Brighton Medical Clinic.

Q.   Did you ever actually seek any mental health treatment of any degree or sort related to depression?

A.   Prior to Eric Aguilar, I did not.

Q.   Who's Dr. Anthony Lake?

A.   Dr. Anthony Lake.  I don't remember that name.  If you gave me what company that person was with, I might be able to help you with that.

Q.   So have you ever been to see a psychiatrist?

A.   I recently went to Cumberland Heights for the issues around the alcohol and I did see a psychiatrist while I was there, yes.

Q.   Other than at Cumberland Heights had you ever had reason to see a psychiatrist at any other point in your life?

Clay Crockett Volume I
November 21, 2024

Page 54

A.   No.
Q.   What about a psychologist?
A.   No, not that I recall.
Q.   Okay.  So as you sit here today, do you have a pending appointment with Mr. Aguilar?
A.   I do.  I have a pending appointment in January 2025.
Q.   Have you seen the movie Fight Club?
A.   I have seen the movie Fight Club.
Q.   I'm going to ask you a Fight Club type of question.  Have you ever been in a fight before?
A.   Have I ever been in a fight before?  How would you define a fight?
Q.   It's a great line in the movie, he says, how much do you know about yourself if you've never been in a fight.  It's really true.
     But, like, have you been in a fist fight with somebody where literally they punched you in the head or face?
A.   No, I haven't.  I don't recall anything like that.
Q.   Before this incident on the cruise ship, had you ever suffered any type of trauma or impact to your head of any degree where you needed to put a Band-Aid on it?

Page 55

A.   That's a pretty broad question.
Q.   It's intentionally broad.
A.   I'm not sure how to answer that question.
Q.   So let's start from the most severe and work our way back then.  Have you ever suffered any type of trauma or impact to your head where you had to seek medical treatment for it?
A.   No, I haven't.  Prior to the incident we're talking about.
Q.   Okay.  So you never had any type of stitches on your head or face of any sort?
A.   Correct.
Q.   I don't remember if I asked you this question or not.  I apologize if I have.  Have you ever lost consciousness for any reason?
A.   I never lost consciousness for any reason.
Q.   We're going to get to the alcohol thing in just a second, but before we do, have you ever been intoxicated to such a degree that you could not remember the day before?
A.   No.
Q.   Have you ever had any type of cognitive testing, I'm not talking about the CPA exam, other than the CPA exam, have you ever had any type of cognitive testing on your ability to think or

Page 56

function mentally?
A.   Not that I recall.
Q.   Have you ever had any type of neuropsychological examination done?
A.   Not that I'm aware of.
Q.   When you were at the Cumberland Heights, did they do any type of mental or cognitive testing of any sort?
A.   I'm not sure I know what the definition of cognitive testing is.  I mean, they certainly asked me, you know, questions about my mental health and my circumstances.
Q.   Okay.  In other words, they never did any type of deep dive diagnostic examination on how your brain functions?
A.   I would agree with that.
Q.   Okay.  So Cumberland --
     MS. GOODMAN:  Can we take a break?
     MR. DRAHOS:  Sure, let's take a break.
     (Thereupon, there was a brief recess.)
BY MR. DRAHOS:
Q.   So we were about ready to get into Cumberland Heights but before we do I just want to wrap up two more quick areas.
     First going back to the headaches, have you

Page 57

ever taken any medication for headaches other than like over-the-counter Tylenol type stuff.  Any prescription medication for headaches prior to the subject cruise?
A.   Not that I remember, no.
Q.   As I understand it you've been diagnosed with sleep apnea?
A.   I have been diagnosed with sleep apnea, yes.
Q.   When did you receive that diagnosis?
A.   That would have been in 2017 or 2018.
Q.   Who would have been the one to make the diagnosis?
A.   I went to asleep lab called Alpha Sleep Lab.
Q.   Alpha, A-l-p-h-a?
A.   Correct.
Q.   Where is it located?
A.   It is located in Jackson, Tennessee.  I had a sleep study and their doctor would have read those results and diagnosed that.
Q.   And so you use a CPAP machine to sleep at night?
A.   I do.
Q.   Have you used the CPAP machine regularly since 2017, 2018 time frame?
A.   I have, that's correct.

Clay Crockett Volume I
November 21, 2024

Page 58

Q.   Do you see a sleep medicine doctor?

A.   Not since the sleep study.

Q.   So it's just been that one and only time?

A.   Correct.

Q.   Okay.  So Cumberland Heights, we were just ready to start talking about, prior to going there, had you ever been for any type of drug or alcohol therapy of any sort in your lifetime?

A.   No.

Q.   So I had asked you if you had ever been arrested, you told me no.  Which I assume that means you never had a DUI?

A.   That's correct.  I never had a DUI.

Q.   So what is your drink of choice when you do drink alcohol?

A.   My last drink of choice was vodka.

Q.   When you say your last, have you quit drinking cold turkey?

A.   I went to Cumberland Heights to help me -- to detox and stopped after that.

Q.   So that can mean different things to different people.  So let me try to drill down a little bit more.

Does that mean that you no longer drink alcohol at all period?

Page 59

A.   Correct.

Q.   Has that been the case since you were at Cumberland Heights?

A.   I had one occasion of a slip of a relapse, not long after I left Cumberland Heights, but other than that incident, no alcohol.

Q.   So when was the quote unquote relapse?

A.   It would have been in June of this year.

Q.   What do you call a relapse?

A.   Just drinking again.  Just purchasing and consuming alcohol.

Q.   So are you counting a relapse like I had a gray goose and tonic at a bar or did you actually get intoxicated?

A.   It would have been closer to your first scenario.  I purchased vodka and had several drinks over a period of several hours.  I would not say that I was intoxicated at that point.

Q.   Okay.  So are you an alcoholic, a recovering alcoholic?

A.   I would say that I am.

Q.   Currently today, do you participate in any type of therapeutic or counseling of any sort for alcohol dependence?

A.   I am part of a 12-step program.

Page 60

Q.   I have heard of that, but I'm not intimately familiar with the details.  Does that mean that there are 12 stages of the recovery?

A.   That means there are 12 steps to the program that I'm a part of that are suggested to follow to remain sober.

Q.   So where are you in that 12-step program?

A.   I don't think I understand your question.

Q.   Maybe I don't understand what I'm asking you.

When you stay 12-step program, I'm understanding that to mean like step 1 is recognition and step 12 is like saying goodbye to alcohol forever.

Are there advancements in the recovery that you strive for?

A.   I mean, the ultimate goal is to be in recovery, to not actively consume alcohol.

Q.   So in other words, once you're in the 12-step program, are you always in the 12-step program?

A.   I think that would be up to each individual's situation.

Q.   When you say you're in the 12-step program, can you help me understand where you are in that

Page 61

12-step program, like closer towards full recovery and alcohol is no longer a concern or you're still kind of challenging your -- you're still challenged by it.  Where are you?

A.   I would say that I am less challenged by it then I have been in the past.  My desire to drink is much weaker than it was in the past.

Q.   So do you have a counselor that you speak to directly for these kind of things?

A.   So the program is not a situation where I would be seeing a professional as part of being in that program.  It is alcoholics helping other alcoholics.

Q.   I'm familiar with alcoholics anonymous, are you in that?

A.   Yes, I am.

Q.   How long have you been involved with alcoholics anonymous?

A.   Since August of 2023.

Q.   So did you participate in any degree of counseling, whether it be professional or unprofessional, related to alcohol at any point prior to the subject cruise?

A.   No.

Q.   When do you believe that your challenges

Clay Crockett Volume I
November 21, 2024

Page 62

with alcohol first arose?

A.   I would say approximately 2020.

Q.   And that happens to be around the time frame that the generalized anxiety, at least as I understand it, first came about?  Are the two related in your mind?

A.   They're somewhat related in the sense that I used alcohol to cope with anxiety and to try to relax at night.

Q.   Okay.  It's one thing to have a drink or two to help you go to sleep at night.  There's another to where if you have a drink you can't stop until you're blacked out drunk.

What was your habit like?  Are you the type that if you have a drink you're going to get blacked out drunk or you have one or two and maybe you just decided you don't want to keep doing that the rest of your life?

A.   Both.  So I think it was a continuum.  Prior to 2020 I was more of a -- maybe call it a social drinker.  I might do what you said, I might have done what you said and then I might have had, you know, two drinks in the evening to kind of wind down but over, you know, a period of time, I found that I was drinking more.  I never let it get to the point of

Page 63

affecting a -- you know, a large part of my life but it was something that I was using more of to get the same affect.

Q.   Is it only alcohol or have you had any type of issues with recreational drugs?

A.   It's only alcohol.

Q.   Do you smoke cigarettes?

A.   I do not.

Q.   Cigars?

A.   I do not.

Q.   No tobacco dependency of any sort?

A.   Correct, none.

Q.   The Cumberland Heights experience for lack of a better word, as I understand it, it began on May 19, 2024?

A.   That sounds correct, yes.

Q.   Is Cumberland Heights, you check yourself in, so to speak?

A.   Yes.  I can only speak of what I did.  I'm sure other people get there other ways, but I made the decision that I needed help with my alcohol use more so than anything that I could do.  So I checked myself in.

Q.   Okay.  So what prompted that?  Was there an intervention?

Page 64

A.   No.

Q.   This was a self decision?

A.   Yes.

Q.   Did your wife have any role in encouraging this or you made it on your own independently?

A.   I made it on my own independently.

Q.   I would imagine -- I mean, this was a significant decision, right, you're going to have to tell your wife and then your daughter is going to have to find out where you're going as well?

A.   That's correct.

Q.   What specifically was going on with you in May of 2024 that led to that decision?

A.   Yeah, so as I said I've been in the recovery community, you know, for since the summer of 2023 and in the fall of 2023, I had a period of sobriety of about 90 days, but I ended up relapsing and going back to drinking and was unable to stop on my own and the expression is, you know, I was sick and tired of being sick and tired and that I knew it wasn't a healthy pattern and if I continued on that, there could be bigger repercussions down the road.  It could cause a lot of other personal issues I did not want to experience so in May of 2024 I just finally said enough is enough, I've got to stop this.

Page 65

Q.   Okay.  So you're using words that I don't know if they're terms of art or you're coming up with them.  When you say you were in the recovery community since the summer of 2023, what does the recovery community mean?

A.   I would say that's another way of saying that I attended A.A. meetings that I was around a community of people that were having the common goal of staying sober.

Q.   Okay.  So when specifically in the summer of 2023 did you enter into the recovery community?

A.   Well, that's more of a informal term than a formal term.  So I don't know that there's an exact date that I could give you.

Q.   Let me get right to the heart of it.

A.   Okay.

Q.   The cruise was in July of 2023, were you in the recovery community before the cruise?

A.   I was not.

Q.   Okay.  So if we know you were not in the recovery community in July of 2023, does that help you then identify a little bit more specifically when you would have been, because if you tell me the summer that leads us with August or September.  So would it have been sometime in either August or

Page 66

September?

A.   So my very first A.A. meeting was on the cruise ship in July.

Q.   Help me understand how that possibly could have been?  How did that come to be?

A.   I was obviously aware of A.A. and realized that there was that meeting, you know, on the cruise ship and that was a less threatening way for me to, I guess try it out, because I knew it was not going to be people that I would probably ever see again, so I was looking for a change at that point and knowing that I needed to make a change so I chose to go to the meeting that was held on the cruise ship.

Q.   So did you go on this cruise specifically for A.A.?

A.   No, no.

Q.   How did you come to learn that there was going to be an A.A. meeting on the cruise ship?

A.   I think I Google searched it and it's printed on the cruise ship's schedule.  The time and place where the meeting is held.

Q.   So did you get on the ship with a premeditated plan to have some kind of A.A. experience during the cruise, or did something happen on the cruise that prompted you to Google search it?

Page 67

A.   It would have been before.  I think before I would have researched it and known that that was a possibility.  You know, that I had just read that they have A.A. meetings on cruise ships, so when I saw it on the schedule when we did get onboard, I didn't have the schedule of activities before we got onboard.  When I saw it listed, I chose to go to see what it was about.

Q.   Did your wife know that you were going?

A.   She did.

Q.   Other than your wife, did anyone else know that you were going to be going?

A.   No.

Q.   What day of the cruise was this?

A.   I don't recall the day.

Q.   So we're going to get into a lot more specifics, but for the time being now we're just on the -- day one was July 8th and the ship was in Galveston, did you go on day one?

A.   No, it wouldn't have been day one.

Q.   Day two was July 9th, it was the first sea day of the cruise, did you go on July 9th?

A.   It is possible that I went on July 9th because I know it was not at a time that we were doing a shore excursion.

Page 68

Q.   The next day July 10th is also a sea day, so is what you're telling me that you must have done it on a day that the ship was at sea?

A.   Yes.

Q.   Okay.  So there's a total of three of those, it would have either been July 9th or July 10th or July 14th, the day of the incident?

A.   It was not the day of the incident.

Q.   So it was either the 9th or the 10th?

A.   Correct.

Q.   Did you go to a particular room on the ship?

A.   Uh-huh.  Yeah it was printed on the schedule, the time and the room to go to.

Q.   Okay.  So when you arrived to this room, were there other cruise passengers there?

A.   I was the only person in the room for a period of time.

Q.   Does that mean not even a -- strike that.
Was there somebody leading the discussion like a moderator?

A.   There was not, no.  What it turned into was me and one other person and that person had been in A.A. for a period of years from what I remember.  And so more so that an actual meeting where somebody stood at the front and led, like you asked about.  It

Page 69

really turned into more of a discussion, just between he and I.

Q.   This other person I know that their identity cannot be made, and I'm not looking for that, but were they a guest on the ship?

A.   Yes, it was another guest.

Q.   Other than this encounter with this particular guest, were there any other meetings related to alcohol anonymous?

A.   I recall that there was a second one during the week -- during the cruise there was a second meeting.  I couldn't tell you what day or time.  I didn't attend it.  I just went to the one.

Q.   This particular individual, did you have any further discussions with him or was it the one and only time?

A.   One and only time.

Q.   So since the time of the subject cruise up until present day, have you participated in any other alcoholics anonymous functions?

A.   Yeah, I regularly attend meetings of A.A.

Q.   At what frequency?

A.   On average I would estimate twice a week.

Q.   Are these meetings that are held in person or virtually?

Clay Crockett Volume I
November 21, 2024

Page 70

A.   They are held in person.  Near my home in Jackson or surrounding communities.

Q.   Do you have a support person, I don't know what that title is, as I understand it, isn't there a moment in time where you have like a person that you can call if you're feeling vulnerable or something?

A.   The term I think you're looking for is a sponsor, and I do have a sponsor, yes.

Q.   Are you a sponsor for anyone else or is it like a mutual sponsorship?

A.   The relationship is that he is my sponsor and he himself is sponsored by somebody else.

Q.   So are you a sponsor to anyone else?

A.   No.

Q.   When you have these issues with alcohol; is it vodka that is the weakness or is it all forms of alcohol?

A.   I would say all forms of alcohol are a potential issue.

Q.   Okay.  So this challenge with alcohol, is this one that you have singularly and independently identified as an issue or have there been others who have approached you with concerns?

A.   It singularly has been my decision.  I have -- it's been in a way where it didn't affect

Page 71

other areas of my life.

Q.   Like in other words, has your wife come to you and said you need to --

A.   She has --

Q.   -- get a handle on it?

A.   Excuse me, I didn't mean to walk on you. But no, she has not.

Q.   Your mom hasn't come to you and been like I'm concerned, you seem to be drinking a lot, nothing like that?

A.   Correct.

Q.   So how long were you at Cumberland Heights for?

A.   So I checked in on a Sunday and I left on a Friday.

Q.   So I have it 5/19/24 to 5/24/24, that would have been five days?

A.   Roughly.  Yeah.  I went in the late afternoon of the 19th so that wasn't a full day.

Q.   When you checked yourself into Cumberland Heights, is this the type of rehab where people on the outside can't come and intervene into what you're doing, like are you isolated from the whole world during that time frame?

A.   There are people that -- I'll use the term

Page 72

again, you know, part of the recovery community that do come in and lead meetings while you're, you know, a part -- while you're there.  But it's not a situation where people just come and go as they please.  It's, you know, it's I guess scheduled or by invitation.

Q.   Is this covered by insurance or you pay for this cash?

A.   It's covered by insurance.

Q.   So did your wife and daughter come to the sessions with you there at Cumberland Heights?

A.   No.

Q.   You see them when you come home kind of thing, is that how it works?

A.   Yeah, it's an inpatient.  And it's about two hours from, you know, from my house.  So I stayed there, you know, for the full time and didn't leave. So, yeah, I saw them when I got back.

Q.   Now is this like a counseling and detox?  In other words, like you're trying to get rid of the chemicals in your body to help eliminate the addiction type thing?

A.   That's correct.  Yes, that is correct.  It's detox and I went to meetings and I had I guess learning -- opportunities to learn how to better cope

Page 73

with alcohol and with life in general.

Q.   Okay.  Have there been any follow-up appointments or visits to Cumberland Heights since you left there on May 24th?

A.   Yes, they reach out periodically.  They have somebody's whose job it is to check, you know, on prior patients.  So he'll call periodically to do that.  And then I've also been part of a support group that they have in Jackson so it's not an A.A. meeting but it's a meeting for people who have attended Cumberland Heights and again it is a support group but it's a more informal structure, and I've been to that several times.

Q.   I was going to ask you that, when was the last time you did that support group?

A.   Approximately three weeks ago.

Q.   Is that an as needed type of basis or do you all schedule these things in advance?

A.   They are scheduled, it's the same time every week.  So it's, you know, like a Tuesday at 6:00 p.m., same place every time.  And then whoever -- whoever can show up, you know, they do.  You don't have to, you know, preregister or anything like that.

Q.   Okay.  When has been the last time that you have participated in a support group related to

Page 74

Cumberland Heights prior to three weeks ago?

A. It probably would have been -- it would have been three or four weeks before that. So I don't go every -- every week.

Q. Is there any particular reason why you don't go every week to this one?

A. There's two reasons. One would just be work and family conflicts and then the other is, you know, if I'm already going to another support group meeting, it's a little bit of a duplicate effort, so there may not really always be a need to go to that one.

Q. That's kind of what I was getting at next and then we're going to move on. Is there like a degree of urge that you start to feel to where you say I need to up it and then like the A.A. -- take it up another level and go to Cumberland Heights meeting or is it just a matter of --

A. No, it's more of a matter of -- a lot of it is a matter of convenience. There are lots of meetings in lots of different places. And so anybody is free to go to any of them that work, you know, for their schedule, but they're somewhat interchangeable. Because they're all support related and all kind of built on the same principals.

Page 75

Q. So prior to the subject cruise, had you ever been on a cruise ship before?

A. Yes. I've been on several. We had been on -- during -- during the last five years, so I'll say it this way between 2019 and 2023, we had been as a family on three other cruises. We had been on one Disney cruise, one Carnival cruise, and one Royal Caribbean cruise. And then when I was a kid, my mother, my sister and I went on another Carnival cruise.

Q. I'm aware of your mother living in town you made mention of her before, but I have not heard anything about your father; is he still alive?

A. No, he passed away when I was 11.

Q. Sorry to hear that. Heart attack?

A. Correct.

Q. Okay. The Carnival cruise that you had been on as a kid, do you recall the name of that ship?

A. I don't.

Q. The three that you had been on, I'm assuming these were before the subject cruise, Disney, Carnival, Royal?

A. Yes, they were all before the subject cruise.

Q. Specifically the Carnival ship, do you

Page 76

recall which on that was?

A. That was the Carnival Valor.

Q. During any one of these three cruises, the Disney, the Carnival Valor or the Royal Caribbean, had you ever needed to seek medical care on the ship?

A. No, I hadn't.

Q. Had you ever needed to seek medical care at any foreign ports of call?

A. No, I hadn't.

Q. The experience on Carnival Valor, how would you describe it?

A. I would describe it as a good vacation, yeah, it was fun.

Q. Any criticisms or critiques of any aspect of that experience?

A. No, not that I recall. I mean, it was five years ago now. But it was -- yeah, we -- I'll just say we enjoyed cruising, yeah.

Q. Okay. So the subject cruise; was there any occasion that you -- that prompted you to schedule that?

A. Just looking for a summer getaway.

Q. A summer getaway?

A. Uh-huh.

Q. Any particular reason why you booked this

Page 77

particular ship?

A. That would have been a combination of the itinerary or the ports of call, obviously we looked at the dates, you know, that were the dates going to fall in line with something that fit our schedule. The amenities of the ship. A lot of factors go into it.

Q. Okay. Did you do research for this cruise?

A. I did some, yes, my wife and I both did research for this cruise.

Q. Do you recall the information that you were researching specifically?

A. It would have been the things that I just mentioned, you know, the dates, the Ports of call, the amenities of the ship.

Q. When you say the amenities of the ship, what specifically were you looking for?

A. We would have been looking for kid's activities. So, you know, we have -- again, we have the daughter that went with us, so we want to make sure there's going to be a lot of things for her to do. Obviously a good state room for a reasonable price. The shows on the ship, the age of the ship.

Q. Okay. So who would have been the one in your family to actually book the cruise itself?

Clay Crockett Volume I
November 21, 2024

Page 78

A. I believe that was my wife that booked it. We would have made the decision together and both been right -- probably right there at the computer doing it together.

Q. Okay. Did anyone else attend other than you, your wife and your daughter?

A. Attend like?

Q. Like did anybody accompany you on the trip?

A. No.

Q. All right. So I think we were talking about before the first day of the cruise was July the 8th, and it originated out of Galveston, had you ever been to Galveston before?

A. I had not ever been to Galveston before, no.

Q. How did you get there from Jackson to Galveston, did you drive?

A. We flew.

Q. Did you fly into Houston?

A. That's correct. We flew into Houston.

Q. So if the cruise started on July 8th, when did you get to Houston?

A. We would have gotten there the day before on July 7th.

Q. And what did you take like an Uber or shuttle or something to the port?

Page 79

A. We took an Uber to the port.

Q. So you arrived on July 7th, when were you scheduled to fly out of Houston?

A. The return flight back home?

Q. Yes, sir.

A. It would have been the afternoon, the same day the cruise ended. It would have been that afternoon, the 15th.

Q. And so what airport do you fly out of, Nashville?

A. We either fly out of Nashville or Memphis.

Q. Which one did you fly out of for this cruise?

A. I don't recall.

Q. What airline did you fly?

A. We flew Southwest.

Q. Did you fly into Hobby Airport or George Bush?

A. We flew into Hobby.

Q. Okay. And you had I assume the same setup, you were going to Uber from the Port back to Hobby Airport to fly home on the 15th?

A. That's correct.

Q. Did you bring any medical devices or equipment of any sort with you on to the cruise?

Page 80

A. I would have brought, I did bring my CPAP machine.

Q. Okay. Anything else?

A. Medications?

Q. That was going to be my next question. But I'm focusing on supplies or equipment at the moment. So other than the CPAP machine, any other medical supplies or equipment of any sort?

A. No.

Q. When you say medicines, what medicines did you bring on the ship for you?

A. For me, I would have brought -- I brought my blood pressure medicine, the one that we mentioned earlier and the Venlafaxine that I take daily and then we would have brought, you know, over-the-counter medicine if you wanted to write that down.

Q. Do you get sea sick?

A. Generally, no.

Q. When you say generally no?

A. I mean, you know, I'm not saying I could never get sea sick, but I have not had a problem with it.

Q. Do you bring sea sickness medication with you on these cruises?

Page 81

A. I recall that my wife brought some sea sick medication on the cruise.

Q. Okay. So in all of your prior cruise experiences, though, you've never suffered any sea sickness before?

A. Correct.

Q. All right. This has got to be the longest I've gone without an exhibit, it's a record.

So I'm going to hand you what we're going to mark as Exhibit 1 to the deposition. This is what we call a movement details report. It's got the smallest Bates number in history on it. If you can read that, Lisa, good for you. I think it's GR5?

MS. GOODMAN: Yes, it is.

BY MR. DRAHOS:

Q. Mr. Crockett, this movement report is a summary of all of the times you came on and off of the ship according to Carnival.

A. Okay.

Q. I may be using this during portions of my questioning. You're welcome to reference it as we go.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Clay Crockett Volume I
November 21, 2024

Page 82

Q.   According to the document here, Carnival indicates that you would have bordered the ship at 11:17 a.m. on July the 8th, is that accurate to your understanding?

A.   To my understanding that is accurate.

Q.   Do you recall what you guys did that first day on the ship?

A.   I recall that we went up on the top deck to, you know, watch the sail away, you know, from the pier, they have a party, a dance and music and so we did that.  I remember that we checked into our room, you know, got settled and unpacked a little bit.  I recall that we would have had dinner on the ship that night.

Q.   Okay.

A.   But those are the specifics that I recall.

Q.   All right.  So did you book any excursions before the cruise?

A.   Yes, we did.

Q.   Which excursions did you book?

A.   So in Montego Bay we booked a day pass for a resort.

Q.   Which one, which resort?

A.   It was a Hilton resort, so we paid for that where you can go use their facilities, go eat, go

Page 83

drink, that kind of thing.

Q.   At the Hilton in Montego Bay?

A.   It was -- it was not in Montego Bay.  I remember, you know, driving I would kind of out away from the Port and the Port city.

Q.   Do you recall what town in Jamaica that was in?

A.   I don't.  And then we booked -- we pre-booked a Dolphin excursion, you know, swim with the Dolphins in Grand Cayman and we pre-booked a similar resort for a day but it's in Cozumel but it's not connected to a hotel, it's just a place that's just available during the day.

Q.   Like a beach?

A.   Yeah, it's a beach but it's a resort area where you have to pay to get in.  And they have pools, water slides, food, beverages, kind of an all inclusive package but it's just not a -- there's no hotel there.

Q.   Okay.  So the one that you did in Montego Bay, is food and drinks and stuff already included?

A.   That's correct.

Q.   Does that include alcohol?

A.   That's correct.

Q.   How about the same for this excursion in

Page 84

Cozumel, is food, alcohol drinks all included?

A.   Yes, it is.

Q.   Any other excursions other than these three?

A.   No.

Q.   So getting back to the ship on this first day, July 8th, as I understand it, the subject incident occurred underneath the stairwell -- well, it happened underneath the stairwell, I want to call that particular area the subject area.

A.   Okay.

Q.   So on July 8th, were you anywhere near the subject area at any point in time, from the time you got on the ship until the time you went to bed that night?

A.   I don't recall specifically being in that area.  I guess it's, you know, depends on how you define area.

Q.   Let's see if we can do a little bit better.

A.   Okay.

Q.   Before the subject incident, had you ever sat in that particular chair or in that vicinity before the day of the incident?

A.   I had not sat in that particular chair before the day of the incident.

Q.   Do you have a memory of that stairwell at

Page 85

any point in time from the time you got on the ship until the time of the incident?

A.   I have a -- I have memories of using stairwells throughout the ship, but a lot of them, you know, look really similar.  They're all the --

Q.   Okay.  So I guess what I'm trying to get at here, I'm just trying to be as specific as I can to help us both.

A.   Sure.

Q.   Do you have any memory of there being anything unsightly or unusual about the particular stairwell that was involved in this incident before the subject incident itself?

A.   I do not have a particular memory of anything with any stairwell.  You know, there being a problem with stairwells.

Q.   That helps, thank you.

So up until this point then on July 8, 2023.  From getting on the ship until the time you're going to bed, any complaints at all about any aspect of your experience?

A.   Not that I recall.

Q.   Did you have any alcohol that day?

A.   Which day?

Q.   The first day?

Clay Crockett Volume I
November 21, 2024

Page 86

A.   The first day of the cruise?

Q.   Yes.

A.   I can say I'm sure that I did, yeah.

Q.   So did you purchase the drink package?

A.   Yes, we did.

Q.   Both you and your wife?

A.   Yes.

Q.   What is your understanding of how that drink package works?

A.   My understanding is that every adult in the cabin would have to purchase it, it's all or none, so we chose to both purchase it.  It allows you to get alcoholic drinks without paying a fee or, you know, having a charge every time you go get a drink.

Q.   Okay.  Does your wife drink alcohol?

A.   She does.

Q.   I don't mean to get into any kind of personal issues with her at all.  Just in general does she have any type of challenges with alcohol like you?

A.   She does not.

Q.   What is her drink of choice?

A.   The thing I would see her drinking more, probably most often would be wine.

Q.   Does she ever drink to a level where she

Page 87

gets intoxicated as well or is she kind of more like a light drinker?

A.   I would classify her as a light drinker.

Q.   During the cruise, did you ever use her drink package, her card to get a drink?

A.   I recall -- I recall using both cards to get two drinks.  One for me and one for her.

Q.   What's your normal routine when not on vacation, what time do you go to bed?

A.   I generally go to bed at 10:30 on a week night.

Q.   How about on a weekend?

A.   It's about the same.  But, you know, I might stay up until 11:00 or 11:30, you know, slightly later on the weekends.

Q.   And during the week, what time do you typically wake up?

A.   6:00.

Q.   On the weekend?

A.   7:00.

Q.   You're like me.

A.   I can't keep sleeping.

Q.   Okay.  What about when you're on vacation, same deal you're going to bed around 10:30 or 11:00?

A.   Yeah, it is.  Generally the same general

Page 88

schedule.

Q.   And you're waking up around 7:00?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes, that is a yes.

Q.   First time.  Awesome another record.
Day two of the cruise, it's July the 9th, 2023 and the ship is at sea all day long.

A.   Right.

Q.   Do you recall that particular day what time you would have gotten up?

A.   I don't recall specifically what time we got up, no.

Q.   Do you remember what you did that day on the ship?

A.   I remember -- I really -- no, I really don't.  I can give you some generalities of what we probably did, but I don't have specific memories of that day.

MS. GOODMAN:  Do you want to take a break?

MR. DRAHOS:  Sure.  We've been going an hour, take a break.

(Thereupon, there was a lunch recess.)

BY MR. DRAHOS:

Q.   Before we get any further, I just want to go

Page 89

back and cover some things that I may not have been aware of perhaps because I didn't ask you the right questions.
Before you became a CPA, did you work as a firefighter?

A.   I was a volunteer firefighter.

Q.   For which entity?

A.   So two different ones during my life time, the first was Wenasoga Fire Department, W-e-n-a-s-o-g-a, that's in Mississippi; right outside of my hometown Corinth and I did that for a couple of years during college.

Q.   Were you thinking about becoming a full-time firefighter?

A.   Not really.  It was more of a hobby, a way to give back to the community, that was something else that we didn't really talk about was you asked me about hobbies, I like to serve where I can.  So it was fun.  It an adrenaline rush and good to help people.  I mean, it was an adrenaline rush and it's good to help people.  And then the second department was in Brighton that I mentioned earlier, Brighton Fire Department.

Q.   And what period of time did you work as a volunteer firefighter for Brighton?

Clay Crockett Volume I
November 21, 2024

Page 90

A.   Well, just to be clear, I was not working. I was not an employee of the city or anything like that.  It was -- we moved back in 2018 to Jackson but it was before that.  It would have been approximately 2016 and so let's say from 2013 to '16 would have been when I was active there in Brighton.

Q.   Just generally, what does a volunteer firefighter actually do, are you carrying the hose up the flight of stairs or are you just kind of helping pass out bandages?

A.   Yeah.  It could be anything; right.  But certainly we were trained as a full fireman, so to speak, but just a point of clarity, both of these are pretty rural.  If, you know, you're trying to compare it to like a Miami firefighter, it's very much not the same thing as far as call volume.

But we did a lot of training and went on just a few fire calls.  Primarily it would be grass fires, car wrecks, those were more common than actually a building structure fire.

Q.   During any of the time that you served in these capacities, did you experience any type of a particular trauma or something that upset you psychologically?

A.   No, hu-huh.  Certainly could be if the

Page 91

circumstances were different, but I didn't experience some of the horrible things that can be seen.

Q.   We touched a little bit on your history of depression and I need to ask you something to make sure I walk out of here with a full understanding. Did your issues with depression ever reach a suicidal level?

A.   Yes, they did.

Q.   On how many instances?

A.   I can only think of one.  To be clear, I never attempted suicide, but I had thoughts of it.

Q.   Was that one instance that you're talking about before or after the cruise?

A.   It was before.  It would have been several years before.

Q.   Several years before?

A.   Uh-huh.

Q.   No other thoughts or efforts to consider suicide beyond that one episode you're telling me about?

A.   Yes.  So to be clear, I think there was this one in particular time where I probably more seriously considered it, but I never, you know, I never acted on it.  I never attempted it.  There were other times fairly recently that I've had suicidal

Page 92

thoughts that I would call passive and that's part of the reason why I started seeing Eric Aguilar was because, you know, those symptoms were back.

It wasn't that they went on for years.  It was that it kind of happened, you know, a number of years before the cruise, went away completely the depression was what I call resolved.  The anxiety wasn't but the depression was resolved for a period of years.  And it's been only fairly recently that the depression came back.  So there were some again what I'd call passive suicidal thoughts.

Q.   Okay.  So this one instance that you're talking about that happened several years ago, did something manifest beyond a thought, meaning there was a physical act of some sort?

A.   Yeah.  I took out a gun and held it and considered it.

Q.   Okay.

A.   That was the one time, that's why in my mind there is kind of two different situations.  I never planned or had any means ready, so to speak, after that one occasion.

Q.   Okay.  So this episode with the gun, did that happen before or after the general anxiety disorder that we talked about, the diagnosis?

Page 93

A.   It would have been after the diagnosis.

Q.   Was there anyone that you went to go see specifically for help following that episode?

A.   No.

Q.   I take it that that's the most aggressive -- most advanced suicidal thought you had in your lifetime?

A.   Yes.

Q.   Let's jump back to the cruise then.  So we were talking about day two, which would have been the first full day you're set to be on the ship at sea. We were talking about what time you got up.  Trying to get oriented back into that time frame for you. What I want to do is I'm going to hand you what we'll mark as Exhibit 2.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q.   I don't know why somebody stapled these prematurely.  So it should be a four-page document. Is there any paper clips up there?  We're going to mark this as Exhibit 2 to your deposition.  This is what we call a sign and sail account.

Here we go.  This is a summary of all of the charges that were levied against your account during

Page 94

the subject cruise, okay?

A.   Okay.

Q.   You're welcome to take all of the time you need to review anything before answering my questions.  The one that I would like to cover with you right now is if you look along the left-hand side there's dates and times; do you see that there?

A.   I do.

Q.   All right.  If we look at the time frame of July the 9th starting at 8:44 a.m.; do you see that there?

A.   Uh-huh.

Q.   You're welcome to check my math if you would like, but if we go all the way down to the last charge, which would have been at 9:53 p.m. on July 9th, according to my count you had 12 alcoholic drinks that day.  Does that appear accurate to you?

A.   Let me recount.

Q.   I should have known when asking an accountant you're going to recheck my math.

A.   Of course I am.  I would agree with the number you counted.  My question back would be are all of these alcoholic drinks?  Because I think in the package coffees and other like premium sodas are part of it.

Page 95

Q.   So there is a charge there for a coffee at 8:10 p.m., but the other ones are at bars, specific bars on the ship, so the Red Frog Bar would be one of the ones you were at most frequently.  There's a Horizons Bar, Ocean Plaza, so I can't imagine as you sit here today, that you could specifically recount every single alcoholic drink that you had on the ship?

A.   I would agree with that statement.

Q.   Right.  So if it was Carnival's contention that these charges on here are for alcoholic drinks, would you have any way of disputing that?  And saying no, that's absolutely wrong, I did not have 12 alcoholic drinks on July the 9th?

A.   I would not have a way to specifically dispute that, no.

Q.   Now, this alcoholic anonymous meeting that you told me about, it happened during the day or in the evening?

A.   During the afternoon.

Q.   So we had talked about this before, and we tried to narrow it down, and my understanding was it was either on the 9th or the 10th?

A.   Uh-huh.

Q.   Did anything happen specifically on the 9th

Page 96

to prompt you to go in there or were you going into that meeting no matter what?

A.   I would say no to both of those questions.  Nothing made me go, but I was also not bound and determined to go either.  I think it was an option that I knew existed, because I had looked at the schedule and I chose to go.

Q.   Okay.  So in other words, you didn't get into an argument with your wife about drinking excessively --

A.   Correct.

Q.   -- or nothing like that?

A.   Correct.  I did not.

Q.   Did you get intoxicated on July the 9th?

A.   I don't recall.

Q.   Okay.  Do you have any complaints about any aspect of your experience on the ship on July 9th?

A.   Not that I recall.

Q.   Okay.  The following day was day three, July 10th, again, the second day the ship is scheduled to be out at sea.  Again, you can check my math if you would like, but according to the sign and sail you would have had 13 alcoholic drinks that day, any reason to dispute the accuracy of that report?

A.   No reason to dispute that.

Page 97

Q.   Okay.  Same question as before:  Do you have any complaints or criticisms about any aspect of your experience on the ship on July the 10th?

A.   Not that I recall.

Q.   So we're going to use both pieces of information on here now.  So on July the 11th the ship is scheduled to be in Montego Bay, as we had talked about before.  And you had told me that you had an excursion planned to go to the Hilton; correct?

A.   Correct.

Q.   Okay.  So what we do know based upon this information is that on July 11th according to the movement details report, you would have got off the ship at 10:28 a.m., any reason to dispute that?

A.   No reason to dispute that.

Q.   And then according to Carnival you would have gotten back on the ship at 4:42 p.m.; is that accurate?

A.   Yes, it looks accurate.

Q.   Did your wife and daughter accompany you to the Hilton?

A.   Yes, they did.

Q.   While you were at the Hilton, did you make any purchases?

Clay Crockett Volume I
November 21, 2024

Page 98

A.   Not that I recall, no.

Q.   Did you have any alcoholic drinks?

A.   I -- I would say, yes, that I did.

Q.   Do you know how many you did?

A.   I do not know that.

Q.   When you came back onto the ship at 4:42 p.m., we have a first charge at the Red Frog Bar at 5:47 p.m.; do you see that there?

A.   On the 11th, yes, I do.

Q.   Okay.  According to Carnival's records you would have had five alcoholic drinks the remainder of that day, does that appear accurate to you?

A.   It does, day and night.  I would notice that it goes through 9:00 p.m., but yes.

Q.   Yes, sir.  Any complaints or criticisms about any aspect of your experience on the ship on July the 11th?

A.   Not that I recall.

Q.   Next day July the 12th, the ship is scheduled to be in Grand Cayman.  I think you told me you were going on a Dolphin excursion that day?

A.   That's correct.

Q.   According to Carnival's records you got off the ship at 8:08 a.m. and you would have returned at 11:47 a.m., does that appear accurate to you?

Page 99

A.   It appears accurate.

Q.   Did you go on that Dolphin excursion as planned?

A.   Yes, I did.

Q.   All right.  According to Carnival's records, you would have had nine alcoholic drinks on the ship on July the 12th, any reason to dispute the accuracy of that report?

A.   No reason to dispute.

Q.   Any complaints at all about any aspect of your experience on the ship on July the 12th?

A.   Not that I recall.

Q.   Next day is day six of the cruise, it's July 13th, the ship is scheduled to be in Cozumel, according to Carnival's records you would have got off the ship at 9:44 a.m. and you would have returned at 2:46 p.m., does that sound right to you?

A.   Yes, that sounds correct.

Q.   You had told me that in Cozumel you also did another one of these all inclusive beach pool type excursions; correct?

A.   Correct.

Q.   While you were there in Cozumel, did you have any alcoholic drinks?

A.   I did.

Page 100

Q.   Do you know how many you had?

A.   I do not.

Q.   Okay.  And then according to Carnival sign and sail on the date of July the 13th you would have had ten alcoholic drinks, any reason to dispute the accuracy of that report?

A.   No.

Q.   Any complaints at all about any aspect of your experience?

A.   Not that I recall.

Q.   So now we're up to day seven of the cruise, it's July the 14th, this is the day of the incident, the ship is scheduled to be at sea all day.  So on that particular day, do you recall your happenings on the ship before the subject incident that you can kind of give me a general overview of what you were doing?

A.   No.  I don't have a good memory of that day.

Q.   Is that something specific as to that day or just in general you don't really remember your mornings and activities aboard the ship?

A.   It is more specific to that day due to the injury.

Q.   So what is the first thing that you do remember about July the 14th, 2023 that you can share

Page 101

with me?

A.   I remember choosing the deck chairs, the spot that we were going to sit down.

Q.   You sat with your wife; correct?

A.   Correct.

Q.   Where was your daughter at the time?

A.   She was with us part of the time and then she was going to the pool and water works area.

Q.   Was she present at the time of this incident?

A.   She was not present.

Q.   Was your wife?

A.   She was.

Q.   Do you know how long you had been sitting in the chair for before this incident occurred?

A.   I don't recall that, no.

Q.   If we look at the sign and sail, what we're able to gather from this, is that there's a first charge at the Cheers Ocean Plaza bar at 9:32 a.m., would you agree?

A.   I would.

Q.   Would this be the bar that accompanies the particular area that you were sitting in or was this in some other location on the ship, to your knowledge?

Page 102

A.   I don't remember the names of each of the bars or necessarily where they're located.

Q.   Okay.  So what I'm trying to do is figure out how long you had been sitting there beforehand.

A.   Okay.

Q.   We know there's a charge at 9:32, and then you see another charge at the coffee shop at 10:33; correct?

A.   Uh-huh.

Q.   And then there's a charge at the Blue Wine bar at 10:47 a.m.; do you see that?

A.   I do.

Q.   Do you know if you had already been sitting, because at that point the next charge isn't until 2:26.  So do you know if you had been -- how long you had been sitting for at the chair after this last charge?  In other words, did you get up from the chair and go get a drink and come sit back down?

A.   I would say that I probably did.  I would feel confident in saying that we were sitting there before 10:47.

Q.   Okay.  But how much sooner in time before 10:47, you couldn't tell me?

A.   Correct.  I could not tell you.

Q.   And what time do you contend this incident

Page 103

occurred?

A.   Approximately 11:30.

Q.   All right.  That then means by the process of elimination that you must have been sitting in that chair for at least close to an hour before the incident?

A.   I would agree with that math.

Q.   Okay.  Why did you choose that particular chair?

A.   I chose that particular chair because it was in the shade and it was available.  Not a whole lot of chairs were available.  I chose it because the crew members put it there and provided it for us to sit on.

Q.   Okay.  Did you get an opportunity to -- I mean, this is going to be a weird question, but it's the circumstance.  When you sat there, did you get an opportunity to look underneath the staircase?

A.   I had no reason to look at the staircase as far as I think you're asking about an inspection.

Q.   Well, I'm not suggesting an inspection.  I guess what I'm getting at is:  Could you tell me anything about the condition of the stairwell before the subject incident that you had noticed?

A.   I can say that if anything looked abnormal,

Page 104

I -- I would have -- I wouldn't have sat there.

Q.   Okay.  In other words, you don't have a specific recollection of the condition of the stairwell, but by virtue of the fact that you had sat there, clearly you didn't notice anything unusual or out of the ordinary, is that what you're saying?

A.   Correct.

Q.   Did you ever hear anybody make any complaints at all about the staircase or stairwell prior to this incident?

A.   No, I didn't hear anybody making any complaints.  And, you know, my -- my understanding is that Carnival would have made it safe.  You know, I was on a ship that they maintain, that they have -- have people to do maintenance on.  My understanding was that they had proper maintenance, that the stairs, the pieces on the stairs wouldn't be loose.

There were no warning signs to tell me not to sit there.  There was no caution tape.  I didn't move the chair there.  A Carnival employee put the chairs there.

We didn't hear any audio announcements to be watching for anything falling or to be careful.  You know, these stairs are out in the open.  They're exposed to wind and rain and sun and, you know,

Page 105

possibly the bolts were rusted.  I wouldn't have any way of knowing any of that.  I trusted Carnival to provide a safe ship for me to be on.  And certainly if I had known that there was a danger, I wouldn't have sat there.

Q.   All right.  So to summarize what you just said, you agree with me that prior to this incident, you did not observe anything visually that would lead you to believe that there was something out of order related to the staircase; correct?

A.   Correct.

MS. GOODMAN:  Objection, you can go ahead and answer.  You can go ahead.

BY MR. DRAHOS:

Q.   Correct?

A.   Correct.

Q.   Nor did you hear anything that would have led you to believe that there was something out of the ordinary with that stairwell?

A.   That's correct.

Q.   Nobody said anything in the area complaining at all about the stairwell prior to the incident?

A.   No.  Nobody said anything about the stairway.

Q.   Do you have any information as you sit here

Clay Crockett Volume I
November 21, 2024

Page 106

today that Carnival had any knowledge about anything unusual about that stairwell prior to this incident?

A.    I have knowledge that this type of incident has happened numerous times on other Carnival ships that stairs have fallen apart and injured their passengers and they continue to allow conditions that allow this to happen again.

Q.    So other than through a conversation with your lawyer, have you done some sort of research or something that has led you to that understanding?

A.    I relied on my attorney for that information.

Q.    I don't want to know anything that you discussed with your lawyer.  Outside of anything that you might have learned from your lawyer, do you know of anything today that should have prompted Carnival to know that there was something wrong with that stairwell prior to the incident?

A.    Can you restate that question?

Q.    Sure.  Outside of anything that you've spoken about with your lawyer, do you have any personal knowledge of anything related to that stairwell that should have put Carnival on notice that this was going to happen prior to this incident?

A.    No, I don't.

Page 107

Q.    So tell me what happened.

A.    So again, you know I expected that Carnival would -- would provide a safe ship, that we would not have a danger of, you know, something falling and hitting me in the head, so we chose to sit there.  We chose to, again, be in the shade where it wasn't too hot.

It was an open place, you know, there people loved to save chairs and obviously there's a lot of people out there and there's not a lot available, and so we chose those just as a place to relax.  We -- at the time that it happened, I was reading my Kindle, so I was looking down and I didn't -- didn't see anything -- you know, I didn't see it falling.

I wasn't able to put my hand up to, you know, block it any kind of way or deflect it, so it fell directly on the crown of my head and my forehead, I had -- immediately after I had what I'll call a goose egg on the top of my head, a large swollen spot and I had an abrasion.

I was actively bleeding from my forehead.  I still have a scar on my forehead today and it led to a host of symptoms that I can tell you about when you're ready.

Q.    Okay.  So let me go back to the original

Page 108

question of what happened.  So I gather from what you just said, you're sitting reading your -- what is the name of the device you said?

A.    Kindle.

Q.    Your Kindle, thank you, when something from up above fell and hit you in the head?

A.    Correct.

Q.    Okay.  So I'm going to hand you what we're going to mark as Composite Exhibit 3.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q.    It's three photographs.  I'm going to hand this to you.  Can you look at those photographs and tell me if you recognize what is depicted there in the photos?

A.    That looks like a staircase on the ship and that looks like a similar setup to -- I don't -- I have no idea of knowing if that's the staircase, because I think there's several that are identical. But yeah, that looks like it could be where I was sitting.

Q.    Right.  That's the first photo, what about the second one?  Do you recognize what's depicted in the second photograph of Composite Exhibit 3?

Page 109

A.    The second photograph is -- yeah, again a depiction of the two -- the chairs that were placed there and where we sat.

Q.    Would you have been sitting in the lounge chair that's directly adjacent to that metal bar there?

A.    To the handrail?

Q.    Yes.

A.    Likely I would have, yes.

Q.    And then if you'll turn your attention to the third photograph?

A.    Okay.

Q.    Do you see there's stuff there on the chair, there's like a yellow maybe cover up of some sort and then a black bag?

A.    I do.

Q.    There's a lady sitting in the chair right next to it, is that lady your wife?

A.    It is.

Q.    That things that are on the chair there, are those hers?

A.    I would say they were our family's.  The yellow cover up likely is my daughters.

Q.    Okay.

A.    And that bag was a bag that we all shared.

Clay Crockett Volume I
November 21, 2024

Page 110

Q. Okay. So if photograph three clearly depicts your wife, does that then help us confirm that indeed that chair that's directly to her right would have been the chair that you were sitting in on the day in question?

A. Yes. I would agree with that.

Q. So does photograph three then truly and accurately depict the area as you recall it on the date in question?

A. Yes, it does.

Q. Okay. Can you approximate for me how far a distance you believe this material had fallen from when it hit you?

A. I would estimate it fell eight feet.

Q. Do you know what caused it to fall?

A. I know the conditions that could have led to it falling.

Q. My question is much more specific. Do you know specifically what caused it to fall in this instance?

A. No.

Q. Okay. Do you know if anyone was walking up or down the stairwell at the time of this incident?

A. The stairwell is a main stairwell from one deck to the other, so I would -- I would imagine that

Page 111

there were people in the stairway at all times of the day.

Q. Specifically at the time of this incident, could you tell me definitively one way or another whether or not somebody was walking up or down that stairwell at the time?

A. No, I don't think I could do that.

Q. Okay. So I'm going to hand you what we'll mark as Exhibit 4 to the deposition.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q. I'm going to represent to you, sir, that this is a photograph that was taken by the ship's security staff immediately following the incident, do you see that portion there that's exposed?

A. I do.

Q. We can call that a kick plate, would you agree?

A. Okay. Yeah, we can call it that.

Q. If Carnival was to represent that this was the piece of material that had fallen, would you have any reason to dispute that?

A. I would not have a reason to dispute that.

Q. And then I'm going to hand you what we'll

Page 112

mark as Exhibit 5.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q. This is a close up picture of the kick plate itself; do you see that there, sir?

A. I do.

Q. If Carnival were to represent that this was the portion that had fallen from the stairwell, would you have any reason to dispute Carnival's position in that regard?

A. I would not.

Q. Do you happen to know how much that kick plate weighs?

A. I would estimate it weighs ten pounds.

Q. Did you do any type of an exam or testing of it of any sort following the incident?

A. No, actually because I think Carnival wanted to conceal, so they took it away immediately and wouldn't let us look at it, touch it, photograph it.

Q. When you say Carnival wanted to conceal, did somebody make a statement to you to that effect or that is just some kind of an impression that you formulated?

A. That was the impression that I formulated.

Page 113

Q. To my point, you never had an opportunity to examine or test this in any way, shape or form?

A. That's correct.

Q. Looking at Exhibit Number 5, could you tell me what portion of the kick plate made contact with your body first?

A. No, I couldn't do that.

Q. All right. What portion of your body did make contact with this kick plate?

A. Again, the crown of my head, my forehead on the left side and I had on my right leg, I had some minor pain, so I know it kind of scraped there as well.

Q. So the crown of your head, the forehead on the left side and your right leg?

A. Uh-huh.

Q. Is that a yes?

A. Yes, that's correct.

Q. Did the kick plate crack, bend or break in any way after it made contact with you?

A. Not to my knowledge.

Q. Okay. So I gather by virtue of the fact that you were looking down, you didn't brace for the impact?

A. That's correct. I was unable to brace for

Clay Crockett Volume I
November 21, 2024

Page 114

the impact or deflect in anyway, move my head or put my arm up. It came full speed.

Q. Did you lose consciousness at any point?

A. I did not lose consciousness totally. My -- immediately after it happened, my ears were ringing, obviously I had a lot of pain -- severe pain and my eyes went dim as if I was about to pass out, but as I sat there and kind of regained my composure, I was able to -- yeah, I didn't pass out.

Q. Okay. So in other words, did you know at all times who you were, where you were and the time of day?

A. No, I wouldn't agree with that.

Q. Was there a point in time where you didn't know who you were?

A. There was not a point in time where I didn't know who I was.

Q. Did there ever come a point in time where you didn't know where you were?

A. I would say yes, I mean, immediately after it happened, I was so stunned, yeah.

Q. So I'm trying to appreciate what you are trying to convey to me. Are you saying that the force of the impact was of such a degree that, you were suddenly unsure of where you were?

Page 115

A. Yes, I would agree with that.

Q. Were you able to recognize your wife?

A. I was.

Q. How long of a period of time did you experience this confusion?

A. I think it was a period of seconds. It came back pretty quickly, fortunately. But that complete disorientation would have lasted certainly less than a minute.

Q. Would you say then that by the time anyone from Carnival arrived to the scene that the disorientation resolved itself?

A. The total disorientation where I, you know, didn't even know where I am, I would say it certainly improved to where I was able to know that I was on a cruise ship.

Q. Other than that you were on a cruise ship, were you able to appreciate anything else about where you were specifically?

A. Yeah. I was able to know that I was on the deck and that oh, something must have just fallen. That's why -- you know, the first instinct was I didn't know why I was hurting. It all happened so fast. You know, what's going on. Then I see the board, oh, okay. This must have fallen and hit me in

Page 116

the head.

Q. Did you vomit at any point in time while you were there sitting?

A. Not while I was sitting, no.

Q. Was there any swelling or bruising on your forehead?

A. Yes, on my forehead I had swelling, I had a cut, I was actively bleeding and had to use a pool towel to stop the bleeding.

Q. Give me a sense of what degree of blood we're talking about here. Was the pool towel soaked with blood to the extent that it was dripping blood or was this just like a scrape that you were just kind of controlling?

A. I was able to control it with the pressure of the towel. The towel was a huge towel of course, but it wasn't soaked, the whole thing wasn't soaked, no.

Q. Where is that towel today, do you know?

A. I don't know, no.

Q. Did you get any blood on your clothing?

A. I don't recall.

Q. Were you wearing a shirt or shirtless at the time?

A. I had -- I don't -- I don't recall. I

Page 117

really don't.

Q. But as you sit here today, you don't have any clothing that has blood on it, do you?

A. I do not.

Q. Did this impact cause you to fall off of the chair or were you able to maintain your position in the chair?

A. I was able to maintain sitting in the chair. I was, you know, laid back, so I was able to maintain my spot there.

Q. Do you know how much time passed between the time of the incident and the time somebody from Carnival first arrived?

A. I don't have an understanding of that.

Q. Were there any other -- strike that. Were there any eyewitnesses to this incident?

A. Yes, my wife was an eyewitness to the incident.

Q. Other than your wife, did anyone else witness it?

A. Yes. Multiple other people on the -- on the ship, you know, or in the general area saw it.

Q. Did you get their names?

A. I didn't have the opportunity to get their

Clay Crockett Volume I
November 21, 2024

Page 118

names, no.

Q.   As you sit here today, you don't know who any of those individuals were?

A.   That's correct.

Q.   So do you know who from Carnival first arrived on scene following the incident?

A.   I believe there's a picture with a name tag in it.  To my recollection that's the first person that came, it was a female.

Q.   Do you know this person's role on the ship?

A.   No.  I don't know that.

Q.   Do you know how many different crew members arrived on scene to assist?

A.   I remember a total of three.  There was somebody with like a light green top on.  I think that would be somebody like in a housekeeping type of role.  Then there were two security guards.

Q.   Okay.  Did any of those crew members make any statements at all about the condition of the stairwell?

A.   No, not that I recall.

Q.   What statements if any do you recall these three individuals making there on the scene?

A.   They didn't make any statements that I'm aware of.

Page 119

Q.   I just want to ask this question in such a way so that I can walk out of here assured that I know the whole story.

A.   Okay.

Q.   So we're calling it statements, I want to make sure that there isn't some discrepancy there.  Do you recall any of those crew members saying anything?

A.   No, not specifically.

Q.   Did you immediately seek medical attention?

A.   I did, yes.

Q.   Why?

A.   Repeat the question.

Q.   Why did you immediately seek medical attention?

A.   Because I was bleeding and hurting.

Q.   Okay.  Did anybody provide medical attention to you there on the scene?

A.   No.

Q.   So did somebody offer or did you request it?

A.   I don't remember that.  I remember a security guard escorting me to the ship's medical clinic, but I don't remember who initiated the trip down there.  I would have -- I would have either asked to go myself or if they said do you need to go,

Page 120

I would have said yes.

Q.   Were you able to leave the scene and travel to the Medical Center on your own power?

A.   I was able to.  I had to hold the wall most of the way and the handrail due to my balance issues and weakness in my legs.

Q.   Let me make sure I understand that.  When you got up from the chair, you're saying that you needed some kind of assistance to be able to travel the deck towards the Medical Center?

A.   Correct.

Q.   Okay.

A.   I specifically remember on the interior of the ship on the way to the infirmary really having, it seemed to get worse as I walked, as I traveled, I remember having to use the wall pretty substantially, though, to not fall over.

Q.   Did anybody need to assist you from your chair on the open deck towards the elevator?

A.   I don't remember if anybody helped me up or not.  I don't remember that.

Q.   Did you have to hold onto anything from the time that you got up from the chair until the time you reached the elevator?

A.   I don't recall if I did or not.

Page 121

Q.   Why didn't your wife go with you?

A.   Because our daughter was still, you know, away at the water park.  Obviously she didn't know what was going on.  And we didn't want her to basically be lost on the ship.

Q.   The water park being the pool?

A.   She was either at yeah, what I think they call the water works or the pool.

Q.   Can you look at picture two of Exhibit 4.  I'm sorry Exhibit 3, picture two?

A.   Yes.

Q.   Do you see down below there that's where the pool area is --

A.   Okay.

Q.   -- is that where your daughter was or was she up there in the water slide area in the top deck?

A.   She was in the water slide area on the top deck.

Q.   Okay.  So are you telling me that at the time you were sitting here, you and your wife did not know specifically where she was in that area or that she was generally there?  I don't follow you.

A.   We gave her permission to be either in the pool area or the water slide area and she was of the age where she could be in those two areas by herself.

Clay Crockett Volume I
November 21, 2024

Page 122

Q.   Did your wife at any point in time locate your daughter, then meet you down at the Medical Center?

A.   No, they didn't.  The other fact to point out is we didn't know how serious this was, at the time we just thought it was a bump on the head and a scrape.  The symptoms got worse as the day went on.

Q.   Okay.  So would you agree with me then that immediately following this incident your wife was not as concerned about this incident that she felt the need to go to the Medical Center?

MS. GOODMAN:  Objection.

BY MR. DRAHOS:

Q.   You can answer.

MS. GOODMAN:  You can answer.  When I object, I'm objecting to the form of the question.  Unless I specifically tell you to not answer, you answer every question.

THE WITNESS:  Okay.  I would answer that and say that my understanding is she wouldn't have been able to go into the Medical Center, I remember it's a locked facility.  You can't just come and go as you want to.  So I would say that --

BY MR. DRAHOS:

Page 123

Q.   Did she make any effort to come down to the Medical Center while you were there?

A.   I'm not aware if she did or not.

Q.   In other words, did anyone tell her she could not come into the Medical Center?

A.   I'm not aware if anybody told her that or not.

Q.   I'm handing you what we'll mark as Exhibit 6.  This is the guest consultation form that guests are asked to fill out.  In looking at this form, is this your handwriting?  Is your handwriting contained on Exhibit 6?

A.   Yes, it is.

Q.   Would you have been the one that filled out your name and street address and phone number?

A.   That's correct.

Q.   You circled 11:33 a.m., is that accurate as to the time that you arrived?

A.   Yes, that is correct.

Q.   You circled hypertension, depression and anxiety; correct?

A.   Correct.

Q.   That section specifically asks do you have any medical problems and you said yes; correct?

A.   Correct.

Page 124

Q.   One of the medical problems that you identified was depression?

A.   Correct.

Q.   Is that your signature down there on the bottom?

A.   Yes, it is.

Q.   Have you seen the medical chart in this case?

A.   No, I haven't that I recall.

Q.   All right.  We'll mark this as Exhibit 7.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q.   I'll hand you a copy.  All right.  So you're welcome to read any portion of this that you want.  I'm going to point to the particular portions of it and ask you to comment on some things.

A.   Okay.

Q.   Page one, there's a triage section; do you see that there?

A.   I do.

Q.   It states there by the nurse who entered the triage, guest walked into Medical Center and stated that something fell on his head; do you see that?

A.   I do.

Page 125

Q.   Would you agree that you walked into the Medical Center on your own power?

A.   I do.

Q.   It says here, by the time you arrived to the Medical Center, did the cut on your head stop bleeding?

A.   I wouldn't agree with that, no.

Q.   So did the nurse get that wrong if she indicates here that you were no longer actively bleeding at the time?

A.   I would have to say yes, she did.

Q.   It says guest feeling dizzy, but alert and awake, no nausea or vomiting, no double vision, is that an accurate assessment of your condition at the time you arrived?

A.   I was alert and awake, I was nauseous, I had not vomited at that point.

Q.   Okay.  So you're stating then that the nurse has made two mistakes, she indicated that the bleeding was no longer active, which you're saying is wrong, and her indication here that you were not experiencing nausea is also wrong?

A.   That's correct.

Q.   Were you experiencing any double vision?

A.   No, I was not.

Clay Crockett Volume I
November 21, 2024

Page 126

Q.   Did you see the ship's doctor while you were there?

A.   I know I did the second time I was there. I'm unsure if I did the first time or not.

Q.   Let me turn your attention to page seven.

A.   Okay.

Q.   This is a note entry that was written by Dr. Murugan --

A.   Okay.

Q.   Which is indicative, at least according to the note of an assessment that was done on you when you came into the Medical Center at 11:30.  So I want to be clear about that, are you saying definitively you did not see a doctor or that you don't recall?

A.   My statement was that I knew that I did the second time I was there.  I was -- I didn't recall if I did or not the first time I was there.

Q.   All right.  If this note was entered in at 12:30, you're not suggesting are you that the doctor fabricated this, are you?

A.   I'm not suggesting that, no.

Q.   Turn to page eight, sir, there's an assessment there, it's a neurological assessment, if it was the opinion of the doctor that you were oriented to person, place and date at the time you

Page 127

were at the Medical Center, would you have any reason to dispute that?

A.   No, I wouldn't.

Q.   Turn your attention to page 14, according to Carnival's note, at 12:50 p.m. you were not complaining of nausea, vomiting or loss of consciousness, is that an accurate assessment of your condition at 12:50 on July the 14th?

A.   I would -- no, I would not agree with that.

Q.   What part of that is wrong?

A.   Again the nausea and the dizziness, I was given a medication for nausea while I was there.

Q.   So in the next entry up there it says guest walked out of medical stable, awake and alert no nausea or dizziness, dressing cleaned and antibiotic cream applied and dry dressing, are you saying that the nurse got that wrong, that you were nauseous?

A.   Yes, I'm stating that I was -- I was nauseous.

Q.   Are you stating that you were dizzy?

A.   I don't recall if I was dizzy when I left the infirmary or not.

Q.   Were you able to walk out on your own power?

A.   I was able to walk out on my own power.

Q.   Are you saying you received anti-nausea

Page 128

medication in the Medical Center during that first visit?

A.   Yes, that's my recollection.

Q.   Do you know what time you left the Medical Center?

A.   I would estimate I was there about an hour.

Q.   According to Carnival's records you were discharged at 12:33 p.m.; does that sound about right to you?

A.   That sounds right.

Q.   If we go back to the -- strike that.
     What did you do when you left the Medical Center?

A.   I went back to the cabin and laid down.

Q.   For how long a period of time?

A.   I would estimate about an hour or so.

Q.   What did you do after that?

A.   We -- I don't recall other than I left the cabin.  I do recall, you know, getting up and trying to as best I was able to enjoy the end of our trip.

Q.   Okay.  So you're welcome to turn your attention to the sign and sail document if you'd like, but according to Carnival's records you would have had an alcoholic drink at the Red Frog Bar at 2:26, at the lobby bar at 4:04, at the lobby bar at

Page 129

4:29, at the Southern bar at 6:18 and then again in your cabin at 7:51.  Any reason to dispute the accuracy of their records?

A.   No.

Q.   Does that help refresh your recollection as to what your activities were at the remainder of the cruise that day?

A.   Somewhat.  It shows where I was.  It doesn't really help me remember the gaps between, you know, where I -- what I did or where I was between those times.

Q.   When is the next time that you saw your wife after you left the Medical Center?

A.   I would -- she was there in the room with me.  It was during that hour.  So my recollection is when that I left the Medical Center, she was still in the area on the deck with the chairs and I told her I was going to go lay down and she accompanied me back to the cabin.

Q.   You would have left the Medical Center, gone back to the chairs and she was still there?

A.   Uh-huh.

Q.   Is that a yes?

A.   That is a yes.

Q.   You would have told her I'm going back to

Clay Crockett Volume I
November 21, 2024

Page 130

the cabin to lay down, and she accompanied you to the cabin?

A. Yes.

Q. Did she stay in the cabin with you the entirety of the time that you were resting?

A. I don't recall.

Q. Was your daughter with you guys?

A. I don't recall that.

Q. Okay.

A. I would add that we would not leave her alone, so I would assume she was there, but I can't recall.

Q. All right. Did your wife accompany you when you went to each of these bars?

A. I don't recall.

Q. Now there came a point in time when you decided to return to the Medical Center?

A. That's correct.

Q. Tell me what was going on that prompted you to do that?

A. So my symptoms were getting worse and knew symptoms were presenting that evening. So I had a headache, you know, basically all day that wasn't going away. I did vomit during the early evening. We did go to dinner. I didn't tolerate that well. I

Page 131

ended up vomiting. I would say the nausea was still there. I was starting to be disoriented and confused and then the weakness that I experienced irritability, you know, just agitation was getting worse and then the sensitivity to light and sound just to the point that I couldn't be around any noise and we determined because my symptoms were getting worst that I need to go back.

Q. So is it your testimony that from the time of the impact until the time of your return to the Medical Center for a second time that your nausea never went away?

A. I would say that the medicine that they gave me in the infirmary helped for a while.

Q. Okay.

A. Whether it just wore off or the symptoms got worse, it came back, but it was gone for a time.

Q. The disorientation that you mentioned, did you leave the Medical Center disoriented the first time?

A. No.

Q. So were you disoriented throughout the day?

A. No.

Q. So at what point in time did the degree of disorientation return?

Page 132

A. In the early evening.

Q. What was it about your senses that led you to be disoriented. Give me an example or describe it for me if you can?

A. Sure. One example was when we were in the cabin together, I was trying to explain the symptoms to my wife, and I started repeating myself.

Q. Repeating how?

A. I was repeating the same, you know, statements to her or I would ask her a question and then a few minutes later I would ask the exact same question with no recollection that I just asked to her just minutes before.

Q. So can you give me an example of something you were repeating specifically?

A. I cannot.

Q. You're just saying you were repeating your symptoms?

A. Yes.

Q. Repeating the symptoms how, like, I'm nauseous, I'm nauseous, I'm nauseous, or I'm confused I'm confused, I'm confused?

A. Again, I can't remember specifics. We weren't talking about, you know, other things unrelated to the cruise and the injury and those kind

Page 133

of things. So I can't be more specific than that.

Q. Did you ever go back to the staircase and examine that stairwell?

A. When I went back up to meet her after the first time I left the infirmary, I did. And I recall that they had the staircase closed at that time and to the best of my recollection the board had been replaced at that point.

Q. Okay. So does that mean then you didn't have an opportunity to examine the particular area?

A. Yeah, they wouldn't let me near it, of course.

Q. Did you take any pictures?

A. I did.

Q. Where are those pictures today?

A. They were submitted as part of the interrogatory.

Q. How many pictures in total did you take?

A. I recall taking two pictures related to the deck, the staircase and specifically one picture of a Carnival crew member holding the board immediately after it happened.

Q. Who took those pictures?

A. To the best of my knowledge, I did.

Q. Why did you take those pictures?

Page 134

A. To document what had happened.

Q. Was that because you were contemplating a lawsuit at that time?

MS. GOODMAN: Objection. You can go ahead and answer.

THE WITNESS: No. I was not contemplating a lawsuit at that time.

BY MR. DRAHOS:

Q. You made a comment about how one of the symptoms that was intensifying was your irritability. What did you mean by that?

A. The sensitivity to light and sound, I have a specific memory of when we were going back to the infirmary we were in a elevator with other people trying to get down, it's on a lower level of the ship and they were talking at what my wife said was a normal volume but my perception of it was that it, you know, was a level where everybody was screaming, it -- you know, even though I consciously knew they weren't screaming, it sounded -- my perception was that it was at a really high volume and it made me have acute anxiety and the irritability would just be a symptom of kind of fight or flight response.

Q. All right. Do you know what time specifically you vomited?

Page 135

A. It was approximately 4:00 p.m.

Q. How do you have that degree of specificity?

A. Because it was a significant event in the sense that to me that seemed as a symptom of an actual brain injury as opposed to after it immediately happened, I was just under the impression that I had a knot and a, you know, a cut on my head but when -- from -- from just, you know, knowledge -- prior knowledge I guess when I think of somebody having a head injury and then they start vomiting, that sounds pretty serious.

Q. Where were you when you vomited?

A. In the cabin.

Q. Did anybody witness that?

A. My wife did.

Q. Was your daughter in the cabin at the time?

A. I don't recall.

Q. What time did you return to the Medical Center?

A. Approximately 7:00 p.m.

Q. Why did you wait so long?

A. The symptoms -- because of the way the symptoms were presenting. They continued to stack on top of each other. More things were happening as the evening went on.

Page 136

Q. So according to Carnival's records, you would have returned at 9:08 p.m., which is a little bit later kind of than what you're saying, do you have any reason to dispute Carnival's description?

A. No, I don't.

Q. And you're welcome to turn your attention to the particular entry, but I'm now focused on page 14.

A. Okay.

Q. This is a summary that was written by a Nurse Marietta Mananggit, M-a-n-a-n-g-g-i-t. According to the nurse, you would have returned at 2108, which is 9:08. You reported that you had vomited, specifically according to the nurse, you were fully oriented to person, place and time, is that accurate or inaccurate?

A. Person place and time. I would say that is accurate.

Q. You were not complaining of any visual difficulties according to the nurse; is that accurate?

A. That's accurate.

Q. Okay. You again, denied any loss of consciousness; is that right?

A. Correct.

Q. The nurse describes the wound on your head

Page 137

as an abrasion on the left forehead, no redness, no swelling, no wound, no bleeding noted on his left forehead, is that accurate or inaccurate description?

A. Inaccurate.

Q. In what sense?

A. There was lots of swelling. It had been bleeding, they already said in their first note that they addressed it and put a bandage on it. That's obviously contradictory.

Q. Were you actively bleeding?

A. I was no longer actively bleeding, no. The skin was not healed.

Q. But you're saying it was still swollen at that time?

A. It was still swollen and she said no wound. There was still a wound there.

Q. Okay. So this particular time you do recall an encounter with the doctor?

A. I do.

Q. What did you tell the doctor your symptoms were?

A. I told him that I was dizzy, that I had vomited, that the pain was not getting any better, the headache, I talked to him about the sensitivity to light and sound and the confusion.

Clay Crockett Volume I
November 21, 2024

Page 138

Q.   All right.  So following this report that you made to the doctor, what recommendation if any did the doctor make to you?

A.   He recommended that I stay for observation since the symptoms seem to be escalating.  He recommended I stay for observation.

Q.   Did you remain in the Medical Center for the remainder of the cruise?

A.   I did overnight, yes.

Q.   Was there a specific recommendation made to you about seeking medical care at the conclusion of the cruise?

A.   Uh-huh.

Q.   What was recommended to you?

A.   He recommended that I leave the ship and go to an ER.

Q.   All right.  You did not agree with that recommendation?

A.   That's correct.

Q.   Nor did you seek medical care following the cruise in that local ER?

A.   In that local ER, I did not.

Q.   Can you turn attention to, it's a Bates stamp, so the lower red numbers, Bates stamp 22.

A.   Okay.

Page 139

Q.   When the doctor made the recommendation that you seek medical care immediately at the conclusion of the cruise and you rejected that, were you asked to sign a form indicating you were acting against the medical advice of the ship's physician?

A.   Yes, I was.

Q.   And is that your signature in the lower left hand corner?

A.   Yes, it is.

Q.   Is your signature indicating that you're not in agreement with seeking medical care at the conclusion of the cruise?

A.   Immediately after the cruise, that's correct.

Q.   Did your symptoms change in any way while you were in the Medical Center that night?

A.   Yes, they did improve slightly.  I didn't vomit anymore.  My level of dizziness seemed to resolve over night.  Some of the -- yeah, just, you know, the acute level of the things that I was dealing with were not as acute.  It was less severe.  I felt like I was a little better the next morning than I had felt certainly when I got to the Medical Center.

Q.   Any complaints or criticisms about any of

Page 140

the medical care that you received on the ship?

A.   Oh, absolutely, yeah, they treated me quite poorly.  The -- the first nurse that I saw, well, they were dismissive number one.  Obviously they've written the -- their answers in a way that they were trying to dismiss what really happened and not accurately document what I -- what I told them and they, you know, just treated the symptoms and I didn't feel that it was, you know, a professional medical environment.  I wasn't pleased with it.

Q.   As it relates to your statement that they were dismissive, did they say something that was dismissive of you or this is just an impression you formulated?

A.   I think it's evidenced by what was written.

Q.   All right.  Well, you haven't looked at the medical chart until today; right?

A.   Right.  So it's really easy to see when you see the words, you know, no wound and the things that I know that I've told them are not reflected there.

Q.   All right.  So at the time that you were in the Medical Center, did you have this feeling that they were being dismissive or is this an opinion that you formulated now following your review of the record?

Page 141

A.   I was -- I think the level of professionalism I immediately, you know, kind of picked up on.  It was not what I would have expected, you know, in what is supposed to be a life saving.  It didn't compare to, you know, other facilities I had been in.  But the dismissiveness was not apparent at the time, no.

Q.   Okay.  And so you've used that term twice I think, the professional environment.  What was it about the environment that led you to believe it was not professional?

A.   They didn't have a lot of equipment.  It was pretty limited on any kind of testing they could do.  Really I was given no testing whatsoever other than, you know, blood pressure and temperature.

Q.   Was there any equipment or testing that they wanted to perform on you that they were not able to do, that they told you about?

A.   I'm not aware of what they would have liked to have done.

Q.   Okay.  So when you say there's no equipment; is there any equipment that you can specifically identify for me here that you're claiming that they should have had available to them?

A.   I remember the doctor saying that they

Page 142

didn't have any imaging equipment onboard.  And that was the reason that he recommended that I go to the ER.

Q.   That would be CT imaging; right?

A.   He just -- I just remember imaging.  I don't know what kind of imaging it might or might not have been.

Q.   Okay.  Any other complaints about your experience in the ship's Medical Center?

A.   No.

Q.   So according to Carnival's records you would have exited or disembarked from the vessel or debarked from the vessel at 9:30 a.m. the following morning; is that --

A.   It sounds correct.

Q.   -- accurate?  You were able to leave on your own power?

A.   I was.

Q.   And again you did not seek medical care there in Galveston; correct?

A.   Correct.

Q.   Did you instead go to Hobby Airport?

A.   I did.

Q.   What time was your flight, you said it was that afternoon?

Page 143

A.   Yeah, I don't remember the exact time.  But it would have been, you know, we booked it in a way that we would have plenty of time to get from the ship to the airport.

Q.   All right.  So I mean, you had spent the evening in the ship's Medical Center; right?

A.   Uh-huh.

Q.   Why didn't you seek medical care as soon as you got off the ship?

A.   The -- I knew that I could get medical care when I got back home.  The injury had already happened.  I wasn't getting any worse.  You know, my symptoms weren't getting any worse and just to not further disrupt, you know, the trip and we weighed all the, you know, as best we could we weighed the pros and cons and decided that I could go home and get medical care with the people that I was already familiar with.

Q.   Okay.  So is what you're telling me that you were not concerned enough about your own condition at the time you got off the ship to immediately seek medical care, you thought you could wait and do it when you got home?

MS. GOODMAN:  Objection, you can go ahead and answer.

Page 144

THE WITNESS:  Yes, that's correct.

BY MR. DRAHOS:

Q.   Did you make that flight, the afternoon flight?

A.   I did.

Q.   Was it a direct back to the airport?

A.   Yes, it was a direct flight.

Q.   When you got -- when you landed in Tennessee, did you seek medical care that day?

A.   I immediately scheduled an appointment with my primary care doctor for the next available.

Q.   The answer is no, you did not seek medical care that day?

A.   Correct.

Q.   Why not?

A.   Same answer as before.  The damage was already done.  I wasn't actively bleeding or I didn't see that it was an emergency situation in the sense that anything would change if I immediately went to the ER.

Q.   So according to our records you would have landed in Tennessee on the 15th, your appointment at the Jackson Clinic was on the 18th; is that accurate?

A.   If that's what the medical records say, yeah, I don't disagree with that.

Page 145

Q.   There was a period then of four days where you did not seek any medical care at all?

A.   That's correct.

Q.   Why not?

A.   Because the injury had already happened.  My symptoms were the same, not getting any worse.  And so I didn't -- didn't need to go to an extra level of care at that point.

Q.   So your symptoms weren't getting any worse, were they getting any better?

A.   Some of them were and some were not.

Q.   Okay.  What had gotten better?

A.   So the headache went from a constant headache to one that could be controlled better with over-the-counter medicine.  It would come back quickly, but it would be controlled and then the nausea improved somewhat.  It was retriggered by certain things, such as, you know, being out in the heat and, you know, physical exertion but those were steps in the right direction from the sense that they weren't constant anymore.

Q.   Okay.  So when you got on the plane in Texas, were you still nauseous?

A.   I would say at that point it was being controlled by the medication that they gave me on the

Page 146

ship.

Q.   Okay.  When did your nausea next return, if at all?

A.   Yeah, so it came and went for, you know, a period of months.  But it was --

Q.   I don't mean to cut you off.  But just to make sure you answer the question I'm intending, I'm talking about the time frame between 7/15 and 7/18.  So as I understand it you're saying you were not nauseous when you got on the plane because you were under the influence of the medication; right?

A.   Yes, correct.

Q.   At any point between 7/15 and 7/18 did your nausea return?

A.   Yes.

Q.   On 7/15?

A.   I don't recall the specific day or time at this point.  I remember that during that period it would come back and I would take the medicine that they prescribed to me and it would resolve for a period of time.

Q.   When you got on the plane in Texas, did you have a headache?

A.   I don't recall if I did or not at that point.

Page 147

Q.   Okay.  Is it your testimony that at some time between 7/15 and 7/18 your headaches returned?

A.   It's my testimony that they never left, but that they would come and go and were somewhat controlled or somewhat helped by over-the-counter Ibuprofen and Tylenol, those kind of things.

Q.   Other than nausea and headaches, any other symptoms that you experienced between 7/15 and 7/18?

A.   Yeah, I continued to have the sensitivity to light and sound, the --

Q.   What does that mean exactly?

A.   So it means that when I'm in a situation where there is a loud sound for example, whether it's a loud group of people talking or a loud piece of machinery, it gives me a sense of panic.

It feels like being overwhelmed and that was something that never -- I had never experienced before the cruise.  I was routinely around, you know, lots of groups of people.  We, you know, went to -- you know, we had friends that we were with.  We went to church.  You know, all these just various things of life and none of those were a problem before the cruise and then when I get back, you know, for example with church we would go and I would -- the first time we went I remember as it was letting out

Page 148

and you've got a big group of people kind of standing in the lobby chatting, that level of sound, which would have been just normal and I wouldn't have even thought twice about it before, it gives this flight or -- fight or flight response and this, you know, level of kind of panic where I can't handle it, I can't be around it.  And so I have to remove myself from the situation to, you know, to make it better to get away from it.

Q.   So this sensitivity to light and sound was going on between 7/15 and 7/18?

A.   If it were a situation that would have triggered it, yes.

Q.   Any other symptoms between this time frame of 7/15 to 7/18?

A.   Again, the memory loss was becoming apparent at that point.  The dizziness, the headaches.

Q.   When you say memory loss, can you give me some specifics?

A.   Sure.  Specifics, I'll kind of fast forward today to give you --

Q.   I'm more interested in the 7/15 to 7/18 time frame.

A.   Sure.  I was unable to really form short-term memory.  So, you know, conversation

Page 149

that -- that I had with my wife, you know, for example, I may have forgotten parts of that.

Q.   Is there a specific conversation that you can recall having this issue?

A.   Not between those two dates, no.

Q.   Okay.  So you said short-term memory conversations with your wife, any other type of memory loss that you can describe for me going on between 7/15 and 7/18?

A.   I had to take off of work because I wasn't able to function at a level to be able to actually work and do my job at the level I had always -- had been able to.  I couldn't keep up with the task that I needed to do.

(Thereupon, there was a brief recess.)

BY MR. DRAHOS:

Q.   You were telling me that you had to take off work because you could not function; correct?

A.   Not to full capacity, that's right.

Q.   All right.  Looking at the calendar, the 15th was a Friday and the appointment that you made was the 18th a Monday, so you took off work to go to the medical appointment --

A.   Yeah --

Q.   -- right?

Clay Crockett Volume I
November 21, 2024

Page 150

A.   -- and following, yes.

Q.   During that medical appointment on the 18th, they took a CAT scan of your head; right?

A.   Correct.

Q.   It came back normal; correct?

A.   I was diagnosed with a concussion.

Q.   Let me hand you this.  We don't need to mark this as exhibit, you're welcome to look at it.  Did they go over the findings with you?  Actually, let's just mark it.  We'll make it 8.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q.   So I'm looking at page two.  It says impression, negative head CT; right?

A.   I see that written.

Q.   Did the clinicians at Jackson explain to you that there was nothing anatomically wrong with your head on this CT image?

A.   Not that I recall, no.

Q.   Is this the first time you're hearing this?

A.   Yes.

Q.   Now you returned to the Jackson Clinic on July 24th according to their records; is that accurate?

Page 151

A.   That's accurate.

Q.   Did you go anywhere for medical care between the time of July 18th until this return visit on the 24th?

A.   No.

Q.   During that particular visit you met with Dr. Myatt; right?

A.   The second visit I did.  The first visit on the 18th was with the nurse practitioner that was available for the appointment.

Q.   Okay.  Let me hand you what we'll mark as Exhibit 9.  This is that medical record dated July the 24th.  And I want to go through some of the notes that Dr. Myatt wrote in here.

A.   Okay.

Q.   Now it indicates here, it says that Mr. Crockett is here for an annual wellness visit; do you see that?

A.   Uh-huh.

Q.   Were you coming in on July the 24th for a scheduled wellness visit?

A.   I was.  That was prescheduled --

Q.   Okay.

A.   -- before the incident occurred and when I had the first appointment on the 18th and then we got

Page 152

the CT done, she saw my records that I was already going to be coming back on the 24th, and she said great.  That would be a great time to follow up.

Q.   And third paragraph down under the history of present illness, it says he drinks alcohol, he's working on quitting drinking, he has reached out to a therapist and a psychiatrist.  Do you know what psychiatrist is being referenced there?

A.   I don't.

Q.   It says here he has been encouraged to get lab testing to see what medicines for anxiety would work better for him based on his genetics.  Who was it that was giving you these comments about medicines working better because of your genetics?

A.   I remember asking him about that because it was something that I had heard that there was testing for.  And I just asked the question hey, do you guys, you know, offer that.  I just understood from, you know, conversations with other nonmedical people, friends or whatever, that was a new thing.  And so I asked him about it and he said that the Jackson Clinic was not offering that yet.  That he was aware of it, I think.

Q.   Going back to this.  Is the doctor wrong, did you not reach out to a therapist and psychiatrist

Page 153

or you did and you just don't remember who you reached out to?

A.   I do not remember reaching out to a psychiatrist.  I do not know who he is speaking about there.

Q.   The therapist he's referring to, is that Mr. O'Connor?

A.   No, that would have been the Better Help online solution we talked about.

Q.   And then next paragraph, second sentence, he had an evaluation last week and CT was reassuring; do you see that there?

A.   Let me get there, yes.

Q.   So did Dr. Myatt give you some degree of reassurance on July the 24th that the CT did not show any evidence of an abnormality?

A.   No, he didn't.  I don't recall that he said it didn't have abnormality.

Q.   Okay.

A.   I do remember that we talked at length about concussions.

Q.   Okay.  It's your testimony that Dr. Myatt was under the impression that you had a concussion?

A.   That is my testimony, yes.

Q.   So you would have went to see a Dr.

Clay Crockett Volume I
November 21, 2024

Page 154

Sumathira, I'm just going to spell it, first name S-u-m-a-t-h-i-r-a, Second last name S-a-t-h-a-n-a-d-a-n.  Do you recall that doctor?

A.   I do.

Q.   He's a neurologist?

A.   She was a neurologist that I was referred to by Dr. Myatt, yes.

Q.   Okay.  And you saw that neurologist on August 14th; correct?

A.   That's correct.

Q.   So between the time of your last visit at the Jackson Clinic and August 14th, did you see any other medical providers?

A.   Not that I recall.

Q.   Why not?

A.   Dr. Myatt had given me the more medication to treat the nausea that I was still dealing with, encouraged me that doing the over-the-counter pain medicine was fine to continue doing, referred me to the neurologist and said that I would be -- I would be fine to -- as long as symptoms didn't get worse or new symptoms present, that I would be fine to wait and see her at that point in August.

Q.   Okay.  So during this particular visit with the neurologist on August 14th, did she evaluate the

Page 155

head CT with you?

A.   I don't recall that, you know, she pulled it up and we looked at it together.  I'm sure it was part of my records, I'm sure she reviewed it at some point.  I don't recall us looking at it together.

Q.   So if according to Dr. Sam on August 14th, she indicates in her notes that she reviewed the head CT it showed no acute abnormality, are you saying she did not convey that to you during this visit on August 14th?

A.   I don't recall her conveying that.  I do recall her recommending that I get an MRI.

Q.   Okay.  Where did you get the MRI done?

A.   I got it done at the Jackson General Hospital north campus.

Q.   When did you have that done?

A.   It would be in the records.  It was as soon as we could schedule it after my visit with her.

Q.   Okay.  I have it here.  Did Dr. Sam tell you that there was anything abnormal on the MRI?

A.   She said that the MRI looked good, I think was the word I remember her using that she cleared me medically after the MRI.  She did give me -- we talked about the memory loss specifically.  I remember her saying that that, you know, the severity

Page 156

of that and how long it last and if it's permanent or not just varies by patient.  You just -- you don't know exactly what -- how that's going to look.

Q.   Was this discussion had during the first or second visit with Dr. Sam?

A.   It would have been the second visit after the test results were in.

(Thereupon, the document was marked for I.D.)

BY MR. DRAHOS:

Q.   I'm going to hand you what we'll mark as Exhibit 10.  This is your second visit with Dr. Sam --

A.   Okay.

Q.   -- dated November 29, 2023.  Did you ever see her after this visit?

A.   No, I did not.  She released me after this visit.

Q.   Did you have any other medical care with any other providers between the time of August 14th when you first saw Dr. Sam and November 29th when you saw her a second time?

A.   We'd have to refer to my medical records for that.  I don't recall.

Q.   Who else would you have seen if anyone?

Page 157

A.   I don't recall.

Q.   Are there any other doctors who you can identify having seen for injuries related to this incident other than Dr. Sam and the Jackson Clinic?

A.   During that time frame, no.

Q.   How about up until the present day?

A.   This week I have met with a doctor from Ethos Health Group.

Q.   E-t-h-o-s?

A.   Uh-huh.

Q.   Health Group?

A.   Uh-huh.

Q.   What's the doctor's name?

A.   I don't recall her name.  We met by -- yeah, I don't recall her name.

Q.   You said met by and then you paused?

A.   We met by -- virtually on Monday.  That was the first interaction I had with her.  I just -- I don't remember her name.

Q.   What kind of doctor was this?

A.   She is a nurse practitioner.

Q.   And what was the point of the visit?

MS. GOODMAN:  I'm going to jump in.  This was for a medical examination that we sent him to, my office.

Clay Crockett Volume I
November 21, 2024

Page 158

BY MR. DRAHOS:

Q.   It's a virtual exam.  You said you met her virtually on Monday?

A.   I think just the initial consult of going over the symptoms.

Q.   Are you invoking some kind of a work product or attorney/client privilege over this?

MS. GOODMAN:  Potentially we're deciding whether or not to use them as an expert in the case.  You're also sending him to be evaluated by your medical expert.  To the extent that he remembers, he's already testified about the name of the facility.  He doesn't recall the provider or the provider's name.

BY MR. DRAHOS:

Q.   He said he was at Ethos Health Group with a nurse practitioner and it was a virtual conference on Monday; right?

A.   Correct.

Q.   Okay.  So I don't want you to tell me anything that you may have discussed with your attorneys about this visit, but what did you discuss with the healthcare provider?

A.   Just my symptoms.  You know, what happened, the level of symptoms, what am I dealing with.  Both

Page 159

during -- you know, immediately after the incident and then also through present day.

Q.   How long was the visit for?

A.   Approximately 30 minutes.

Q.   Do you have any follow-up visits scheduled?

A.   I do.

Q.   When is the next visit?

A.   The next visit is scheduled for tomorrow.

Q.   Are you seeing the same nurse practitioner?

A.   I am not aware of who I am seeing next.

Q.   Okay.  What is tomorrow's visit for?

A.   I don't know that either.  Just the next steps, I would assume.

Q.   Where are you going?

A.   It's TeleMed as well.

Q.   You have a Telemedicine visit tomorrow and you don't know why?

A.   Correct.  I know why.  I don't know what we're specifically going to talk about.  I know that we're trying to understand more about the injury.

Q.   So you're seeing the same person?

A.   I don't know who I'm seeing tomorrow.

Q.   And you said this was also a virtual visit?

A.   Correct.

Q.   Do you have any other pending medical

Page 160

appointments?

A.   I have a pending medical appointment with the doctor that you have --

Q.   My doctor?

A.   -- your side has me going to.  Yeah, that's tomorrow.

Q.   Any others?

A.   None pending right now.

Q.   So you had a visit with a nurse practitioner virtually, you don't know what this person's qualifications or specialty is?

A.   Correct.

Q.   Did you talk about your symptoms?

A.   Uh-huh.

Q.   Did this person give you a diagnosis?

A.   No, not to my knowledge.

Q.   What's your understanding for why a second visit is scheduled with this person?

A.   My understanding --

MS. GOODMAN:  Objection, you can go ahead and answer.

THE WITNESS:  My understanding is just to establish what next.

BY MR. DRAHOS:

Q.   Establish what next?

Page 161

A.   Next steps.

Q.   In what sense?  What next steps in your treatment?

MS. GOODMAN:  Objection.

THE WITNESS:  Yes, in my treatment.  Or to begin treatment.

BY MR. DRAHOS:

Q.   And you can't tell me if this person is a mental health or medical practitioner?

A.   I mean, again we're dealing with memory loss, so no I can't.

Q.   You're saying you don't remember?

A.   I don't remember.

Q.   Somebody told you who this person was and you don't remember, is that what you're saying?

A.   That's what I'm saying; that's correct.

Q.   Did I give it to you already, Exhibit 10?

A.   Yeah, 10.

Q.   This is a note from Dr. Sam dated November the 29th.  This would have been for your follow-up visit; correct?

A.   Yes, that's correct.

Q.   Have you ever seen this before?

A.   I have not.

Q.   Dr. Sam's first paragraph, this 41-year-old

Clay Crockett Volume I
November 21, 2024

Page 162

patient was initially seen by me on August 14, 2023, for post concussive syndrome.  He was experiencing headaches, nausea, vomiting and irritable mood with subjective feeling of fogging of his thoughts, but no findings for any significant cognitive impairment. On the mini mental status exam, which he scored as a 29 out of 30; do you see that?

A.   I do.

Q.   Did the doctor tell you that you had scored a 29 out of 30 on your mini mental status exam?

A.   She did.  She did, yes.

Q.   Did the doctor tell you that you had no findings of any significant cognitive impairment?

A.   I don't remember those words specifically.

Q.   Did she say it generally?

A.   I remember us talking about the score and I remember, you know, her saying that I didn't need to come back, that there wouldn't really be anything extra we could do.  That some of it would be -- would be see how it resolved over time.

Q.   Okay.  The next paragraph down, it says patient has completed a brain MRI without contrast on 9/8/2023 which shows no acute intercranial abnormality scar tissue or lyosis.  (Phonetic).
        Did you have a discussion with Dr. Sam about

Page 163

the MRI findings?

A.   Yes.

Q.   Did she tell you that it was normal?

A.   She did.

Q.   It says here patient has kept a diary of his symptoms and feels he is doing well overall with resolution of headaches to the point that he stopped taking the Depakote.  Where is that diary?

A.   She scanned it and put it into my records there in the clinic.

Q.   Dr. Sam did?

A.   She did.

Q.   Are you keeping a diary of symptoms going forward?

A.   I'm not.

Q.   Is Dr. Sam right, did you tell her on November 29th that you felt like you were doing well overall with resolution of the headaches to the point you weren't taking medication anymore?

A.   Yes, I agree that the headaches had improved from nearly constant to a much more tolerable, you know, than it was level.

Q.   Okay.  Dr. Sam described it as an overall resolution of the headache; is she accurate or inaccurate?

Page 164

A.   I would say that's inaccurate.

Q.   How would you describe it?

A.   I would describe that I have more headaches now than I used to.  I think what she was referring to there would be the constant head pain that, you know, it was 24 hours a day for a period of time.

Q.   Well, according to Dr. Sam, you told her that you were no longer taking medication, have you since returned to taking medication or does that still remain the case?

A.   So the Depakote is what she's referring there.  That was a -- that was not a medication to prevent or treat headaches.  It was more of a -- I think it was supposed to just help with overall healing maybe.  I'm not sure what it was -- I don't remember what it was for.

Q.   All right.  Are you taking any prescription medications fore headaches today?

A.   No.

Q.   She indicates here he still feels like his cognitive function is not 100 percent back to baseline and apparently his wife has also mentioned the same.  Has your wife ever spoken to Dr. Sam?

A.   Yeah, she was there at the first appointment with me.  She was there.

Page 165

Q.   But she was not on this return visit?

A.   To my knowledge she was not there during the second one.

Q.   Dr. Sam says however he did well on the mini mental testing with me; do you see that there?

A.   I do.

Q.   When you said to her I don't feel like my cognitive functioning is back to 100 percent, did she respond to you and say, yeah but you did well on the mini mental test with me?

A.   I would agree with that, but I think the mini mental test and real life are two different things.

Q.   What do you mean?

A.   I remember she gave me like five words, you know, she said hey, remember these five words and then we -- you know, there was only a period of like 30 seconds and then she said okay, what were the five words?  And I said them back to her.  You know, that's very different from my day-to-day life, of actually needing to remember complex situations for longer than 30 seconds.

Q.   All right.  Tell me whether or not I've accurately summarized this encounter with Dr. Sam.

A.   Okay.

Clay Crockett Volume I
November 21, 2024

Page 166

Q.  Did she tell you during this follow-up visit, we've done an MRI on you and it shows no abnormality.  You tested well on my test.  I don't see any evidence of cognitive impairment here?

A.  I agree with the first two things you said.  I don't remember her saying I don't see evidence of a cognitive impairment.  I don't remember that.

Q.  Did she tell you that any testing she was able to perform was indicative of any type of cognitive impairment?

A.  No, not that I remember.

Q.  During this visit, did you ask her about DTI imaging?

A.  Yes, I mentioned -- I did mention it.  I see she wrote it here and I don't disagree with that.

Q.  We talked about this earlier, you have no medical training; correct?

A.  Correct.

Q.  How did you know about DTI imaging?

A.  I had really Googled, you know, like everybody does I guess just, you know, imaging for concussions and had seen that pop up.  And I just said, is that -- is that what I had.  Did I have a DTI MRI?  And she said no.

Q.  That's not what it says here.  It says he

Page 167

asked about having a DTI MRI --

A.  Right.  And so I was --

Q.  -- you were requesting it of her?

A.  Yeah, and I went on to ask her, if that's not what I had, is that a possibility?

Q.  How often have you Googled information like this?

MS. GOODMAN:  Objection.

THE WITNESS:  Yeah, like what?

BY MR. DRAHOS:

Q.  Since the time of the subject cruise, have you been doing Google searches on brain injuries?

A.  I remember looking at that at one point.  It's not an ongoing search.

Q.  Yes, you have done Google searches on brain injuries since the time of this incident?

A.  Yes.

Q.  Particularly you looked up DTI imaging?

A.  No, I didn't go seeking DTI imaging.  I just looked up concussion, brain injury and that was a result that popped up, it said it can be good imaging for that kind of an injury.

Q.  Did you read anything adverse to the reliability of DTI imaging?

A.  Not that I recall.

Page 168

Q.  Did you look up DTI imaging in its relationship in litigation?

A.  No.

Q.  What did Dr. Sam say to you when you suggested DTI imaging?

A.  She said that it wasn't available there at their facility.  I believe she even said that that machine -- that kind of machine is not at Jackson, it would be something I would need to go to another city for.

Q.  Well, didn't she tell you that she didn't believe it was required?

MS. GOODMAN:  Objection.

THE WITNESS:  Yeah, I think that she said that it would not be needed in this case.

BY MR. DRAHOS:

Q.  Have you since that visit gone for any DTI imaging?

A.  I went -- yes, for a DTI imaging this week.

Q.  Where was the imaging done?

A.  Here in Miami.  The clinic is called Stand Up MRI.

Q.  All right.  So this visit that you had with Dr. Sam was in November of 2023; correct?

A.  Correct.

Page 169

Q.  And she told you in November of 2023 that it wasn't required; correct?

MS. GOODMAN:  Objection.

THE WITNESS:  Correct.

BY MR. DRAHOS:

Q.  And you waited a year to ultimately go for this testing?

A.  I have researched the testing independently after my meeting with her.  I actually looked at going to a neurologist in Nashville, in Vanderbilt, which she mentioned here.  And it was going to be a three plus month wait for a first appointment and so I didn't follow through with it.

Q.  You never went to Vanderbilt, though, did you?

A.  Correct, I did not.

Q.  Instead you decided to go to Stand Up MRI here in Miami?

A.  Correct.

Q.  Other than Stand Up MRI, have you done testing anywhere else of any degree or nature?

A.  This week I did testing at -- related to Ethos at a clinic they asked me to go to.

MS. GOODMAN:  Again, this is a clinic that you were sent to by Hickey law firm.  And we will

Clay Crockett Volume I
November 21, 2024

Page 170

disclose experts in compliance with the Court's scheduling order, experts who will be testifying at trial.

MR. DRAHOS: So are you instructing him not to answer? I didn't ask the question. I was going to ask him what clinic did he go to? Are you telling him not to answer?

MS. GOODMAN: He answered. He said Ethos. The clinic that he went to was Ethos.

BY MR. DRAHOS:

Q. What testing was done there?

A. It was testing about balance, about my vision and about my sense of smell.

Q. Who did the testing?

A. Dr. Martinez I believe his name was.

Q. What kind of doctor is Dr. Martinez?

A. I'm not sure.

Q. How long was the testing for?

A. It was approximately an hour, an hour to hour and a half.

Q. Okay. So for the hour to hour and a half you did testing on your balance, vision and smell, any other kind of testing done on you?

A. And then my reflexes, you know, just how quickly I could react to instructions based on the

Page 171

computer.

Q. Have you done any type of written test of any sort?

A. Written test? And then I forgot to mention there was an ECG or EEG done at that time. But no, there was no paper -- paper written test.

Q. Have we covered the extent of all tests that were performed on you since the time of your last visit with Dr. Sam on November the 29th up until the present day?

A. Yes.

Q. Do you have any other tests scheduled?

A. Outside of what we discussed with your doctor tomorrow, no.

Q. Okay. So just give me a summary of what symptoms you contend you're continuing to suffer from today.

A. Sure. Do you want details or just --

Q. You can answer it however you would like to.

A. Okay. Today I'm continuing to have headaches, more than I did before the incident, about three times a week. I continue to have the sensitivity to light and sound and again, you know, I can't be as active as I was.

I have to, you know, avoid crowds and really

Page 172

make sure I'm -- that I have an escape plan so to speak with those kind of situations and the -- the memory loss continues to be a challenge, short-term memory loss specifically, somewhat long-term but the memory loss where I have a meeting with a coworker and we talk about something and two days later I can't even remember that we had a meeting.

Not only, you know, can I not remember what we talked about, I mean, there's a hole in my memory of the entire meeting that's unlike before. Before I would, you know, have a meeting and might make notes to cover the details but days, weeks, months later, I could give somebody a general summary of, yeah, we had that discussion, here were the, you know, the things that we talked about.

Now I have to rely heavily on making lots of notes, thorough notes. I have to put everything on the calendar or it will be forgotten, my wife has shared with me that the memory problems are such an issue she can't rely on me to do things, you know, that I say I'm going to do unless she reminds me repeatedly.

If I say, I'm going -- yeah, I'll pick our daughter up, I'll pick Hannah up from school today. I may forget it, I may not show up, so she has to

Page 173

remind, hey, you're still going to pick her up today, right, is that still going to work? Those were things that she took, you know, she was able to take for granted before the incident.

If I said -- at 8:00 in the morning I said, yeah, I'll get Hannah from school today, she didn't have to wonder if it was going to happen or not. The depression that we talked about earlier that had went away and, you know, has come back because of this having to isolate and not being around people as much and all of it together how it makes me feel. I continue not to feel like myself. My just ability for problem solving is a challenge. I struggle to find words and convey what I'm thinking just all of the time and these are things that I didn't have any problem with before -- before the incident.

Q. Have you been on any vacations since the subject cruise?

A. I have.

Q. How many vacations have you been on?

A. I remember two specifically.

Q. Okay.

A. In January of this year we went to Savannah, Georgia and then in June we went to Utah and Arizona.

Q. Okay. Do you have any vacations planned?

Clay Crockett Volume I
November 21, 2024

Page 174

A.   No.

Q.   Did you go to Montana to see the Eclipse?

A.   No, no, we didn't go to Montana.  I've never been to Montana.

Q.   Maybe it's Missouri, Poplar Bluff.

A.   We did go to Missouri to see the Eclipse, yeah, that's right.

Q.   You went to Poplar, P-o-p-l-a-r, Bluff Missouri to see the Eclipse?

A.   That's correct.  We kind of treated it as a science trip for my daughter, it's a day drive, it was not an overnight, it wasn't a vacation.

Q.   That was in April of 2024?

A.   Yes, that would be accurate.

Q.   Did you say you have a vacations planned or you're not sure yet?

A.   I don't have any planned.

Q.   Okay.  How many days were you in Utah?

A.   Approximately five.

Q.   You said Utah and there was another state I thought I heard you mention during that trip?

A.   Arizona, then we flew into -- flew in and out of Las Vegas.

Q.   How long was that trip in total?

A.   When I said five days.  It was five days in

Page 175

total.

Q.   Five days for the whole thing?

A.   Uh-huh.  We were kind of on the border between Utah and Arizona.

Q.   Did we cover the extent of all symptoms that you're currently suffering today?  I want to make sure I give you a chance to tell me everything.

A.   Let me go back over what I said.

Q.   Okay.

A.   I think we have.

MR. DRAHOS:  Okay.  Those are all of the questions I have.  Thank you, sir.

CROSS-EXAMINATION

BY MS. GOODMAN:

Q.   I have some follow-up questions.  Do you need a break, or can we keep going?

THE COURT REPORTER:  I don't need a break.

BY MS. GOODMAN:

Q.   Let's push through.  Just to clarify before the incident were you -- when I say the incident, again, I mean the incident onboard the Carnival ship on July 14, 2023.  So before the incident, were you experiencing any headaches?

A.   No.  Not with any regularity.  I was not.

Q.   As human beings sometimes on occasion we

Page 176

have headaches?

A.   Right.

Q.   Maybe if a headache was bad you would take like a Tylenol or an Advil for it?

A.   Correct.

Q.   But nothing that required a prescription?

A.   Correct.

Q.   And before the incident you never sustained any head injuries; right?

A.   That's correct.

Q.   Before the incident you were dealing with depression; right?

A.   At times, yeah, it was, you know, ten years ago and then I had, you know, another bout with it but immediately before and for a period of, you know, two plus years, I was not dealing depression.

Q.   On July 8, 2023, were you dealing with depression?  That's the day that you boarded the cruise, just for reference.

A.   Thank you.  I'm trying to remember what year you said, no, I was not dealing with depression on that day.

Q.   And looking back at Exhibit 6 the document that you filled out in the medical infirmary, you circled that you -- it says do you have any medical

Page 177

problems you say yes, please circle any conditions you have.  You circled depression and anxiety in one circle.  Were you at that time experiencing depression or is that something you circled because you had experienced it in the past?

A.   I had dealt with it in the past.  I was not dealing with it at that point.  At the time I was in a lot of pain.  I might have only meant to circle anxiety as well.

Q.   Could you -- well, strike that.

Are you dealing with depression now since the incident?

A.   Yes.

Q.   Could you be able to differentiate the depression you were experiencing before the incident versus after the incident?

A.   Yeah, sure.  The depression before the incident was what I call situational in nature in that the first time I had it was after a death of a relative and, you know, the other time was a time -- was just at a really dark time season of just a lot of things not going right in life, so to speak but again all of that had resolved and this recent incident, which I'll say kind of started during 2024 has been because of change of lifestyle that I've had

Clay Crockett Volume I
November 21, 2024

Page 178

to -- had to do because of the injury.  I'm again not as outgoing, I'm not able to do the things that I enjoyed in the past.  And it's really centered around that.  And just constantly not feeling good leads me to it.

Q.    You were shown a bunch of your medical records Exhibit 7, 8, 9 and 10, you have those in front of you?

A.    I do.

Q.    Just generally do you write your own medical records?

A.    I do not.

Q.    Does somebody else write your medical records?

A.    They do.

Q.    Once the medical records are written, do they give them to you to check to make sure they're accurate?

A.    No, they do not.

Q.    Did you check your medical records to see if they were all accurate before you sat here today?

A.    No, I didn't.

Q.    I looked up one of the medications that you were given onboard the Carnival trip Ondanestron, O-n-d-a-n-s-e-t-r-o-n is a medication for nausea and

Page 179

vomiting.  That's one of the medications that was administered by the Carnival infirmary to you?

A.    Yes, I remember that.

Q.    And then did you keep taking that medication after?

A.    I did.  They sent me home with a bottle, so I wouldn't run out and then my -- when I met with the first person Whitney Wright in Jackson on the 18th, she renewed that prescription or made a new prescription for the same thing.

Q.    When you say they sent me home with a bottle, do you mean the crew members in Carnival's infirmary onboard the ship?

A.    Yes.

Q.    So Carnival's crew members onboard the ship sent you home with a bottle of medication to prevent nausea and vomiting; right?

A.    That's correct.

Q.    Okay.  And then you would have taken that medication throughout the day on the 15th when you got off the ship, on the Saturday, July 16th, Sunday, July 17th and then you had your appointment on Monday July 18, 2023; right?

A.    That's correct.

Q.    You were discharged from the Carnival

Page 180

infirmary onboard the ship on July 15th, the same day that you disembarked the ship; right?

A.    That's correct.

Q.    Turning to Exhibit 10 the record from Dr. Sam, you were asked questions about the DTI MRI here it says I do not believe this is required at this time, but if the patient feels that he is still having cognitive issues six months from now, he can consider referral to Vanderbilt University for further evaluation.  Do you see that?

A.    I do.

Q.    It does not say that the doctor did not think that a DTI MRI was not required at anytime; right?

A.    That's correct.

Q.    It was just at this time?

A.    That's correct.

Q.    But if you were still dealing with issues six months from now, she would provide a referral?

A.    That's right.

Q.    You were asked some questions about I guess the fact that you had treatment on July 15, 2023, and the next time you get treatment was July 18, 2023, basically from Friday to Monday, you didn't have treatment the Saturday or Sunday; right?

Page 181

A.    Correct, yes, I had it as soon as I could.

Q.    But it's not that you didn't think your injury was serious enough; right?

A.    That's correct.  I knew it was a serious injury.  I just got the first available appointment.

Q.    You were managing your symptoms with the medication that Carnival's crew members from onboard the ship had given you?

MR. DRAHOS:  Object to form.

THE WITNESS:  That's right.

BY MS. GOODMAN:

Q.    So let's -- before we do that.  You were asked questions about loss of consciousness, do you recall that?

A.    I do recall those questions.

Q.    When you're asked questions about loss of consciousness, does somebody explain that loss of consciousness can include you being awake but you not being present?  You don't necessarily have to pass out to lose consciousness, has anyone made that distinction?

MR. DRAHOS:  Object to form.

THE WITNESS:  No.

BY MS. GOODMAN:

Q.    When you were answering the question about

Clay Crockett Volume I
November 21, 2024

Page 182

whether or not you lost consciousness, did you understand that to mean whether or not you passed out?

A.   Right.  I thought those two things were one and the same.

Q.   If you were explained did you stay awake but were you not understanding what was going on or making I guess memories as to what was going on at that time in terms of loss of consciousness, would that change your response to those questions?

MR. DRAHOS:  Object to form.

THE WITNESS:  It would have.

BY MS. GOODMAN:

Q.   We know you didn't pass out after the incident; right?

A.   Right.

Q.   But just because you didn't pass out doesn't mean you didn't lose consciousness; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  I understand that now.

BY MS. GOODMAN:

Q.   But you would agree with that, just because --

A.   I would -- I would agree with that, yes.

Q.   Let's go back to the subject staircase and

Page 183

I'm looking at Exhibit 4, which shows that the steps of the staircase -- this is called -- where I'm pointing to is called the tread and this is called the rise, there's a kick plate on the right of the steps of the staircase, do you see that?

A.   I do.

Q.   Do you see how there's one kick plate missing?

A.   Yeah, one whole board missing, yes.

Q.   That would be the board that hit you in the head; right?

A.   That's correct.

Q.   And the purpose of a kick plate, do you know what that is?

A.   I do not.

Q.   So I Googled the purpose of a kick plate it's the part of the step that you would kick against when going up or down the staircase.

MR. DRAHOS:  Object to the form.

BY MS. GOODMAN:

Q.   You would agree that if the kick plate is being kicked when people are going up and down the staircase, that would lead to wear and tear of the kick plate; right?

MR. DRAHOS:  Object to form, yes.

Page 184

THE WITNESS:  Of course, yes.

BY MS. GOODMAN:

Q.   We know that passengers and crew members go up and down this staircase; right?

A.   Yes.

Q.   And that would mean that passengers and crew members were both kicking this kick plate as they go up and down the stairs, potentially?

A.   Yes.

Q.   Do you know how many passengers are onboard the ship?

A.   I don't know how many.

Q.   Quite a bit?

A.   Yes, I mean, multiple thousands are on the ship at any time.

Q.   There's been many cruises onboard that ship?

A.   Right.  It's not a new ship.

Q.   So there would be wear and tear of the kick plates in this staircase; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  Right.

BY MS. GOODMAN:

Q.   You were asked questions about how Carnival would know about the dangerous conditions, do you recall those questions?

Page 185

A.   I do.

Q.   Okay.  You would agree that Carnival would know that passengers and crew members are going up and down the staircase, kicking that kick plate; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  Yes.

BY MS. GOODMAN:

Q.   So Carnival would also know that because Carnival passengers and Carnival crew members are going up and down the steps kicking the kick plate that there would be wear and tear of the kick plate; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  Yes.

BY MS. GOODMAN:

Q.   Knowing that Carnival should regularly inspect the kick plates on the staircase; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  Yes, they should.

BY MS. GOODMAN:

Q.   If you also look back at Exhibit 4, do you see that there's this anti skid strip on the tread of the staircase?

A.   I do.

Clay Crockett Volume I
November 21, 2024

Page 186

Q.   Do you know if the anti skid strip needs to be replaced at any point?

MR. DRAHOS:  Object to form.

THE WITNESS:  I would think it does as part of the maintenance program.

BY MS. GOODMAN:

Q.   You would agree that every time a Carnival crew member is replacing the anti skid strip, they would be able to observe whether or not the kick plate is lose; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  Yes.

THE COURT REPORTER:  Lisa, can you slow down.

BY MS. GOODMAN:

Q.   Do you know who would be responsible for fixing something wrong with the staircase?

MR. DRAHOS:  Object to form.

THE WITNESS:  The maintenance crew that's hired by Carnival to do so and their supervisors.

BY MS. GOODMAN:

Q.   The maintenance crew, those are employees of Carnival?

MR. DRAHOS:  Object to form.

THE WITNESS:  Right.

Page 187

BY MS. GOODMAN:

Q.   And so Carnival would be responsible for fixing something wrong with the staircase?

A.   Yes, they would be.

MR. DRAHOS:  Form.

BY MS. GOODMAN:

Q.   And this is staircase onboard the Carnival ships?

A.   Correct.

Q.   And this is a staircase that crew members can go up and down at any point and observe if there's an issue with?

A.   Yes, that's right.

Q.   And Carnival controls the staircase if we look at Exhibit 3, we see that Carnival has cornered off the staircase, meaning that passengers and crew members cannot access the staircase?

MR. DRAHOS:  Object to form.

THE WITNESS:  That's right.

BY MS. GOODMAN:

Q.   At the time of the incident, the staircase was not cornered off?

A.   No, during the time of the incident the staircase was not cornered off.

Q.   Meaning that passengers and crew members

Page 188

were accessing this staircase?

A.   Yes, that's right.

Q.   And the lounge chairs that you see in Exhibit 3 on page two, those lounge chairs, those were not set up by you; right?

A.   Correct.  Those were not setup by us.

Q.   Those would have been setup by Carnival cruise members?

A.   Yes.

Q.   No one told you that you couldn't sit there?

A.   Correct.  Nobody told us we couldn't sit there.

Q.   And in fact because there were lounge chairs, that led you to believe that it was safe to sit there?

A.   Yes, correct.

Q.   If you knew for any reason that it would not have been safe or if you knew that this was going to happen, would you have ever sat in this lounge chair?

A.   No, we wouldn't have.

Q.   Who do you blame for the incident?

A.   Carnival Cruise Line.

MR. DRAHOS:  Object to form.

BY MS. GOODMAN:

Q.   Why do you blame Carnival Cruise Line?

Page 189

A.   Because they didn't provide a safe ship, they didn't properly maintain their ship, they didn't warn me of the danger that I was under while I was on their ship.

Q.   Looking back at Exhibit 4 when you're looking at the rise of the steps, this metal panel, do you see rust on this metal panel that I'm pointing to?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, I do see visible rust on the metal of the staircase.

BY MS. GOODMAN:

Q.   Do you also see it for the metal panel on the step that is missing the rise because that's the rise, the metal panel of the rise is what fell on you?

MR. DRAHOS:  Form.

THE WITNESS:  Correct.

BY MS. GOODMAN:

Q.   Back to Exhibit 2 your sign and sail.  You already went through this --

A.   I did.

Q.   -- during your direct testimony?

A.   Yes, I did.

Q.   But I just want to confirm in this document,

Clay Crockett Volume I
November 21, 2024

Page 190

Exhibit 2, we don't see what the actual drink was that you obtained at any of these locations?

A.   That's correct.

Q.   And your drink package included being able to get other soft drinks?

A.   That's correct and coffee's and milk shakes.

Q.   And because we don't have the actual receipt showing what the actual beverage was, we don't know what your actual beverage was at each of these locations; right?

MR. DRAHOS:  Object to form.

THE WITNESS:  That is correct.

BY MS. GOODMAN:

Q.   You were explaining I guess your symptoms and limitations since the incident; right?

A.   Right.

Q.   You talked about not recalling like if you had a meeting that you wouldn't recall even having the meeting afterwards?

A.   Right.  I call them just holes in my memory. Not only do I not remember what was talked about, but I may not even remember that we even had the meeting. It could have been an hour long and I have no recollection of it.

Q.   Before the incident?

Page 191

A.   I had no memory problems.  I could easily remember if I talked to somebody weeks, maybe months later and could give a summary of that meeting with no problem at all.

Q.   And is there anyone other than your wife that would be able to testify and explain how your memory has changed from before the incident to after?

A.   Sure.  My co-workers I'm constantly -- I find myself saying multiple times a week, I don't remember if we talked about this but and it's truly because I don't remember.  So my co-workers would be able to testify that I have memory problems.  My mother, my co-workers at my previous job that I was at during the time of the incident and after the incident, friends, my daughter, anybody that is close to me.

Q.   I think you also talked about calendaring, that now you have to like write everything down otherwise you would miss an appointment or picking up your daughter situation?

A.   That's right.  I've had a calendar.  We all have calendars I think.  But before the incident I would use it just as a reminder, hey, I know I have something, I know I have a meeting this afternoon, is it at 2:33 or is it 3:00, well, I'll look at the

Page 192

calendar.

Now I live and die by my calendar, if an event is coming up and it doesn't go on my calendar, I'm likely not going to remember it at all and I will probably miss that event.

Q.   Just to make sure we cover everything, I know you talked about dealing with noise sensitivity, how are you dealing with noise sensitivity since the incident?

A.   Yes, it's really challenging, it is -- it's an isolating issue.  When I can't go to a movie without having to plug my ears because it's too loud and it's triggering this -- this anxiety and this feeling of panic.  It's very different today, you know, that recently happened.  I went to a movie and almost had to run out of the theater but I did have to physically close my eyes and plug my ears.

I can't go to the car wash, drive-thru car wash without again being -- having all this anxiety and panic.  Daily life, you know, we don't know when we're walking down the street if a big truck is going to go by or a horn blow or a siren.  It just pops up everywhere.  And I don't always know when it's going to pop up.  I can't always anticipate it.  But it has led me to not be as outgoing and active and want to

Page 193

be around friends and social situations.  It's required me to remove myself from, you know, church and other sittings where there's lots of people.  It continues on.  And it can continue on forever.

Q.   What about sleep issues.  I know you use a CPAP machine.  Are you dealing with sleep issues as a result of the subject incident?

A.   The headaches that I have, you know, lead to poor sleep.  I have excessive sweating during the night.  Even when I use my CPAP, you know, these are not issues related to sleep apnea.  They're things that I've been dealing with since the incident that I'm getting poor sleep.  I go to bed not feeling myself.  I can't get a good night sleep, so then I wake up again feeling drained and not feeling like myself and the cycle kind of continues.

Q.   What about irritability.  Are you experiencing any irritability as a result of the incident and the injuries that you sustained?

A.   Yeah, that goes hand and hand with the noise and sound issue we were talking about.  That makes me irritable when I forget something that I should be able to remember that makes me irritable, because it's embarrassing, you know, if I'm around a coworker it's embarrassing to not remember what we just talked

Clay Crockett Volume I
November 21, 2024

Page 194

about, it does make me irritable. I don't want to be around people, you know, I don't want to have interactions with people anymore than I have to.

Q. Are you still experiencing headaches?

A. I am still experiencing headaches. They're not all day everyday like right after the incident. But more than normal. You know, probably on average more than three times a week which is way more than before the incident, it might have happened once or twice a month maybe, just a regular headache people have due to your eyes getting tired looking at the screen too long or something. Now they're more frequent and harder to make them go away.

Q. Could you put on a pain scale, one being almost no pain or zero being no pain and ten being the most pain, how would you rate those headaches that you experience now?

A. They're still depending on the day like a six to a seven on the pain scale is where I would generally rate them. They're not a migraine but they're definitely painful and get in the way of daily life.

Q. Do you take any medication for those headaches?

A. I do have to take Advil, Ibuprofen or

Page 195

Tylenol. Sometimes I have to take both to get rid of them. Generally I'll take one and sometimes that doesn't help, so I end up taking a dose of the other, so, yes, I do have to take medication to get rid of them.

Q. So in a given week how many times are you taking Tylenol, Ibuprofen or both?

A. Three to six times a week I'm taking a dose of one or both of those.

Q. What about brain fog. Are you dealing with any brain fog since the incident and since the injuries you sustained?

A. Yeah. I deal with brain fog and I link it closely to not being able to find my words and I link it to the memory loss. It kind of all goes hand and hand, I feel like. During, you know, work is always a good example. Before the incident I was quick, I was able to easily recall facts and figures and data and history, but now I walk around with this fog and I don't feel like myself. I feel like I'm slower to be able to give an intelligent answer and even when I give that answer I may forget that answer because of the related memory issues. But yeah, I talk with my family and others about I just feel like I'm walking around with my head in a fog.

Page 196

Q. What has this incident taken from you?

A. It has taken my -- a lot of my joy, just because I don't feel like myself. I don't feel good. I'm hurting, I'm confused. I'm not able to express my feelings like I used to.

It has taken a lot of the joy that I had in life which led to the depression that we talked about. It's taken away some of my ability to be an effective employee.

It's taken away -- one thing I highly value is my role as a dad and it's, you know, made it where my wife can't even rely on me to do dad duties because I'm going to forget about it. It's taken away my -- the ability for people to count on me when it really matters.

Again, I don't know if that will ever come back. I don't know if my memory will ever get better. I don't know if this sound and the anxiety around sound and light will ever go away. It's really frustrating and really unfortunate situation.

Q. Do you worry what your future holds in terms of how your injuries will continue to affect you?

A. I do. Because my ability to earn a living is based on my mind, my decision making, my ability to remember and to, you know, make good decisions and

Page 197

as I age, it may get worse. I don't know. I don't know what the future holds. If I'm not able to do that, I don't know how I'll have an income, how I'll support my family.

MR. DRAHOS: Just to clarify are you making a wage loss claim, because in the answers to interrogatories you said you weren't?

MS. GOODMAN: We're not. That's all the questions I have for you. Thank you.

MR. DRAHOS: Mr. Crockett, you have the right to read the transcript or you can waive that's up to you.

MS. GOODMAN: We will read.

MR. DRAHOS: Type it up.

MS. GOODMAN: I will take a copy.

(Thereupon, the deposition was concluded at 3:30 p.m.)

Clay Crockett Volume I
November 21, 2024

Page 198

CERTIFICATE OF OATH

I, Paul Cunningham, Florida Professional Reporter, Notary Public, State of Florida certify that Clay Crockett personally appeared before me on November 21, 2024 and was duly sworn.

Signed this 2nd day of December, 2024.

_____
Paul Cunningham, FPR
Notary Public, State of Florida
Commission No: GG100673
Commission Expires:  June 22, 2025

Page 199

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )
                        )  SS:
COUNTY OF MIAMI-DADE     )

I, Paul Cunningham, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of Clay Crockett, pages 1 through 201; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes to the best of my ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 2nd day of December, 2024.

_____
PAUL CUNNINGHAM, FPR
FLORIDA PROFESSIONAL REPORTER

Page 200

WITNESS NOTIFICATION LETTER

December 2, 2024
Clay Crockett
C/O:  Lisa Goodman, Esquire
12150 S.W. 128th Court, Suite 225
Miami, FL 33186

In re:  Clay Crockett vs. Carnival Corporation

U.S. Legal Support No. 6744609

The transcript of the above-referenced proceeding is now available for your review.
Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

Any corrections you wish to make to the transcript should be made on the errata sheet.  Please do not write on the transcript itself.

Please complete your review within 21 days.

Sincerely,
Paul Cunningham, FPR
U.S. Legal Support, Inc.
One S.E. Third Avenue, Suite 2500
Miami, FL 33131
(305) 373-8404

cc via transcript
(Michael Drahos, Esq.)

Page 201

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
IN RE: (Clay Crockett vs. Carnival Corporation)
(Clay Crockett)
(11-21-2024)
Page #   Line #    Correction

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____       _____
Date                         Clay Crockett

Clay Crockett Volume I
November 21, 2024

## Exhibits

**EX 0001 Clay Crockett 1121 24**
 2:15 81:10

**EX 0002 Clay Crockett 1121 24**
 2:16 93:15, 22 189:20 190:1

**EX 0003 Clay Crockett 1121 24**
 2:16 108:9, 25 121:10 187:15 188:4

**EX 0004 Clay Crockett 1121 24**
 2:17 111:9 121:9 183:1 185:22 189:5

**EX 0005 Clay Crockett 1121 24**
 2:17 112:1 113:4

**EX 0006 Clay Crockett 1121 24**
 2:18 123:9, 12 176:23

**EX 0007 Clay Crockett 1121 24**
 2:18 124:10 178:7

**EX 0008 Clay Crockett 1121 24**
 2:19

**EX 0009 Clay Crockett 1121 24**
 2:19 151:12

**EX 0010 Clay Crockett 1121 24**
 2:20 156:12 161:17 180:4

---

## 1

**1**
 60:12 81:10
**10**
 156:12 161:17,18 178:7 180:4
**100**
 164:21 165:8
**10:28**
 97:15
**10:30**
 87:10,24
**10:33**
 102:7
**10:47**
 102:11,21,23
**10th**
 68:1,6,9 95:23 96:20 97:3
**11**
 75:14
**11:00**
 87:14,24
**11:17**
 82:3
**11:30**
 87:14 103:2 126:12
**11:33**
 123:17
**11:47**
 98:25
**11th**
 97:6,13 98:9,17
**12**
 60:3,4,13

94:16 95:13
**12-step**
 59:25 60:7, 11,20,24 61:1
**12:30**
 126:19
**12:33**
 128:8
**12:50**
 127:5,8
**12th**
 98:19 99:7, 11
**13**
 11:12 96:23
**13th**
 99:14 100:4
**14**
 127:4 136:7 162:1 175:22
**14th**
 68:7 100:12, 25 127:8 154:9,12,25 155:6,10 156:20
**15**
 42:12,16 180:22
**15th**
 79:8,22 144:22 149:21 179:20 180:1
**16**
 90:5
**16th**
 179:21
**17th**
 179:22
**18**
 179:23 180:23
**18th**
 144:23 149:22 150:2

151:3,9,25 179:8
**19**
 63:15
**1982**
 6:8
**19th**
 71:19

---

## 2

**2**
 93:15,22 189:20 190:1
**20**
 13:3 18:11, 13 19:4
**2000**
 7:7
**2001**
 6:20 34:1
**2002**
 44:23
**2003**
 34:21
**2004**
 7:22
**2006**
 9:20
**2007**
 8:6
**2012**
 8:25
**2013**
 9:4 10:18 90:5
**2016**
 90:5
**2017**
 36:15 57:10, 24
**2018**
 11:16 26:23 27:22 30:22 57:10,24 90:3

**2019**
  75:5
**2020**
  45:11,15,23
  46:8 50:25
  62:2,20
**2022**
  44:4,5
**2023**
  36:25 41:22
  44:1,2,3,4
  51:24 61:19
  64:15,16
  65:4,11,17,
  21 75:5
  85:18 88:8
  100:25
  156:15 162:1
  168:24 169:1
  175:22
  176:17
  179:23
  180:22,23
**2024**
  40:16 46:1
  63:15 64:13,
  24 174:13
  177:24
**2025**
  47:16 54:7
**2108**
  136:12
**22**
  138:24
**24**
  164:6
**24th**
  73:4 150:24
  151:4,13,20
  152:2 153:15
**25**
  18:11,13
  19:4
**27**
  6:10
**29**
  156:15

  162:7,10
**29th**
  156:21
  161:20
  163:17 171:9
**2:26**
  102:15
  128:25
**2:33**
  191:25
**2:46**
  99:17

___

**3**

**3**
  108:9,25
  121:10
  187:15 188:4
**30**
  159:4 162:7,
  10 165:18,22
**38305**
  6:11
**3:00**
  191:25
**3:30**
  197:22

___

**4**

**4**
  111:9 121:9
  183:1 185:22
  189:5
**41-year-old**
  161:25
**4:00**
  135:1
**4:04**
  128:25
**4:29**
  129:1
**4:42**
  97:18 98:7

___

**5**

**5**
  112:1 113:4
**5/19/24**
  71:16
**5/24/24**
  71:16
**5:00**
  17:23 18:4
**5:47**
  98:8

___

**6**

**6**
  6:8 123:9,12
  176:23
**6:00**
  73:20 87:18
**6:18**
  129:1

___

**7**

**7**
  124:10 178:7
**7/15**
  146:8,13,16
  147:2,8
  148:11,15,22
  149:9
**7/18**
  146:8,13
  147:2,8
  148:11,15,22
  149:9
**75**
  19:5 51:8,9
**7:00**
  87:20 88:2
  135:20
**7:51**
  129:2

**7th**
  78:23 79:2

___

**8**

**8**
  85:18 150:10
  176:17 178:7
**8:00**
  18:4 173:5
**8:08**
  98:24
**8:10**
  95:2
**8:44**
  94:10
**8th**
  67:18 78:11,
  20 82:3
  84:6,11

___

**9**

**9**
  151:12 178:7
**9/8/2023**
  162:23
**90**
  64:17
**9:00**
  17:22 98:14
**9:08**
  136:2,12
**9:30**
  142:13
**9:32**
  101:19 102:6
**9:44**
  99:16
**9:53**
  94:15
**9th**
  67:21,22,23
  68:6,9 88:7
  94:10,16
  95:14,23,25

Clay Crockett Volume I
November 21, 2024

96:14,17

**A**

**A-L-P-H-A**
57:14
**A.A.**
65:7 66:2,6,
15,18,23
67:4 68:23
69:21 73:9
74:16
**a.m.**
82:3 94:10
97:15 98:24,
25 99:16
101:19
102:11
123:17
142:13
**ability**
51:15 55:25
173:12
196:8,14,23,
24
**able**
8:7 20:6
25:20 35:22
46:8 53:18
101:18
107:15 114:9
115:2,15,18,
20 116:15
117:6,8,9
120:2,4,9
122:21
127:23,24
128:20
141:17
142:16
149:11,13
166:9 173:3
177:14 178:2
186:9 190:4
191:6,12
193:23
195:14,18,21
196:4 197:2

**abnormal**
103:25
155:20
**abnormality**
153:16,18
155:8 162:24
166:3
**aboard**
100:21
**above**
3:4 108:6
**abrasion**
107:20 137:1
**absolutely**
95:13 140:2
**access**
187:17
**accessing**
188:1
**accident**
33:21,25
34:7,17,19
**accidents**
34:18
**accompanied**
129:18 130:1
**accompanies**
101:22
**accompany**
78:8 97:21
130:13
**accomplishing**
42:9
**account**
93:23,25
**accountant**
94:20
**accounting**
8:9,15,17
9:6 14:11
**accounts**
18:16,17
19:13,20
21:15,17
**accuracy**
96:24 99:7
100:6 129:3

**accurate**
17:20 18:6
45:12 46:3
82:3,5 94:17
97:19,20
98:12,25
99:1 123:17
125:14 127:7
136:15,17,
20,21 137:3
142:16
144:23
150:25 151:1
163:24
174:14
178:18,21
**accurately**
110:8 140:7
165:24
**acre**
25:4
**act**
92:15
**acted**
91:24
**acting**
139:4
**active**
90:6 125:20
171:24
192:25
**actively**
14:5 60:18
107:21 116:8
125:9
137:10,11
144:17
**activities**
67:6 77:19
100:21 129:6
**activity**
18:10
**actual**
68:24 135:5
190:1,7,8,9
**acute**
134:22

139:20,21
155:8 162:23
**add**
130:10
**addiction**
72:22
**additional**
8:17
**Additionally**
41:2
**address**
6:9,10
123:15
**addressed**
137:8
**adjacent**
109:5
**administered**
179:2
**admitted**
37:20
**adrenaline**
89:19,20
**adult**
86:10
**advance**
73:18
**advanced**
93:6
**advancement**
20:11
**advancements**
60:15
**adverse**
167:23
**advice**
29:12 139:5
**Advil**
176:4 194:25
**advise**
33:7
**advised**
29:12
**advising**
15:9

Clay Crockett Volume I
November 21, 2024

Advisory
 14:12,15,20
 15:8,9
affect
 51:15 63:3
 70:25 196:22
affecting
 63:1
African
 42:21
afternoon
 71:19 79:6,8
 95:20 142:25
 144:3 191:24
afterwards
 190:19
age
 77:23 121:25
 197:1
aggressive
 93:5
agitation
 131:4
ago
 24:2 52:25
 73:16 74:1
 76:17 92:13
 176:14
agree
 45:24 56:16
 94:21 95:9
 101:20 103:7
 105:7 110:6
 111:19
 114:13 115:1
 122:8 125:1,
 7 127:9
 138:17
 163:20
 165:11 166:5
 182:22,24
 183:21 185:2
 186:7
agreement
 139:11
Aguilar
 46:17,18,21,

 23 47:1,8,
 17,21,23
 50:3,7,20
 52:18 53:14
 54:5 92:2
ahead
 105:12,13
 134:4 143:24
 160:20
aide
 14:3,4
airline
 79:15
airport
 79:9,17,22
 142:22 143:4
 144:6
alcohol
 49:24 53:21
 55:17 58:7,
 15,25 59:6,
 11,24 60:13,
 18 61:2,22
 62:1,8 63:4,
 6,21 69:9
 70:15,17,18,
 20 73:1
 83:23 84:1
 85:23 86:15,
 19 152:5
alcoholic
 59:19,20
 86:13 94:16,
 23 95:7,11,
 14,17 96:23
 98:2,11
 99:6,24
 100:5 128:24
alcoholics
 61:12,13,14,
 18 69:20
alert
 125:12,16
 127:14
alive
 75:13
Allen
 36:10

allow
 106:6,7
allows
 86:12
Alpha
 57:13,14
amenities
 77:6,15,16
American
 42:21
amlodipine
 31:9
amount
 27:14 32:1
anatomically
 150:18
announcements
 104:22
annual
 151:17
anonymous
 61:14,18
 69:9,20
 95:17
answer
 4:13 5:10
 23:1 55:3
 105:13
 122:14,15,
 18,19 134:5
 143:25
 144:12,16
 146:7 160:21
 170:5,7
 171:19
 195:21,22
answered
 4:18 170:8
answering
 4:6,19 94:4
 181:25
answers
 140:5 197:6
Anthony
 53:15,16
anti
 185:23

 186:1,8
anti-nausea
 127:25
antibiotic
 127:15
anticipate
 192:24
anxiety
 45:4,20
 48:3,8
 49:21,24
 50:2,7,23
 52:6,14
 62:4,8 92:7,
 24 123:21
 134:22
 152:11
 177:2,9
 192:13,19
 196:18
anybody
 25:25 29:14
 31:22 74:21
 78:8 104:8,
 11 119:17
 120:18,20
 123:6 135:14
 191:15
anymore
 139:18
 145:21
 163:19 194:3
anyone
 11:7 31:19
 67:11 70:9,
 13 78:5 93:2
 110:22
 115:10
 117:20 123:4
 156:25
 181:20 191:5
anytime
 180:13
apart
 106:5
apnea
 57:7,8
 193:11

apologize
  55:14
apparent
  141:6 148:16
apparently
  164:22
appears
  99:1
applied
  127:16
appointment
  27:12 29:17
  39:9 47:15
  54:5,6
  144:10,22
  149:21,23
  150:2
  151:10,25
  160:2 164:24
  169:12
  179:22 181:5
  191:19
appointments
  73:3 160:1
appreciate
  114:22
  115:18
approached
  70:23
approximate
  110:11
approximately
  11:15 13:3
  16:12 25:4
  34:21 36:15
  39:4,18
  40:19 42:12,
  15 44:23
  52:24 62:2
  73:16 90:4
  103:2 135:1,
  20 159:4
  170:19
  174:19
April
  6:8 45:11,
  14,22 46:1,7

50:25 174:13
AR
  19:2,12
area
  6:19,20,21
  7:9 10:3,9
  12:2 26:10
  83:15 84:9,
  12,16,17
  101:8,23
  105:21 110:8
  117:23
  121:13,16,
  17,21,24
  129:17
  133:10
areas
  29:5 56:24
  71:1 121:25
argument
  96:9
Arizona
  173:24
  174:22 175:4
arm
  33:17 34:11,
  12 37:11,12,
  19 114:2
arose
  62:1
around
  26:1 34:3
  53:21 62:3
  65:7 87:24
  88:2 131:6
  147:18 148:7
  173:10 178:3
  193:1,24
  194:2
  195:19,25
  196:19
arrested
  21:12 58:11
arrived
  68:14 79:2
  115:11
  117:13
  118:6,13

123:18
  125:4,15
art
  65:2
Asian
  42:21
asked
  55:13 56:10
  58:10 68:25
  89:17 119:25
  123:10
  132:12 139:3
  152:17,21
  167:1 169:23
  180:5,21
  181:13,16
  184:23
asking
  4:14,17 5:11
  26:15 60:9
  94:19 103:20
  152:15
asks
  123:23
asleep
  57:13
aspect
  76:14 85:20
  96:17 97:2
  98:16 99:10
  100:8
assessment
  125:14
  126:11,23
  127:7
assist
  118:13
  120:18
assistance
  120:9
assistant
  20:8
assume
  5:10 58:11
  79:20 130:11
  159:13

assuming
  75:20
assured
  119:2
ATA
  14:12,13,15,
  17 15:7,8
  16:5,6,22,25
  17:13 20:10
ATAP
  14:12
attack
  48:16 75:15
attempted
  91:11,24
attend
  42:13 69:13,
  21 78:5,7
attended
  65:7 73:11
attention
  109:10
  119:10,15,17
  126:5 127:4
  128:22 136:6
  138:23
attorney
  106:11
attorney/
client
  158:7
attorneys
  158:22
audio
  104:22
August
  61:19 65:24,
  25 154:9,12,
  23,25 155:6,
  10 156:20
  162:1
automobile
  34:18,19
available
  27:12 83:13
  103:11,12
  107:10

141:24
144:11
151:10  168:6
181:5
**average**
  69:23 194:7
**avoid**
  171:25
**awake**
  125:13,16
  127:14
  181:18 182:6
**aware**
  45:2 56:5
  66:6 75:11
  89:2 118:25
  123:3,6
  141:19
  152:22
  159:10
**Awesome**
  88:6

---

**B**

**B-U-S-B-A-R**
  46:5
**bachelors**
  7:20
**back**
  8:16 10:18
  13:4 26:23
  28:24 30:10
  35:16,22
  36:4 37:2
  44:22 55:5
  56:25 64:18
  72:18 79:4,
  21 84:5
  89:1,16 90:3
  92:3,10
  93:9,13
  94:22 97:18
  98:6 102:18
  107:25 115:7
  117:9
  128:11,14

129:18,21,25
131:8,17
133:2,4
134:13
143:11  144:6
145:15
146:19
147:23 150:5
152:2,24
162:18
164:21
165:8,19
173:9 175:8
176:23
182:25
185:22
189:5,20
196:17
**background**
  6:6 9:16
**backyard**
  24:16
**bad**
  176:3
**bag**
  109:15,25
**balance**
  120:5
  170:12,22
**Band-aid**
  54:25
**bandage**
  137:8
**bandages**
  90:10
**Bank**
  18:15
**bar**
  59:13 95:3,5
  98:7 101:19,
  22 102:11
  109:5
  128:24,25
  129:1
**bars**
  95:2,3 102:2
  130:14

**based**
  97:12 152:12
  170:25
  196:24
**baseline**
  164:22
**basements**
  11:4
**basically**
  121:5 130:23
  180:24
**basis**
  17:13 18:20
  73:17
**basketball**
  13:16
**Bates**
  81:12
  138:23,24
**bath**
  10:25
**Bay**
  82:21 83:2,
  3,21 97:7
**beach**
  83:14,15
  99:20
**bed**
  84:13 85:20
  87:9,10,24
  193:13
**bedrooms**
  10:23
**beds**
  24:15
**began**
  47:13 63:14
**begin**
  49:4 161:6
**beginning**
  14:22,23
  27:22
**behalf**
  14:2
**beings**
  175:25

**believe**
  23:19 29:16
  32:18 50:15
  53:9 61:25
  78:1 105:9,
  18 110:12
  118:7 141:10
  168:7,12
  170:15 180:6
  188:14
**below**
  121:12
**Benazepril**
  31:9
**bend**
  113:19
**best**
  4:6 13:9,11
  128:20
  133:7,24
  143:15
**better**
  17:25 19:14
  21:23 41:16,
  17 43:3,5,14
  52:5 53:6
  63:14 72:25
  84:18 137:23
  139:22
  145:10,12,14
  148:8
  152:12,14
  153:8 196:18
**beverage**
  190:8,9
**beverages**
  83:17
**big**
  9:5,11 148:1
  192:21
**bigger**
  64:22
**biggest**
  23:20
**billing**
  19:3

Clay Crockett Volume I
November 21, 2024

Biomedical
  16:8
birth
  6:7,8
bit
  4:9 6:2
  23:13 26:10
  30:9 33:24
  53:6 58:23
  65:22 74:10
  82:12 84:18
  91:3 136:3
  184:13
black
  109:15
blacked
  62:13,15
blame
  188:21,25
bleeding
  107:21
  116:8,9
  119:16
  125:6,10,20
  137:2,7,10,
  11 144:17
block
  107:16
blood
  31:14,17
  80:13
  116:10,12,21
  117:3 141:15
blow
  192:22
Blue
  102:10
Bluff
  174:5,8
board
  115:25
  133:7,21
  183:9,10
boarded
  176:18
body
  72:21 113:6,

8
bogie
  13:11
bolts
  105:1
Bones
  33:15
book
  77:25 82:17,
  20
booked
  76:25 78:1
  82:21 83:8
  143:2
bookkeeping
  15:9
border
  175:3
bordered
  82:2
bottle
  50:21 179:6,
  12,16
bottom
  124:5
bought
  10:14
bound
  96:4
bout
  176:14
brace
  113:23,25
brain
  37:25 56:15
  135:5 162:22
  167:12,15,20
  195:10,11,13
break
  5:14,15,22
  56:18,19
  88:20,22
  113:19
  175:16,17
brick
  18:1,3

brief
  56:20 149:15
Brighton
  10:15 30:19
  53:3,7,10
  89:22,25
  90:6
bring
  79:24 80:1,
  11,24
Brittany
  9:18 10:1
broad
  55:1,2
Brock
  25:13,15,22
Brock's
  25:12
broke
  34:12
broken
  33:17
brought
  80:1,12,15
  81:1
bruising
  116:5
building
  18:2 28:4,6
  90:20
built
  74:25
bump
  122:6
bunch
  178:6
Busbar
  46:5
Bush
  79:18
bushes
  24:15
business
  7:20 14:12
  15:5,10
  17:19 40:24

buying
  15:4

───────────

C

C-O-R-I-N-T-H
  6:25 7:4
cabin
  86:11
  128:14,19
  129:2,19
  130:1,2,4
  132:6
  135:13,16
calendar
  149:20
  172:18
  191:21
  192:1,2,3
calendaring
  191:17
calendars
  191:22
call
  5:15 9:11,13
  10:9 15:20
  22:9 27:11
  28:17 31:12
  41:21 59:9
  62:20 70:6
  73:7 76:8
  77:3,14
  81:11 84:8
  90:16 92:1,
  7,11 93:23
  107:19
  111:18,20
  121:8 177:18
  190:20
called
  21:20 53:10
  57:13 168:21
  183:2,3
calling
  119:5
calls
  12:13 90:18

campus
28:6 34:3
155:15
cancel
39:22
capacities
90:22
capacity
21:3 149:19
captive
5:25
capture
4:16
car
90:19 192:18
card
87:5
cardiac
29:7,21,23
cardiologist
29:10 32:23
cardiology
29:6,15,16
30:1,12,14
48:14
cards
87:6
care
24:14,15,22
26:18,21,22
27:17 28:1,
3,8,18 30:4
34:25 37:7
47:25 49:11
53:2 76:5,7
138:11,20
139:2,11
140:1 142:19
143:8,10,17,
22 144:9,11,
13 145:2,8
151:2 156:19
career
20:11,20
48:25
careful
104:23

Caribbean
75:8 76:4
Carnival
75:7,9,17,
22,25 76:2,
4,10 81:18
82:1 97:17
100:3
104:13,20
105:2 106:1,
4,16,23
107:2 111:21
112:8,18,21
115:11
117:13 118:5
133:21
175:21
178:24
179:2,25
184:23
185:2,9,10,
17 186:7,20,
23 187:2,7,
14,15 188:7,
22,25
Carnival's
95:10 98:10,
23 99:5,15
112:10 127:5
128:7,23
136:1,4
142:11
179:12,15
181:7
carried
30:25 45:19
carrying
90:8
case
59:2 124:8
158:10
164:10
168:15
cash
39:7 41:5
43:20,22
72:8

CAT
150:3
caused
34:6 110:15,
19
caution
104:19
Cayman
83:10 98:20
center
30:7 120:3,
10 122:3,11,
21 123:2,5
124:23
125:2,5
126:12 127:1
128:1,5,13
129:13,16,20
130:17
131:11,19
135:19 138:7
139:16,24
140:22 142:9
143:6
centered
178:3
CEO
15:18,21
certain
23:17 49:23
145:18
certainly
20:15 28:1
56:10 90:12,
25 105:3
115:8,14
139:23
certifications
13:25
CFO
14:11 15:11
16:3,10
17:1,8
chair
84:21,23
101:15

102:16,18
103:5,9,10
104:20
109:5,13,17,
20 110:3,4
117:6,7,8
120:8,19,23
188:19
chairs
101:2 103:12
104:21 107:9
109:2
129:17,21
188:3,4,14
challenge
41:3 70:20
172:3 173:13
challenged
61:3,5
challenges
61:25 86:19
challenging
61:3 192:10
chance
6:4 175:7
change
52:3,6
66:11,12
139:15
144:19
177:25
182:10
changed
51:22 191:7
changes
51:3
changing
52:4
charge
18:15 86:14
94:15 95:1
98:7 101:19
102:6,7,10,
14,17
charges
93:25 95:11

Clay Crockett Volume I
November 21, 2024

chart
  124:7 140:17
chatting
  148:2
check
  63:17 73:6
  94:13 96:21
  178:17,20
checked
  63:22 71:14,
  20 82:11
checks
  33:1
checkups
  27:11,21
Cheers
  101:19
chemicals
  72:21
Chiropractic
  35:13,15
  36:6,18
chiropractor
  35:5,6,7,25
  36:10
chiropractors
  36:2,7 37:3
choice
  58:14,16
  86:22
choose
  103:8
choosing
  101:2
chose
  66:12 67:7
  86:12 96:7
  103:10,12
  107:5,6,11
chronic
  32:1
church
  147:21,24
  193:2
cigarettes
  63:7

Cigars
  63:9
circle
  177:1,3,8
circled
  123:17,20
  176:25
  177:2,4
circumstance
  103:17
circumstances
  34:22 37:1
  56:12 91:1
city
  25:5 83:5
  90:2 168:9
claim
  21:6,8 197:6
claiming
  141:23
clarify
  175:19 197:5
clarity
  90:13
classes
  8:19,23
classify
  87:3
Clay
  3:12,18,21
cleaned
  127:15
cleaning
  26:4,8
clear
  4:11 5:5
  90:1 91:10,
  21 126:13
cleared
  155:22
clearly
  104:5 110:1
client
  17:4
clients
  15:9 18:19
  19:15

clinic
  27:1,3,6,8,
  17,18 28:3,
  8,19,25
  29:11,23
  30:15 31:1
  32:22 33:2,3
  37:7 53:10
  119:23
  144:23
  150:23
  152:22
  154:12 157:4
  163:10
  168:21
  169:23,24
  170:6,9
clinical
  12:25
clinicians
  150:17
clips
  93:21
close
  10:16 34:4
  103:5 112:5
  191:15
  192:17
closed
  133:6
closely
  195:14
closer
  59:15 61:1
clothing
  116:21 117:3
Club
  54:8,9,10
co-workers
  191:8,11,13
coffee
  95:1 102:7
coffee's
  190:6
coffees
  94:24

cognitive
  55:22,25
  56:7,10
  162:5,13
  164:21 165:8
  166:4,7,10
  180:8
cold
  58:18
colleagues
  27:13
collecting
  19:2
college
  6:21 7:12
  33:16 34:2,4
  44:23 89:12
combination
  31:8 50:22
  77:2
come
  36:5 43:10
  49:3 66:5,17
  71:2,8,22
  72:2,4,10,13
  102:18
  114:18
  122:23
  123:1,5
  145:15
  146:19 147:4
  162:18 173:9
  196:16
comes
  25:13 43:15
comment
  124:17 134:9
comments
  152:13
common
  65:8 90:19
communicating
  19:15
communications
  10:2

Clay Crockett Volume I
November 21, 2024

communities
 70:2
community
 64:15 65:4,
 5,8,11,18,21
 72:1 89:16
companies
 14:19 15:1
company
 15:7,12,19,
 25 16:3,7,
 11,15 17:21
 21:10 25:7,
 9,10 26:25
 28:4 43:3
 47:18 53:17
compare
 90:14 141:5
compensation
 21:5
complained
 31:25 32:5
complaining
 105:21 127:6
 136:18
complaints
 85:20 96:16
 97:2 98:15
 99:10 100:8
 104:9,12
 139:25 142:8
complete
 115:7
completed
 162:22
completely
 92:6
complex
 165:21
compliance
 170:1
Composite
 108:9,25
composure
 114:8
computer
 78:3 171:1

conceal
 112:19,21
concern
 61:2
concerned
 71:9 122:10
 143:20
concerns
 70:23
concluded
 197:21
conclusion
 138:11
 139:2,12
concussion
 150:6 153:23
 167:20
concussions
 153:21
 166:22
concussive
 162:2
condition
 37:21 46:2
 49:3 103:23
 104:3 118:19
 125:14 127:8
 143:20
conditions
 27:6 36:3
 106:6 110:16
 177:1 184:24
conference
 158:17
confident
 102:20
confirm
 110:2 189:25
conflicts
 74:8
confused
 131:2
 132:21,22
 196:4
confusion
 115:5 137:25

connected
 83:12
cons
 143:16
consciously
 134:19
consciousness
 13:21 55:15,
 16 114:3,4
 127:7 136:23
 181:13,17,
 18,20 182:1,
 9,18
consider
 19:23 20:10
 91:18 180:9
considered
 91:23 92:17
considering
 20:23
consistent
 49:9
constant
 145:13,21
 163:21 164:5
constantly
 178:4 191:8
consult
 158:4
consultation
 123:9
consume
 60:18
consuming
 59:11
contact
 13:15,17
 113:5,9,20
contained
 123:12
contemplating
 134:2,6
contend
 102:25
 171:16
content
 22:8

contention
 95:10
continue
 25:20 106:6
 154:19
 171:22
 173:12 193:4
 196:22
continued
 64:21 135:23
 147:9
continues
 172:3 193:4,
 16
continuing
 171:16,20
continuum
 62:19
contradictory
 137:9
contrast
 162:22
control
 116:15
controlled
 145:14,16,25
 147:5
controlling
 116:14
controls
 187:14
convenience
 74:20
convenient
 27:19 28:1
 36:19
conversation
 4:9 106:8
 148:25 149:3
conversations
 149:7 152:19
convey
 114:23 155:9
 173:14
conveying
 155:11

Clay Crockett Volume I
November 21, 2024

**cooking**
26:4,7
**cope**
62:8 72:25
**copy**
124:14
197:15
**Corinth**
6:23 7:2
89:11
**corner**
139:8
**cornered**
187:15,22,24
**correct**
7:13,18,25
9:23 10:4
12:15 14:9,
16,24 16:20
20:25 25:2
29:25 31:2,4
40:1,13 41:6
42:17 44:8
45:5,21
46:9,10,23
50:4,11
51:1,2,20
55:12 57:15,
25 58:4,13
59:1 63:12,
16 64:11
68:10 71:11
72:23 75:16
78:19 79:23
81:6 83:22,
24 96:11,13
97:10,11
98:22 99:18,
21,22 101:4,
5 102:8,24
104:7
105:10,11,
15,16,20
108:7 113:3,
18,25 118:4
120:11
123:16,19,
21,22,24,25

124:3 125:23
130:18
136:24
138:19
139:14
142:15,20,21
144:1,14
145:3 146:12
149:18
150:4,5
154:9,10
158:19
159:18,24
160:12
161:16,21,22
166:17,18
168:24,25
169:2,4,16,
19 174:10
176:5,7,10
179:18,24
180:3,15,17
181:1,4
183:12 187:9
188:6,11,16
189:18
190:3,6,12
**counsel**
12:17
**counseling**
38:3 40:3
59:23 61:21
72:19
**counselor**
38:17 61:8
**count**
94:16 196:14
**counted**
94:22
**counting**
59:12
**couple**
10:14 89:11
**course**
94:21 116:16
133:12 184:1
**court**
3:6 4:10

175:17
186:13
**Court's**
170:1
**cover**
6:6 26:14
89:1 94:5
109:14,23
172:12 175:5
192:6
**covered**
39:5 72:7,9
171:7
**Covington**
10:16 36:12
**coworker**
172:5 193:24
**Cozumel**
83:11 84:1
99:14,19,23
**CPA**
7:23 8:7,24
13:24 32:17
55:23,24
89:4
**CPAP**
57:20,23
80:1,7
193:6,10
**CPR**
14:4
**crack**
113:19
**cream**
127:16
**credit**
33:5
**crew**
103:13
118:12,18
119:7 133:21
179:12,15
181:7 184:3,
6 185:3,10
186:8,19,22
187:10,16,25

**crisis**
12:11,12,21
**criticisms**
76:14 97:2
98:15 139:25
**critiques**
76:14
**Crockett**
3:12,16,18,
21 81:16
151:17
197:10
**CROSS-
EXAMINATION**
175:13
**crowds**
171:25
**crown**
107:17
113:10,14
**cruise**
23:5,7
26:11,16
28:8 30:14
31:20,24
32:4,19,24
33:13 37:23
38:5 51:25
54:22 57:4
61:23 65:17,
18 66:3,7,
13,14,18,20,
24,25 67:4,
14,22 68:15
69:11,18
75:1,2,7,8,
10,17,21,24
76:19 77:8,
10,25 78:11,
20 79:7,13,
25 81:2,3
82:18 86:1
87:4 88:7
91:13 92:6
93:9 94:1
99:13 100:11
115:16,17
129:7 132:25

Clay Crockett Volume I
November 21, 2024

138:8,12,21
139:3,12,13
147:18,23
167:11
173:18
176:19
188:8,22,25
**cruises**
75:6 76:3
80:25 184:16
**cruising**
76:18
**CT**
142:4
150:15,19
152:1
153:11,15
155:1,8
**culmination**
49:6
**Cumberland**
53:20,23
56:6,17,23
58:5,19
59:3,5
63:13,17
71:12,20
72:11 73:3,
11 74:1,17
**Cunningham**
3:1
**current**
6:9,10 10:19
26:17
**cut**
23:22 116:8
125:5 135:7
146:6
**cutter**
25:23
**cutting**
25:1,16
**cycle**
193:16

**D**

**D-E-E**
40:7
**dad**
196:11,12
**daily**
31:6 80:14
192:20
194:22
**damage**
144:16
**dance**
82:10
**danger**
105:4 107:4
189:3
**dangerous**
184:24
**dark**
177:21
**data**
195:18
**date**
6:7,8 52:1
65:14 100:4
110:9 126:25
**dated**
151:12
156:15
161:19
**dates**
77:4,14 94:7
149:5
**daughter**
11:8,10
17:13,15
22:23 64:9
72:10 77:20
78:6 97:21
101:6 121:2,
15 122:2
130:7 135:16
172:24
174:11
191:15,20

**daughter's**
11:9
**daughters**
109:23
**David**
45:1
**day**
13:13 18:12,
13 19:4 27:5
38:7,8 51:1,
10,23 55:20
67:14,15,18,
19,20,21,22
68:1,3,7,8
69:12,19
71:19 78:11,
22 79:7
82:7,21
83:11,13
84:6,22,24
85:23,24,25
86:1 88:7,8,
10,14,19
93:10,11
94:17 95:18
96:19,20,23
98:12,13,19,
21 99:13
100:11,12,
13,14,18,19,
22 110:5
111:2 114:12
122:7 129:7
130:23
131:22
144:9,13
146:17 157:6
159:2 164:6
171:10
174:11
176:18,22
179:20 180:1
194:6,18
**day-to-day**
17:13 165:20
**days**
13:10 41:3
64:17 71:17

145:1 172:6,
12 174:18,25
175:2
**deal**
87:24 195:13
**dealing**
139:21
154:17
158:25
161:10
176:11,16,
17,21 177:7,
11 180:18
192:7,8
193:6,12
195:10
**dealt**
177:6
**death**
177:19
**debarked**
142:13
**decide**
17:17
**decided**
40:23 62:17
130:17
143:16
169:17
**deciding**
158:8
**decision**
63:21 64:2,
8,13 70:24
78:2 196:24
**decisions**
196:25
**deck**
82:8 101:2
110:25
115:21
120:10,19
121:16,18
129:17
133:20
**Dee**
40:6,9 41:7,

14,15
**deep**
 56:14
**define**
 54:13 84:17
**definitely**
 194:21
**definition**
 48:3 56:9
**definitively**
 111:4 126:13
**deflect**
 107:16 114:1
**degree**
 7:19 8:8,22
 21:14 22:5
 53:12 54:24
 55:19 61:20
 74:15 114:24
 116:10
 131:24 135:2
 153:14
 169:21
**denied**
 136:22
**Depakote**
 163:8 164:11
**department**
 89:9,21,23
**depend**
 8:11
**dependence**
 59:24
**dependency**
 63:11
**dependent**
 49:14
**depending**
 194:18
**depends**
 84:16
**depict**
 110:8
**depicted**
 108:15,24
**depiction**
 109:2

**depicts**
 110:2
**deposition**
 3:1 81:10
 93:22 111:9
 197:21
**depression**
 52:15,21
 53:13 91:4,6
 92:7,8,10
 123:20 124:2
 173:8
 176:12,16,
 18,21 177:2,
 4,11,15,17
 196:7
**describe**
 4:6 17:12,14
 48:4 76:11,
 12 132:3
 149:8 164:2,
 3
**described**
 163:23
**describes**
 136:25
**description**
 136:4 137:3
**descriptor**
 42:20
**designation**
 40:10
**desire**
 61:6
**details**
 60:2 81:11
 97:14 171:18
 172:12
**determined**
 96:5 131:7
**detox**
 58:20 72:19,
 24
**device**
 108:3
**devices**
 79:24

**diagnosed**
 30:17,18
 45:3,16 49:4
 57:6,8,19
 150:6
**diagnosis**
 30:24 45:6,
 7,10,14,20
 52:21 53:1
 57:9,12
 92:25 93:1
 160:15
**diagnostic**
 37:24 56:14
**diary**
 163:5,8,13
**die**
 192:2
**difference**
 16:21,25
**different**
 4:9,17
 10:11,12
 15:1 19:9
 46:21 48:23
 50:11 58:21,
 22 74:21
 89:8 91:1
 92:20 118:12
 165:12,20
 192:14
**differentiate**
 177:14
**difficulties**
 136:19
**dim**
 114:7
**dinner**
 82:13 130:25
**direct**
 3:14 12:19
 19:19,22
 144:6,7
 189:23
**direction**
 15:12,16
 145:20

**directly**
 15:18 19:18
 61:9 107:17
 109:5 110:3
**directs**
 12:16
**disability**
 21:8
**disagree**
 144:25
 166:15
**discharged**
 128:8 179:25
**disclose**
 170:1
**discrepancy**
 119:6
**discuss**
 158:22
**discussed**
 106:14
 158:21
 171:13
**discussion**
 47:7,11
 68:19 69:1
 156:4 162:25
 172:14
**discussions**
 51:7 69:15
**disembarked**
 142:12 180:2
**dismiss**
 140:6
**dismissive**
 140:4,12,13,
 23
**dismissivenes
s**
 141:6
**Disney**
 75:7,21 76:4
**disorder**
 45:4,20 48:3
 92:25

disorientation
  115:8,12,13
  131:18,25
disoriented
  131:2,19,22
  132:3
dispute
  95:16 96:24,
  25 97:15,16
  99:7,9 100:5
  111:23,24
  112:10 127:2
  129:2 136:4
disputing
  95:12
disrupt
  143:14
distance
  6:17 110:12
distinction
  181:21
dive
  56:14
dizziness
  127:11,15
  139:18
  148:17
dizzy
  125:12
  127:20,21
  137:22
doctor
  12:8 26:21,
  22 33:18
  40:11 43:19
  49:11,17
  57:18 58:1
  126:1,14,19,
  24 137:18,20
  138:2,3
  139:1 141:25
  144:11
  152:24 154:3
  157:7,20
  160:3,4
  162:9,12
  170:16

171:14
180:12
doctor's
  30:20 157:13
doctors
  157:2
document
  81:23 82:1
  93:16,20
  108:10
  111:10 112:2
  124:11
  128:22 134:1
  140:7 150:11
  156:8 176:23
  189:25
dog
  34:8,10
doing
  5:4 16:22
  19:1 24:19
  25:25 62:17
  67:25 71:23
  78:4 100:17
  154:18,19
  163:6,17
  167:12
Dolphin
  83:9 98:21
  99:2
Dolphins
  83:10
dosage
  51:7 52:7
dose
  52:5 195:3,8
double
  125:13,24
DRAHOS
  3:15 56:19,
  21 81:15,25
  88:21,24
  93:18 105:14
  108:12
  111:12 112:4
  122:13,25
  124:13 134:8

144:2 149:16
150:13
156:10
158:1,15
160:24 161:7
167:10
168:16 169:5
170:4,10
175:11
181:9,22
182:11,19
183:19,25
184:20
185:6,14,19
186:3,11,18,
24 187:5,18
188:23
189:9,17
190:11
197:5,10,14
drained
  193:15
draw
  14:19,20
dressing
  127:15,16
drill
  58:22
drink
  58:14,15,16,
  24 61:6
  62:10,12,15
  83:1 86:4,8,
  14,15,22,25
  87:5 95:7
  102:18
  128:24
  190:1,4
drinker
  62:21 87:2,3
drinking
  58:18 59:10
  62:25 64:18
  71:9 86:23
  96:9 152:6
drinks
  59:16 62:23
  83:21 84:1

86:13 87:7
94:17,23
95:11,14
96:23 98:2,
11 99:6,24
100:5 152:5
190:5
dripping
  116:12
drive
  6:10 10:20
  44:13,14
  78:16 174:11
drive-thru
  192:18
driven
  15:15
driveway
  34:9
driving
  34:23 83:4
drug
  58:7
drugs
  63:5
drunk
  62:13,16
dry
  127:16
DTI
  166:12,19,24
  167:1,18,19,
  24 168:1,5,
  17,19 180:5,
  13
due
  100:22 120:5
  194:11
DUI
  58:12,13
duly
  3:12
duplicate
  74:10
duties
  19:24 196:12

Clay Crockett Volume I
November 21, 2024

| | | | |
|---|---|---|---|
| **E** | efforts<br>91:18 | encouraging<br>64:4 | ER's<br>37:5 |
| E-T-H-O-S<br>157:9 | egg<br>107:19 | end<br>4:17 10:5<br>39:20 49:15, | Eric<br>46:17,18,21,<br>23 47:1,8, |
| earlier<br>35:9 44:5<br>80:14 89:22<br>166:16 173:8 | eight<br>110:14<br>126:22 | 17 128:20<br>195:3 | 17,21,23<br>50:3,7,20<br>52:18 53:14 |
| early<br>40:16 130:24<br>132:1 | either<br>21:9 65:25<br>68:6,9 79:11 | ended<br>64:17 79:7<br>131:1 | 92:2<br>escalating<br>138:5 |
| earn<br>196:23 | 95:23 96:5<br>119:24<br>121:7,23 | enjoy<br>128:20 | escape<br>172:1 |
| ears<br>114:5<br>192:12,17 | 159:12<br>electric<br>24:6 | enjoyed<br>76:18 178:3 | escorting<br>119:22 |
| easily<br>191:1 195:18 | elevator<br>120:19,24 | enter<br>65:11 | establish<br>160:23,25 |
| east<br>6:15 | 134:14<br>eliminate | entered<br>124:22<br>126:18 | estimate<br>35:21 69:23<br>110:14 |
| easy<br>140:18 | 72:21<br>elimination<br>103:4 | entire<br>172:10 | 112:15<br>128:6,16 |
| eat<br>82:25 | embarrassing<br>193:24,25 | entirety<br>130:5 | Ethos<br>157:8 158:16<br>169:23 |
| ECG<br>171:5 | emergency<br>28:20,23 | entity<br>89:7 | 170:8,9<br>evaluate |
| Eclipse<br>174:2,6,9 | 37:8,9<br>144:18 | entry<br>126:7 127:13 | 154:25<br>evaluated |
| education<br>12:24 | Emily<br>35:2,4 | 136:7<br>environment | 158:10<br>evaluating |
| EEG<br>171:5 | employed<br>14:8 16:5 | 140:10<br>141:9,10 | 19:10<br>evaluation |
| effect<br>112:22 | 46:18<br>employee | episode<br>33:8 49:5<br>91:19 92:23 | 153:11<br>180:10 |
| effective<br>196:9 | 90:2 104:20<br>196:9 | 93:3<br>episodes | evening<br>62:23 95:19<br>130:22,24 |
| effects<br>47:5 50:23 | employees<br>186:22 | 33:10<br>equipment | 132:1 135:25<br>143:6 |
| Effexor<br>50:10,13,16,<br>19,25 | employment<br>9:14 | 16:7,23<br>79:25 80:6,8 | event<br>22:23 135:3<br>192:3,5 |
| efficient<br>19:2,13 | encounter<br>69:7 137:18<br>165:24 | 141:12,16,<br>21,22 142:1<br>equivalent | everybody<br>5:22 134:18 |
| effort<br>74:10 123:1 | encouraged<br>152:10<br>154:18 | 15:21<br>ER<br>138:16,21,22<br>142:3 144:20 | 166:21 |

everyday
  18:2,3,7
  48:16 194:6
evidence
  153:16
  166:4,6
evidenced
  140:15
exact
  65:13 132:11
  143:1
exactly
  28:11 147:11
  156:3
exam
  55:23,24
  112:16 158:2
  162:6,10
examination
  3:14 56:4,14
  157:24
examine
  113:2 133:3,
  10
examined
  3:13
examples
  48:24
excessive
  48:4,9 193:9
excessively
  96:10
excursion
  67:25 83:9,
  25 97:9
  98:21 99:2
excursions
  82:17,20
  84:3 99:21
Excuse
  71:6
exertion
  145:19
exhibit
  81:8,10
  93:15,22
  108:9,25

111:9 112:1
113:4 121:9,
10 123:9,12
124:10 150:8
151:12
156:12
161:17
176:23 178:7
180:4 183:1
185:22
187:15 188:4
189:5,20
190:1
existed
  45:10,22
  96:6
exited
  142:12
expect
  4:1,3
expected
  107:2 141:3
experience
  29:22 35:24
  63:13 64:24
  66:24 76:10,
  15 85:21
  90:22 91:1
  96:17 97:3
  98:16 99:11
  100:9 115:5
  142:9 194:17
experienced
  131:3 147:8,
  17 177:5
experiences
  81:4
experiencing
  125:22,24
  162:2 175:23
  177:3,15
  193:18
  194:4,5
expert
  158:9,11
experts
  170:1,2

explain
  132:6 150:17
  181:17 191:6
explained
  182:6
explaining
  190:14
exposed
  104:25
  111:16
express
  196:4
expression
  64:19
extent
  13:16 116:12
  158:11 171:7
  175:5
extra
  8:23 18:4
  145:7 162:19
extreme
  49:5
eyes
  114:7 192:17
  194:11
eyewitness
  117:18
eyewitnesses
  117:16

-----

F

fabricated
  126:20
face
  54:19 55:11
Facebook
  21:17 22:14,
  16,25 23:4
facilities
  82:25 141:5
facility
  122:22
  158:13 168:7
fact
  29:1 104:4

113:22 122:4
180:22
188:13
factors
  77:6
facts
  195:18
fair
  40:25
fairly
  10:16 19:7
  91:25 92:9
fall
  64:16 77:5
  110:15,19
  117:5 120:17
fallen
  106:5 110:12
  111:22 112:9
  115:21,25
falling
  104:23
  107:4,14
  110:17
familiar
  5:8 60:2
  61:14 143:18
family
  10:21 12:2,5
  22:22 23:2
  29:7 74:8
  75:6 77:25
  195:24 197:4
family's
  48:25 109:22
far
  17:9 29:22
  45:9 46:8
  50:24 90:16
  103:20
  110:11
fast
  115:24
  148:20
father
  75:13

**favorable**
29:24
**February**
35:10
**fee**
86:13
**feel**
5:24 31:13
74:15 102:20
140:9 165:7
173:11,12
195:16,20,24
196:3
**feeling**
12:14 27:4
29:19 70:6
125:12
140:22 162:4
178:4 192:14
193:13,15
**feelings**
196:5
**feels**
147:16 163:6
164:20 180:7
**feet**
110:14
**fell**
107:17 108:6
110:14
124:24
189:15
**felt**
42:8 122:10
139:22,23
163:17
**female**
42:18,19
118:9
**field**
12:24 13:2
**fight**
54:8,9,10,
11,12,13,16,
17 134:23
148:5

**figure**
102:3
**figures**
195:18
**filed**
21:5,8
**fill**
123:10
**filled**
123:14
176:24
**finally**
17:7 49:6
64:24
**financial**
17:20 18:6
48:20
**financials**
20:3,5
**find**
23:3 43:10
64:10 173:14
191:9 195:14
**findings**
150:9 162:5,
13 163:1
**fine**
19:11
154:19,21,22
**finish**
9:15
**fire**
89:9,23
90:18,20
**firefighter**
89:5,6,14,25
90:8,15
**fireman**
90:12
**fires**
90:19
**firm**
14:11 15:2,3
17:2,9,17
18:21,25
19:8 20:4
169:25

**firms**
9:6,13
**first**
3:12,19 6:2,
7 9:1,2,3
14:3,4,15
21:19,20
30:3 36:20
42:5 44:25
52:23,24
56:25 59:15
62:1,5 66:2
67:21 78:11
82:6 84:5
85:25 86:1
88:6 89:9
93:11 98:7
100:24
101:18
108:23 113:6
115:22
117:13
118:5,8
126:4,17
128:1 131:19
133:5 137:7
140:3 147:25
150:21
151:8,25
154:1 156:4,
21 157:18
161:25
164:24 166:5
169:12
177:19 179:8
181:5
**fist**
54:17
**fit**
40:22 77:5
**five**
8:23 11:15
16:12 29:13
71:17 75:4
76:16 98:11
165:15,16,18
174:19,25
175:2

**fixing**
186:17 187:3
**flew**
78:17,19
79:16,19
174:22
**flight**
79:4 90:9
134:23
142:24
144:3,4,7
148:4,5
**Florida**
3:2,3
**flower**
24:15
**flu**
27:24 28:16
**fly**
78:18 79:3,
9,11,12,15,
17,22
**focus**
17:4
**focused**
48:18 136:7
**focusing**
28:24 80:6
**fog**
195:10,11,
13,19,25
**fogging**
162:4
**folks**
17:16
**follow**
17:11 29:12
30:4 60:5
121:22 152:3
169:13
**follow-up**
73:2 159:5
161:20 166:1
175:15
**following**
93:3 96:19
111:15

Clay Crockett Volume I
November 21, 2024

112:17 118:6
122:9 138:1,
20 140:24
142:13 150:1
**follows**
3:13
**food**
83:17,21
84:1
**football**
13:16
**force**
114:24
**fore**
164:18
**forehead**
107:18,21,22
113:10,14
116:6,7
137:1,3
**foreign**
76:8
**foreseeable**
25:23
**forever**
60:14 193:4
**forget**
172:25
193:22
195:22
196:13
**forgot**
171:4
**forgotten**
149:2 172:18
**form**
113:2 122:16
123:9,11
139:4 148:24
181:9,22
182:11,19
183:19,25
184:20
185:6,14,19
186:3,11,18,
24 187:5,18
188:23

189:9,17
190:11
**formal**
4:5 52:20
65:13
**formalized**
12:23
**forms**
70:16,18
**formulated**
112:24,25
140:14,24
**fortunately**
115:7
**forward**
20:18 148:20
163:14
**found**
62:24
**four**
9:2,11 10:24
74:3 145:1
**four-page**
93:20
**frame**
43:23 45:11,
15 51:21
57:24 62:3
71:24 93:13
94:9 146:8
148:14,23
157:5
**free**
23:12 44:24
74:22
**frequency**
69:22
**frequent**
194:13
**frequently**
42:13 95:4
**Friday**
17:22 71:15
149:21
180:24
**friend**
34:5

**friends**
147:20
152:20
191:15 193:1
**Frog**
95:3 98:7
128:24
**front**
34:8 68:25
178:8
**frustrating**
196:20
**full**
4:12 61:1
71:19 72:17
90:12 91:5
93:11 114:2
149:19
**full-time**
89:13
**fully**
136:14
**fun**
6:17 76:13
89:19
**function**
14:21 56:1
149:11,18
164:21
**functioning**
165:8
**functions**
56:15 69:20
**funny**
23:3
**future**
17:17 25:23
196:21 197:2

---

**G**

---

**Galveston**
67:19 78:12,
13,14,16
142:20
**game**
49:15

**gaps**
129:9
**gather**
101:18 108:1
113:22
**gave**
33:8 53:17
121:23
131:13
145:25
165:15
**general**
30:20 48:3,
11,12 73:1
86:18 87:25
92:24
100:16,20
117:23
155:14
172:13
**generalities**
88:17
**generalized**
45:4,20
48:22 62:4
**generally**
27:25 31:15
80:19,20
87:10,25
90:7 121:22
162:15
178:10
194:20 195:2
**generic**
50:16
**genetics**
152:12,14
**gentleman**
43:17
**George**
79:17
**Georgia**
173:24
**getaway**
76:22,23
**getting**
6:3 13:4

20:3 29:8
42:8 74:13
84:5 85:19
103:22
128:19
130:21
131:4,7
137:23
143:12,13
145:6,9,10
193:13
194:11

**give**
3:9 5:22
18:5 23:16
33:5 41:19
53:6 65:14
88:17 89:16
100:16
116:10
132:3,14
148:18,21
153:14
155:23
160:15
161:17
171:15
172:13 175:7
178:17 191:3
195:21,22

**given**
127:12
141:14
154:16
178:24 181:8
195:6

**giving**
152:13

**glean**
46:8

**global**
47:7,9,11

**goal**
49:12 60:17
65:8

**goals**
17:18

**goes**
36:5 98:14
193:20
195:15

**going**
3:19 4:14,
20,24 5:2,
10,23 6:2
15:16 18:13
20:13 22:9
25:22 26:14
27:14 28:13
30:9 34:5
35:14 36:24
41:10 46:4
49:13 50:21
52:3 54:10
55:17 56:25
58:6 62:15
64:8,9,10,
12,17 66:9,
18 67:9,12,
16 73:14
74:9,14
77:4,21
79:21 80:5
81:9 85:19
87:24 88:21
93:14,21
94:20 96:1
97:5 98:21
101:3,8
103:16
106:24
108:8,9,13
111:8,13,25
115:24 121:4
124:16
129:18,25
130:19,24
134:13
148:11 149:8
152:2,24
154:1 156:3,
11 157:23
158:4
159:14,19
160:5 163:13
169:10,11

170:6
172:21,23
173:1,2,7
175:16
177:22
182:7,8
183:18,22
185:3,11
188:18
192:4,21,23
196:13

**golf**
13:6,15
23:11

**golfer**
13:11

**good**
3:16,18 8:10
13:13 16:13
17:11,15
24:6 26:9
33:6 40:22
76:12 77:22
81:13 89:19,
21 100:18
155:21
167:21 178:4
193:14
195:17
196:3,25

**goodbye**
60:13

**GOODMAN**
56:18 81:14
88:20 105:12
122:12,15
134:4 143:24
157:23 158:8
160:20 161:4
167:8 168:13
169:3,24
170:8
175:14,18
181:11,24
182:13,21
183:20
184:2,22
185:8,16,21

186:6,15,21
187:1,6,20
188:24
189:12,19
190:13
197:8,13,15

**Google**
43:11,12,13
66:19,25
167:12,15

**Googled**
166:20 167:6
183:16

**goose**
59:13 107:19

**Government**
21:9

**GR5**
81:13

**graduate**
7:6

**graduated**
7:7

**Grand**
83:10 98:20

**grandmother**
12:4

**granted**
173:4

**grass**
24:14 25:1,
16,22 90:18

**gray**
59:13

**great**
3:25 54:14
152:3

**green**
118:15

**grew**
6:23

**grilling**
26:7

**ground**
4:2 34:12

**group**
20:14,15

Clay Crockett Volume I
November 21, 2024

73:9,12,15,
25 74:9
147:14 148:1
157:8,11
158:16
**groups**
147:19
**grow**
6:22 20:13
**growth**
17:18,20
19:1
**guard**
44:12,14
119:22
**guards**
118:17
**guess**
10:5 13:16
16:25 17:11,
25 30:8 34:2
66:9 72:5,24
84:16 85:6
103:22 135:9
166:21
180:21 182:8
190:14
**guest**
69:5,6,8
123:9 124:23
125:12
127:13
**guests**
123:10
**gun**
92:16,23
**gutsy**
24:3
**guy**
15:14
**guys**
82:6 130:7
152:17

---

**H**

---

**habit**
62:14
**half**
11:1 25:4
41:21 51:9
170:20,21
**hand**
3:6 34:12
81:9 93:14
107:15
108:8,13
111:8,25
124:14 139:8
150:7 151:11
156:11
193:20
195:15,16
**handicap**
13:7,9,14
**handing**
123:8
**handle**
26:4,6 71:5
148:6
**handrail**
109:7 120:5
**handwriting**
123:11
**Hannah**
11:10,11
172:24 173:6
**happen**
33:20,25
66:24 92:24
95:25 106:7,
24 112:13
173:7 188:19
**happened**
34:6 84:8
92:5,13
95:18 106:4
107:1,12
108:1 114:5,
21 115:23

133:22 134:1
135:6 140:6
143:12 145:5
158:24
192:15 194:9
**happening**
135:24
**happenings**
100:14
**harder**
194:13
**he'll**
73:7
**head**
4:20 5:2
34:13 37:24
54:19,24
55:6,11
107:5,17,19
108:6
113:10,14
114:1 116:1
122:6 124:24
125:5 135:7,
10 136:25
150:3,15,19
155:1,7
164:5 176:9
183:11
195:25
**headache**
130:23
137:24
145:13,14
146:23
163:24 176:3
194:10
**headaches**
31:16,20,22
32:1,2,6
56:25 57:1,3
147:2,7
148:17 162:3
163:7,18,20
164:3,13,18
171:21
175:23 176:1
193:8 194:4,

5,16,24
**headquarters**
43:8
**healed**
137:12
**healing**
164:15
**health**
12:7,8,24
18:25 38:2,
3,17 40:3
48:19,24,25
50:15 53:11
56:11 157:8,
11 158:16
161:9
**healthcare**
32:5 158:23
**healthy**
64:21
**hear**
75:15 104:8,
11,22 105:17
**heard**
19:17 60:1
75:12 152:16
174:21
**hearing**
150:21
**heart**
29:9 33:9
48:16 65:15
75:15
**heat**
25:18 145:19
**heavily**
172:16
**hedges**
24:24
**Heights**
53:20,23
56:6,23
58:5,19
59:3,5
63:13,17
71:12,21
72:11 73:3,

11 74:1,17
**held**
66:13,21
69:24 70:1
92:16
**helmet**
34:15
**help**
12:20,22
17:17,18
19:23 41:16,
17 43:3,5,14
48:2 49:7
50:23 52:5
53:18 58:19
60:25 62:11
63:21 65:21
66:4 72:21
85:8 89:19,
21 93:3
110:2 129:5,
9 153:8
164:14 195:3
**helped**
120:20
131:14 147:5
**helping**
19:12 61:12
90:9
**helps**
20:5,16
85:17
**hey**
152:17
165:16 173:1
191:23
**Hickey**
169:25
**high**
7:1,2 13:5,6
31:14,17
134:21
**highest**
13:9
**highly**
196:10

**Hilton**
82:24 83:2
97:9,22,24
**hire**
17:8
**hired**
15:17 186:20
**history**
26:11 29:7
81:12 91:3
152:4 195:19
**hit**
23:17 34:10,
24 108:6
110:13
115:25
183:10
**hitting**
107:5
**hobbies**
23:11 89:18
**hobby**
26:7 79:17,
19,21 89:15
142:22
**hold**
13:24 120:4,
22
**holding**
133:21
**holds**
196:21 197:2
**hole**
172:9
**holes**
190:20
**home**
10:21 11:6,
14,19 23:14,
16 24:20
26:1 70:1
72:13 79:4,
22 143:11,
16,23 179:6,
11,16
**hometown**
89:11

**Horizons**
95:5
**horn**
192:22
**horrible**
91:2
**hose**
90:8
**hospital**
37:20 155:15
**host**
107:23
**hot**
107:7
**hotel**
83:12,19
**hotline**
12:12
**hour**
5:22 6:15
88:22 103:5
128:6,16
129:15
170:19,20,21
190:23
**hours**
5:23 6:14
8:17,18 18:4
59:17 72:16
164:6
**house**
10:15,19
72:16
**housekeeping**
118:16
**Houston**
78:18,19,21
79:3
**HSA**
39:8
**hu-huh**
90:25
**huge**
116:16
**human**
175:25

**hurting**
115:23
119:16 196:4
**hydroplaned**
34:24
**hypertension**
30:17,18
123:20

---

**I**

**i-m-i-n-d**
46:19
**I.D.**
81:24 93:17
108:11
111:11 112:3
124:12
150:12 156:9
**I40**
6:15
**Ibuprofen**
147:6 194:25
195:7
**idea**
108:19
**identical**
108:20
**identified**
70:22 124:2
**identify**
65:22 141:23
157:3
**identity**
69:3
**illness**
152:5
**illnesses**
27:7
**image**
150:19
**imagine**
64:7 95:5
110:25
**imaging**
30:7 37:24
142:1,4,5,6

Clay Crockett Volume I
November 21, 2024

166:13,19,21
167:18,19,
21,24 168:1,
5,18,19,20
**imind**
46:19 47:18,
21
**immediately**
107:18
111:15
112:19
114:5,20
119:10,14
122:9 133:21
135:6 139:2,
13 141:2
143:21
144:10,19
159:1 176:15
**impact**
54:23 55:6
113:24
114:1,24
117:5 131:10
**impairment**
162:5,13
166:4,7,10
**implanted**
33:19
**impossible**
4:16
**impression**
112:23,25
135:6 140:13
150:15
153:23
**improve**
139:17
**improved**
115:15
145:17
163:20
**improvement**
23:14,16
**inability**
48:5

**inaccurate**
136:15
137:3,4
163:25 164:1
**incident**
25:17 26:2
30:3 33:17
54:22 55:8
59:6 68:7,8
84:7,20,22,
24 85:2,12,
13 100:12,15
101:10,15
102:25
103:6,24
104:10
105:7,22
106:2,3,18,
24 110:23
111:3,15
112:17
117:12,17,19
118:6 122:9,
10 151:24
157:4 159:1
167:16
171:21
173:4,16
175:20,21,22
176:8,11
177:12,15,
16,18,24
182:15
187:21,23
188:21
190:15,25
191:7,14,15,
22 192:9
193:7,12,19
194:6,9
195:11,17
196:1
**include**
83:23 181:18
**included**
83:21 84:1
190:4

**inclusive**
83:18 99:20
**income**
197:3
**indeed**
24:18 110:3
**independence**
48:20
**independently**
64:5,6 70:21
169:8
**Indian**
42:22
**indicated**
45:10 125:19
**indicates**
82:2 125:9
151:16 155:7
164:20
**indicating**
139:4,10
**indication**
125:21
**indicative**
126:10 166:9
**indicators**
18:23,24
**individual**
43:20 69:14
**individual's**
60:23
**individuals**
118:3,23
**industry**
12:6
**infection**
28:17
**infirmary**
120:14
127:22
131:14 133:5
134:14
176:24
179:2,13
180:1
**influence**
146:11

**informal**
4:7 65:12
73:12
**information**
17:20 18:6
77:11 97:6,
13 105:25
106:12 167:6
**initial**
158:4
**initially**
45:6,16
162:1
**initiated**
119:23
**injured**
106:5
**injuries**
157:3
167:12,16
176:9 193:19
195:12
196:22
**injury**
34:13 100:23
132:25
135:5,10
143:11 145:5
159:20
167:20,22
178:1 181:3,
5
**inpatient**
72:15
**input**
15:16
**inspect**
185:18
**inspection**
103:20,21
**Instagram**
21:17 22:12,
13,16,21
23:9
**instance**
32:9 91:12
92:12 110:20

instances
  28:12 41:8
  91:9
instinct
  115:22
instructing
  170:4
instructions
  170:25
insurance
  21:10 39:5
  43:21 72:7,9
intelligent
  195:21
intended
  5:13
intending
  146:7
intensifying
  134:10
intentionally
  55:2
interaction
  157:18
interactions
  194:3
interchangeab
le
  74:23
intercranial
  162:23
interested
  15:4,7,8
  148:22
interesting
  23:3
interior
  120:13
internal
  17:9,19
  19:7,12
interrogatori
es
  197:7
interrogatory
  133:17

Interstate
  34:23
intervene
  71:22
intervention
  63:25
interviewing
  20:23
intimately
  60:1
intoxicated
  55:19 59:14,
  18 87:1
  96:14
investment
  15:2
invitation
  72:6
invoices
  18:18
invoking
  158:6
involved
  21:2 61:17
  85:12
involvement
  20:14 22:5
irritability
  131:4
  134:10,22
  193:17,18
irritable
  162:3
  193:22,23
  194:1
isolate
  173:10
isolated
  71:23
isolating
  192:11
issue
  70:19,22
  149:4 172:20
  187:12
  192:11
  193:21

issued
  9:4
issues
  29:7 53:21
  63:5 64:23
  70:15 86:18
  91:6 120:5
  180:8,18
  193:5,6,11
  195:23
itinerary
  77:3

---

**J**

---

Jackson
  6:11,12,19,
  20 7:17
  10:6,9,17,18
  12:2 26:23
  27:1,3,18
  28:24 29:11,
  23 30:15,25
  32:22,25
  43:17 44:12
  57:17 70:2
  73:9 78:15
  90:3 144:23
  150:17,23
  152:21
  154:12
  155:14 157:4
  168:8 179:8
Jamaica
  83:6
January
  15:3 30:22
  35:10 47:16
  54:7 173:23
jargon
  5:8
Jason
  26:19,25
  47:25 51:7
  52:7
job
  17:3 18:9

20:10 73:6
  149:12
  191:13
John
  15:23 36:10
Joint
  35:13,14
  36:6
joy
  196:2,6
Jr
  3:18
July
  65:17,21
  66:3 67:18,
  21,22,23
  68:1,6,7
  78:11,20,23
  79:2 82:3
  84:6,11
  85:18 88:7
  94:10,16
  95:14 96:14,
  17,20 97:3,
  6,13 98:17,
  19 99:7,11,
  14 100:4,12,
  25 127:8
  150:24
  151:3,12,20
  153:15
  175:22
  176:17
  179:21,22,23
  180:1,22,23
jump
  93:9 157:23
June
  16:1,16,18
  39:1 47:13
  59:8 173:24

---

**K**

---

keep
  4:7 62:17
  87:22 149:13

175:16 179:4

**keeping**
163:13

**kept**
163:5

**key**
18:23

**kick**
111:18
112:5,13
113:5,9,19
183:4,7,13,
16,17,21,24
184:7,18
185:4,11,12,
18 186:9

**kicked**
183:22

**kicking**
184:7 185:4,
11

**kid**
34:2,4 75:8,
18

**kid's**
77:18

**kidney**
37:15

**kill**
46:4

**killer**
31:12

**kind**
5:18 6:3,4
9:15 12:1
19:10 20:17
30:24 34:13
48:20 49:12
61:3,9 62:23
66:23 72:13
74:13,24
83:1,4,17
86:17 87:1
90:9 92:5,20
100:16
107:16
112:23

113:12 114:8
116:14 120:9
132:25
134:23 136:3
141:2,13
142:6 147:6
148:1,6,20
157:20 158:6
167:22 168:8
170:16,23
172:2 174:10
175:3 177:24
193:16
195:15

**Kindle**
107:12
108:4,5

**knew**
64:20 66:9
96:6 126:15
130:21
134:19
143:10 181:4
188:17,18

**knocked**
13:19

**knot**
135:7

**know**
4:3,14,20
5:8,16 6:3
9:7 10:11
17:7 19:9
20:5,14,16
22:22 23:2,
3,19 26:16
28:15,16
30:6 43:6,7,
8 45:19,22
47:1 54:15
56:9,11
62:22,24
63:1 64:15,
19 65:2,13,
20 66:7
67:3,9,11,24
69:3 70:3
72:1,2,5,16,

17 73:6,20,
22,23 74:8,
22 77:4,14,
19 80:15,21
82:9,12
83:4,9 84:16
85:5,15
86:13 87:13,
14 90:14
91:23 92:3,5
93:19 97:12
98:4,5 100:1
101:14
102:6,13,15
104:12,13,
24,25
106:13,15,17
107:2,4,8,
14,16
110:15,16,
19,22 112:13
113:12
114:10,15,
17,19
115:13,14,
15,20,22,23,
24 116:19,20
117:9,11,23
118:2,5,10,
11,12 119:3
121:2,3,21
122:5 126:3
128:4,19
129:9 130:23
131:4 132:9,
24 134:18,
19,24 135:7,
8 139:20
140:8,9,19,
20 141:2,4,
5,15 142:6
143:2,12,14,
15 145:18,19
146:4
147:18,19,
20,21,23
148:5,8,25
149:1 152:7,
18,19 153:4

155:2,25
156:3 158:24
159:1,12,17,
18,19,22
160:10
162:17
163:22 164:6
165:16,17,19
166:19,20,21
170:24
171:23,25
172:8,11,14,
20 173:3,9
176:13,14,15
177:20
182:14
183:13
184:3,10,12,
24 185:3,9
186:1,16
190:8
191:23,24
192:7,15,20,
23 193:2,5,
8,10,24
194:2,7
195:16
196:11,16,
17,18,25
197:1,2,3

**knowing**
66:11 105:2
108:19
185:17

**knowledge**
23:6,8 47:3
101:25
106:1,3,22
113:21
133:24
135:8,9
160:16 165:2

**known**
67:2 94:19
105:4

**KPI**
18:22

Clay Crockett Volume I
November 21, 2024

KPI's
  18:20

_____

**L**

_____

L-A-M-B-U-T-H
  7:16
lab
  57:13 152:11
lack
  63:13
lady
  109:17,18
laid
  117:9 128:14
Lake
  53:15,16
Lambuth
  7:15
landed
  34:11 144:8,
  22
landscaping
  24:19 25:12
large
  3:3 9:9 27:8
  63:1 107:19
Las
  174:23
lasted
  115:8
late
  71:18
laundry
  26:5,6
law
  169:25
lawn
  25:7
lawsuit
  134:3,7
lawyer
  106:9,14,15,
  21
lay
  4:2 129:18

130:1
LCSW
  12:25
lead
  19:11 72:2
  105:8 183:23
  193:8
leading
  68:19
leads
  65:24 178:4
learn
  66:17 72:25
learned
  106:15
learning
  72:25
leave
  16:13 42:7
  72:17 120:2
  130:10
  131:19
  138:15
  142:16
leaving
  40:20 44:18
led
  49:6 64:13
  68:25 105:18
  106:10
  107:22
  110:16 132:2
  141:10
  188:14
  192:25 196:7
left
  10:6 16:15,
  18 33:17
  34:11 59:5
  71:14 73:4
  113:11,15
  127:21
  128:4,12,18
  129:13,16,20
  133:5 137:1,
  2 139:7
  147:3

left-hand
  94:6
leg
  113:11,15
legal
  5:7
legs
  120:6
length
  153:20
letting
  147:25
level
  74:17 86:25
  91:7 134:15,
  18 139:18,20
  141:1 145:7
  148:2,6
  149:11,12
  158:25
  163:22
levied
  93:25
license
  9:4
licensed
  12:25
licenses
  13:25
life
  3:21 9:24
  47:7 49:14
  53:25 62:18
  63:1 71:1
  73:1 89:8
  141:4 147:22
  165:12,20
  177:22
  192:20
  194:22 196:7
lifestyle
  177:25
lifetime
  37:13,25
  38:4 58:8
  93:7

light
  87:2,3
  118:15 131:5
  134:12
  137:25
  147:10
  148:10
  171:23
  196:19
limit
  23:17
limitations
  190:15
limited
  24:7 141:13
limits
  24:8
line
  12:21 54:14
  77:5 188:22,
  25
link
  195:13,14
Lisa
  81:13 186:13
listed
  67:7
literally
  54:18
lithotripsies
  37:18
lithotripsy
  37:15
litigation
  21:2 168:2
little
  4:8 6:2,3
  24:9 26:10
  33:24 53:6
  58:23 65:22
  74:10 82:12
  84:18 91:3
  136:2 139:22
live
  44:9,10
  192:2

Clay Crockett Volume I
November 21, 2024

lived
  6:19,20
  10:17 11:13
  30:19
lives
  11:6
living
  10:11,20
  32:25 75:11
  196:23
LLC
  14:12
lobby
  128:25 148:2
local
  30:20
  138:21,22
locate
  122:1
located
  28:4 33:3
  36:11 43:7
  44:11 53:8
  57:16,17
  102:2
location
  6:16 101:24
locations
  190:2,10
locked
  122:22
lofty
  17:18
long
  6:19 11:13
  13:2 15:24
  16:11 20:4
  26:20 27:20
  45:19 59:5
  61:17 71:12
  88:8 101:14
  102:4,15
  115:4 128:15
  135:21
  154:21 156:1
  159:3 170:18
  174:24

190:23
194:12
long-term
  12:21 172:4
longer
  58:24 61:2
  125:9,20
  137:11 164:8
  165:22
longest
  81:7
look
  18:25 85:5
  94:6,9
  101:17
  103:18,19
  108:14
  112:20 121:9
  150:8 156:3
  168:1 185:22
  187:15
  191:25
looked
  77:3 96:6
  103:25
  140:16
  155:3,21
  167:18,20
  169:9 178:23
looking
  18:20,24
  19:1,8 66:11
  69:4 70:7
  76:22 77:17,
  18 107:13
  113:4,23
  123:10
  149:20
  150:14 155:5
  167:13
  176:23 183:1
  189:5,6
  194:11
looks
  30:21 97:20
  108:17,18,21
loose
  104:17

lose
  114:3,4
  181:20
  182:18
  186:10
loss
  127:6 136:22
  148:16,18
  149:8 155:24
  161:11
  172:3,4,5
  181:13,16,17
  182:9 195:15
  197:6
lost
  13:21 55:15,
  16 121:5
  182:1
lot
  16:24 19:7
  20:13 23:1
  24:17 25:5
  49:10 64:23
  67:16 71:9
  74:19 77:6,
  21 85:4
  90:17 103:11
  107:9,10
  114:6 141:12
  177:8,21
  196:2,6
lots
  48:23 74:20,
  21 137:6
  147:19
  172:16 193:3
loud
  4:25 147:13,
  14 192:12
lounge
  109:4 188:3,
  4,13,19
loved
  107:9
low
  34:9 35:16
lower
  36:4 37:2

134:15
138:24 139:7
lunch
  88:23
lyosis
  162:24

M

M-A-N-A-N-G-
G-I-T
  136:10
M-Y-A-T-T
  26:19 48:1
machine
  57:20,23
  80:2,7 168:8
  193:6
machinery
  147:15
made
  8:15 25:18
  28:25 45:6,
  7,14 53:1
  63:20 64:5,6
  69:4 75:12
  78:2 96:4
  104:13
  113:5,20
  125:19
  134:9,21
  138:2,10
  139:1 149:21
  179:9 181:20
  196:11
main
  16:25 17:3
  110:24
maintain
  104:14
  117:6,8,9
  189:2
maintenance
  104:15,16
  186:5,19,22
majority
  7:8

make
4:11,19
18:17 19:15
27:12 57:11
66:12 77:20
91:4 97:24
104:8 112:22
113:9
118:18,24
119:6 120:7
123:1 138:3
144:3 146:7
148:8 150:10
172:1,11
175:6 178:17
192:6 194:1,
13 196:25

makes
4:15 173:11
193:21,23

making
104:11
118:23
172:16 182:8
196:24 197:5

male
42:18

manage
47:1,4

managed
46:14

management
7:20 46:24

manages
46:13

managing
15:20 47:23
181:6

Mananggit
136:10

manifest
92:14

marathon
5:14

March
38:24

Marietta
136:10

mark
81:10 93:15,
22 108:9
111:9 112:1
123:8 124:10
150:7,10
151:11
156:11

marked
81:23 93:16
108:10
111:10 112:2
124:11
150:11 156:8

marketing
10:2

marriages
9:24

married
9:17,18,19
10:12

Martin
8:4,5,6

Martinez
170:15,16

Master
16:6,22

material
110:12
111:22

maternal
12:3

math
94:13,20
96:22 103:7

matter
74:18,19,20
96:2

matters
15:10 196:15

MBA
8:3,8

Mcamus
3:18

mean
12:13 56:10
58:21,24
60:2,12,17
64:7 65:5
68:18 71:6
76:16 80:21
86:17 89:20
103:16
114:20 133:9
134:11 143:5
146:6 147:11
161:10
165:14 172:9
175:21
179:12
182:2,18
184:6,14

meaning
92:14
187:16,25

means
4:21 5:13
58:11 60:4
92:21 103:3
147:12

meant
12:21 177:8

measure
29:19

meat
20:3

Med
16:22

media
21:15

medical
12:6 14:2
16:6 26:11,
14 30:4
32:24 34:25
45:9 53:10
55:7 76:5,7
79:24 80:7
119:10,14,
17,22 120:3,
10 122:2,11,
21 123:2,5,

24 124:1,7,
23 125:2,5
126:12
127:1,14
128:1,4,12
129:13,16,20
130:17
131:11,19
135:18
138:7,11,20
139:2,5,11,
16,23 140:1,
10,17,22
142:9,19
143:6,8,10,
17,22 144:9,
12,24 145:2
149:23 150:2
151:2,12
154:13
156:19,23
157:24
158:11
159:25 160:2
161:9 166:17
176:24,25
178:6,10,13,
16,20

medically
155:23

medication
31:5,6 46:1,
13,24 47:4
48:6 49:14
51:3,22
57:1,3 80:24
81:2 127:12
128:1 145:25
146:11
154:16
163:19
164:8,9,12
178:25
179:4,16,20
181:7 194:23
195:4

medications
47:1,6 49:19

Clay Crockett Volume I
November 21, 2024

50:6,12,14
80:4 164:18
178:23 179:1
**medicine**
58:1 80:13,
16 131:13
145:15
146:19
154:19
**medicines**
47:24 80:10
152:11,13
**meditation**
49:22
**meet**
122:2 133:4
**meeting**
47:14 66:2,
7,13,18,21
68:24 69:12
73:10 74:10,
17 95:17
96:2 169:9
172:5,7,10,
11 190:18,
19,22 191:3,
24
**meetings**
47:2 65:7
67:4 69:8,
21,24 72:2,
24 74:21
**member**
133:21 186:8
**members**
12:5 18:16
103:13
118:12,18
119:7
179:12,15
181:7 184:3,
7 185:3,10
187:10,17,25
188:8
**memories**
85:3 88:18
182:8

**memory**
84:25 85:10,
14 100:18
134:13
148:16,18,25
149:6,8
155:24
161:10
172:3,4,5,9,
19 190:20
191:1,7,12
195:15,23
196:17
**Memphis**
6:15 33:4
79:11
**mental**
12:7,8,24
38:2,3,17
40:3 50:15
53:11 56:7,
11 161:9
162:6,10
165:5,10,12
**mentally**
56:1
**mention**
4:17 19:17
28:25 75:12
166:14 171:4
174:21
**mentioned**
24:23 44:21
77:14 80:13
89:22 131:18
164:22
166:14
169:11
**met**
8:17 151:6
157:7,14,16,
17 158:2
179:7
**metal**
109:5 189:6,
7,11,13,15
**metrics**
18:20

**Miami**
39:22 90:15
168:21
169:18
**mid-sized**
9:13
**migraine**
194:20
**milk**
190:6
**milligram**
51:8,9
**milligrams**
51:4,8
**mind**
43:15 62:6
92:19 196:24
**mine**
26:8
**mini**
162:6,10
165:4,10,12
**minor**
23:14 113:12
**minute**
49:25 115:9
**minutes**
132:11,13
159:4
**missing**
183:8,9
189:14
**Mississippi**
6:23 7:9,12
89:10
**Missouri**
174:5,6,9
**mistakes**
125:19
**modalities**
49:20
**moderator**
68:20
**modernize**
17:9
**mom**
71:8

**moment**
20:24 26:17
70:5 80:6
**Monday**
17:22 149:22
157:17
158:3,18
179:22
180:24
**monitors**
31:3
**Montana**
174:2,3,4
**Montego**
82:21 83:2,
3,20 97:7
**month**
4:23 41:4
47:15 169:12
194:10
**months**
35:21 146:5
172:12
180:8,19
191:2
**mood**
52:9 162:3
**morning**
3:16,18
51:12,13
139:22
142:14 173:5
**mornings**
100:21
**mortar**
18:1,3
**mother**
12:3,7 75:9,
11 191:13
**motorcycle**
33:21,24
34:17
**motorcycles**
33:22 34:3
**move**
10:8,10
11:17 26:9

74:14 104:20
114:1
**moved**
7:11 10:14,
18 11:15
26:23 90:3
**movement**
81:11,16
97:14
**movie**
54:8,9,14
192:11,15
**mowing**
24:14 25:7
**mows**
24:21
**MRI**
155:12,13,
20,21,23
162:22 163:1
166:2,24
167:1 168:22
169:17,20
180:5,13
**multiple**
117:22
184:14 191:9
**mumble**
5:7
**Murray**
44:12,14
**Murugan**
126:8
**music**
82:10
**mutual**
70:10
**Myatt**
26:19,20,24,
25 27:5,21
28:25 31:3,
23 47:25
50:7 51:7
52:7 151:7,
14 153:14,22
154:7,16

**N**

**N-O-B-L-I-N**
36:10
**name**
3:17 7:5
11:9 15:22
25:11 26:19
30:20 35:11
36:19,20
42:4,5 43:3,
18 44:25
46:5,16
48:22 50:16
53:4,5,17
75:18 108:3
118:7 123:15
154:1,2
157:13,14,
15,19
158:12,14
170:15
**named**
7:15 36:10
**names**
3:20 9:6
36:7 102:1
117:24 118:1
**narrow**
95:22
**Nashville**
6:13,14
79:10,11
169:10
**nature**
169:21
177:18
**nausea**
125:13,22
127:6,11,12,
15 131:1,11
145:17
146:2,14
147:7 154:17
162:3 178:25
179:17

**nauseous**
25:19 125:16
127:17,19
132:21
145:23
146:10
**navigate**
26:14
**necessarily**
102:2 181:19
**need**
4:12 5:14,24
8:8 27:9
71:3 74:11,
16 91:4 94:4
119:25
120:18
122:11 131:8
145:7 150:7
162:17 168:9
175:16,17
**needed**
8:18 18:4
26:1 39:16
44:24 54:24
63:21 66:12
73:17 76:5,7
120:9 149:14
168:15
**needing**
165:21
**needs**
186:1
**negative**
150:15
**neurological**
126:23
**neurologist**
32:20,21
154:5,6,8,
20,25 169:10
**neuropsycholo
gical**
56:4
**never**
10:6 13:13
16:25 21:1

22:7 32:21
42:23,24,25
43:1,2 54:15
55:10,16
56:13 58:12,
13 62:25
80:22 81:4
91:11,23,24
92:20 113:1
131:12
147:3,17
169:14 174:3
176:8
**Nice**
6:16
**night**
57:21 62:9,
11 82:14
84:14 87:11
98:13
139:16,19
193:10,14
**nine**
99:6
**Noblin**
36:10
**nod**
4:20
**nodding**
5:2
**noise**
131:6 192:7,
8 193:20
**nonmedical**
152:19
**normal**
4:9 87:8
134:17 148:3
150:5 163:3
194:7
**north**
155:15
**Notary**
3:2
**note**
126:7,11,18
127:5 137:7

161:19
**noted**
137:2
**notes**
151:13 155:7
172:11,17
**notice**
98:13 104:5
106:23
**noticed**
103:24
**November**
11:16
156:15,21
161:19
163:17
168:24 169:1
171:9
**numb**
49:24
**number**
8:18 19:8
44:24 81:12
92:5 94:22
113:4 123:15
140:4
**numbers**
15:14 18:7
138:24
**numerous**
106:4
**nurse**
12:8 46:15
124:22
125:8,18
127:17
136:10,11,
13,19,25
140:3 151:9
157:21
158:17 159:9
160:9

**O**

**O'CONNOR**
38:11,13,21,

22 39:3,10
40:2,24
46:20,22
47:19,21
50:2 153:7
**O-N-D-A-N-S-
E-T-R-O-N**
178:25
**object**
122:16
181:9,22
182:11,19
183:19,25
184:20
185:6,14,19
186:3,11,18,
24 187:18
188:23 189:9
190:11
**objecting**
122:16
**Objection**
105:12
122:12 134:4
143:24
160:20 161:4
167:8 168:13
169:3
**obnoxious**
5:4
**observation**
138:4,6
**observe**
105:8 186:9
187:11
**obsess**
48:10
**obtained**
190:2
**obvious**
4:14
**obviously**
17:2 30:7
66:6 77:3,22
107:9 114:6
121:3 137:9
140:4

**occasion**
31:25 59:4
76:20 92:22
175:25
**occurred**
84:7 101:15
103:1 151:24
**Ocean**
95:5 101:19
**offer**
119:20
152:18
**offering**
152:22
**office**
44:11 157:25
**okay**
3:25 4:22
5:1,6,12,17,
20 6:5 7:5,
23 8:13,21
9:14 10:13
11:13 12:1,5
13:4,15 14:7
15:6 17:5,8
18:5 19:4,21
20:19,22
21:21 22:1
23:4 25:9,
13,22 26:24
27:16 28:24
30:5,9 31:10
36:11,16
37:16 39:21,
24 40:12
41:1 43:14
45:2 46:25
47:10 48:6,
14 49:1,25
51:18 52:20
54:4 55:10
56:13,17
58:5 59:19
62:10 63:24
65:1,10,16,
20 68:5,14
70:20 73:2,
24 75:17

76:19 77:8,
24 78:5
79:20 80:3
81:3,19
82:15 83:20
84:10,19
85:6 86:15
87:23 92:12,
18,23 94:1,2
96:8,16,19
97:1,12
98:10 100:3
102:3,5,22
103:8,15
104:2 107:25
108:8
109:12,24
110:1,11,22
111:8,20
113:22
114:10
115:25
118:18
119:4,17
120:12
121:14,19
122:8,19
124:18
125:18
126:6,9
128:21 130:9
131:15 133:9
136:8,22
137:17
138:25
141:8,21
142:8 143:19
145:12,22
146:2 147:1
149:6
151:11,15,23
153:19,22
154:8,24
155:13,19
156:14
158:20
159:11
162:21
163:23

Clay Crockett Volume I
November 21, 2024

165:18,25
170:21
171:15,20
173:22,25
174:18
175:9,11
179:19 185:2
**onboard**
67:5,7 142:1
175:21
178:24
179:13,15
180:1 181:7
184:10,16
187:7
**once**
5:21 25:13,
14 47:14
60:19 178:16
194:9
**Ondanestron**
178:24
**one**
4:18 9:3
13:8 14:14,
15,17,21
19:19,20
20:2 22:15
27:13 28:2
32:9 34:19
36:17 41:13
43:15 44:16,
22 51:8
57:11 58:3
59:4 62:10,
16 67:18,19,
20 68:22
69:10,13,15,
17 70:21
74:6,7,12
75:6,7 76:3
77:24 79:12
80:13 82:23
83:20 87:7
91:10,12,19,
22 92:12,19,
22 94:5 95:3
99:20 108:24

110:24 111:4
123:14
124:1,19
132:5 133:20
134:9 140:4
145:14 165:3
167:13 177:2
178:23 179:1
182:4 183:7,
9 188:10
194:14
195:2,9
196:10
**one-and-a-
half**
51:9,23
**one-on-one**
47:2
**one-person**
25:10
**ones**
89:8 95:2,4
**ongoing**
167:14
**online**
153:9
**open**
104:24 107:8
120:19
**operating**
14:13
**opinion**
126:24
140:23
**opportunities**
72:25
**opportunity**
103:15,18
113:1 117:25
133:10
**opposed**
135:5
**option**
49:8 96:5
**options**
20:23

**order**
4:11 105:9
170:2
**ordinary**
104:6 105:19
**oriented**
93:13 126:25
136:14
**original**
107:25
**originally**
45:8
**originated**
78:12
**orthopedist**
33:11,12,14
**outgoing**
178:2 192:25
**outside**
71:22 89:10
106:14,20
171:13
**over-the-
counter**
57:2 80:16
145:15 147:5
154:18
**overnight**
138:9 174:12
**overview**
100:16
**overwhelmed**
147:16
**owned**
24:17
**owners**
17:21
**ownership**
15:4

---

**P**

---

**P-A-Y-N-E**
36:18
**P-O-P-L-A-R**
174:8

**P.A.**
26:25 43:4
**P.E.**
15:2,3,6
17:6 20:14,
15
**p.m.**
73:21 94:15
95:2 97:18
98:7,8,14
99:17 127:5
128:8 135:1,
20 136:2
197:22
**package**
83:18 86:4,9
87:5 94:24
190:4
**page**
4:3 23:4
124:19
126:5,22
127:4 136:7
150:14 188:4
**paid**
18:18 19:16
41:5 43:20
82:24
**pain**
35:16,22
36:4 37:2
113:12 114:6
137:23
154:18 164:5
177:8
194:14,15,
16,19
**painful**
194:21
**painting**
23:19 24:5
**panel**
189:6,7,13,
15
**panic**
147:15 148:6
192:14,20

Clay Crockett Volume I
November 21, 2024

paper
  18:7 93:21
  171:6
paragraph
  152:4 153:10
  161:25
  162:21
park
  121:3,6
part
  15:4,7,16
  19:24 22:23
  27:18 28:3
  29:1 40:16
  52:18 59:25
  60:5 61:11
  63:1 72:1,3
  73:8 92:1
  94:25 101:7
  127:10
  133:16 155:4
  183:17 186:4
part-time
  17:3
participate
  59:22 61:20
participated
  69:19 73:25
particular
  7:9 11:14
  14:25 15:24
  22:19 25:6,
  15 26:24
  27:6 41:23
  48:10 52:2
  68:11 69:8,
  14 74:5
  76:25 77:1
  84:9,21,23
  85:11,14
  88:10 90:23
  91:22 100:14
  101:23
  103:8,10
  124:16
  133:10 136:7
  137:17 151:6
  154:24

partner
  15:20
partners
  17:2 20:7
parts
  9:2 149:2
party
  82:10
pass
  9:1 82:21
  90:10 114:7,
  9 181:19
  182:14,17
passed
  9:2 75:14
  117:11 182:2
passengers
  68:15 106:6
  184:3,6,10
  185:3,10
  187:16,25
passive
  92:1,11
past
  14:4 61:6,7
  177:5,6
  178:3
patient
  35:17 47:14
  156:2 162:1,
  22 163:5
  180:7
patients
  73:7
pattern
  64:21
Paul
  3:1
paused
  157:16
pay
  39:7 72:7
  83:16
payable
  18:16 19:20
paying
  18:19 86:13

Payne
  36:17
Payne's
  36:20
payroll
  20:2
pen
  18:7
pending
  39:9 54:5,6
  159:25
  160:2,8
people
  19:18 27:5
  58:22 63:20
  65:8 66:10
  71:21,25
  72:4 73:10
  89:20,21
  104:15
  107:8,10
  111:1 117:22
  134:14
  143:17
  147:14,19
  148:1 152:19
  173:10
  183:22 193:3
  194:2,3,10
  196:14
people's
  48:19
percent
  18:11,13
  19:4 164:21
  165:8
percentage
  18:9
perception
  134:17,20
perform
  141:17 166:9
performance
  18:23
performed
  171:8

period
  10:10 35:19
  36:22 40:14
  58:25 59:17
  62:24 64:16
  68:17,23
  89:24 92:8
  115:4,6
  128:15 145:1
  146:5,18,21
  164:6 165:17
  176:15
periodically
  73:5,7
periods
  41:19
permanent
  156:1
permission
  121:23
person
  19:13 21:19
  25:6 42:2,
  16,25 43:1,
  2,24 44:10
  48:15 53:7,
  17 68:16,22
  69:3,24
  70:1,3,5
  118:8 126:25
  136:14,16
  159:21
  160:15,18
  161:8,14
  179:8
person's
  46:16 53:4
  118:10
  160:10
personal
  12:1 40:22
  64:23 86:18
  106:22
personality
  40:22
pharmacist
  52:11

phone
  5:15 12:13,
  18 123:15
Phonetic
  162:24
photo
  22:22 108:23
photograph
  108:25
  109:1,11
  110:1,7
  111:14
  112:20
photographs
  108:13,14
photos
  23:5 108:16
physical
  92:15 145:19
physically
  18:1 192:17
physician
  26:18 33:2
  47:25 53:2
  139:5
pick
  172:23,24
  173:1
picked
  141:3
picking
  24:25 191:19
picture
  112:5 118:7
  121:9,10
  133:20
pictures
  133:13,15,
  18,19,23,25
piece
  111:22
  147:14
pieces
  19:9 97:5
  104:17
pier
  82:10

pill
  31:8 51:8
pills
  51:10
place
  27:23 30:3
  66:21 73:21
  83:12 107:8,
  11 126:25
  136:14,16
places
  74:21
plan
  66:23 172:1
plane
  145:22
  146:10,22
planned
  92:21 97:9
  99:3 173:25
  174:15,17
planning
  8:15
plans
  11:17
planted
  34:12
plate
  111:18
  112:5,14
  113:5,9,19
  183:4,7,13,
  16,21,24
  184:7 185:4,
  11,12 186:10
plates
  33:18 184:19
  185:18
platforms
  21:15
play
  13:4,12
played
  13:6
Plaza
  95:5 101:19

please
  3:7,16 72:5
  177:1
pleased
  140:10
plenty
  143:3
PLLC
  14:13,17
  15:7
plug
  192:12,17
plumbing
  24:6
point
  5:14 42:8
  46:8 53:25
  59:18 61:22
  62:25 66:11
  84:12 85:1,
  18 90:13
  102:14 113:1
  114:3,14,16,
  18 116:2
  122:1,4
  124:16
  125:17
  130:16
  131:6,24
  133:8 145:8,
  24 146:13,
  18,25 148:17
  154:23 155:5
  157:22
  163:7,18
  167:13 177:7
  186:2 187:11
pointing
  183:3 189:7
points
  49:23
pool
  24:16 99:20
  101:8 116:8,
  11 121:6,8,
  13,24
pools
  24:17 83:17

poor
  193:9,13
poorly
  140:3
pop
  166:22
  192:24
Poplar
  174:5,8
popped
  167:21
pops
  192:22
port
  78:25 79:1,
  21 83:5
portion
  111:16 112:9
  113:5,8
  124:15
portions
  81:20 124:16
ports
  76:8 77:3,14
position
  25:20 112:10
  117:6
possibility
  67:3 167:5
possible
  18:18 67:23
possibly
  19:10 28:16
  48:25 52:4
  66:4 105:1
post
  22:10,13,15,
  21 162:2
posted
  22:7
posts
  23:7
potential
  70:19
potentially
  48:13 158:8
  184:8

pounds
  112:15
power
  120:3 125:2
  127:23,24
  142:17
practice
  27:20 29:2
  32:24 35:11
  39:19 40:21
  42:7 44:19
practitioner
  30:20 38:12
  40:9 46:15
  151:9 157:21
  158:17 159:9
  160:9 161:9
practitioners
  47:18,20
  50:1,5
prayer
  49:23
pre-booked
  83:9,10
preemptive
  29:18,20
  33:6
prematurely
  93:20
premeditated
  66:23
premium
  94:24
preregister
  73:23
prescheduled
  151:22
prescribed
  32:13 50:6
  146:20
prescribes
  50:19,20
prescription
  57:3 164:17
  176:6 179:9,
  10

presence
  21:15
present
  38:7,8 51:1
  69:19 101:9,
  11 152:5
  154:22 157:6
  159:2 171:10
  181:19
presenting
  130:22
  135:23
pressure
  31:14,17
  80:13 116:15
  141:15
pretty
  6:16 27:19
  34:4 55:1
  90:14 115:7
  120:16
  135:11
  141:13
prevent
  164:13
  179:16
preventative
  33:1
previous
  191:13
previously
  26:1
price
  9:10 77:23
Primarily
  90:18
primary
  26:18,20,22
  28:2 47:25
  49:11 53:2
  144:11
principals
  74:25
printed
  66:20 68:12
prior
  16:5,6 21:3

26:2 28:7
30:13 31:19,
24 32:4,19,
24 33:12
35:24 37:23
38:4 40:2,5
41:7,14,15
43:14,25
44:3,4 45:14
47:23 51:6
53:14 55:8
57:3 58:6
61:22 62:19
73:7 74:1
75:1 81:3
104:10
105:7,22
106:2,18,24
135:9
private
  21:9
privilege
  158:7
probably
  18:11 33:6
  46:4 66:10
  74:2 78:3
  86:24 88:18
  91:22 102:19
  192:5 194:7
problem
  49:9 80:22
  85:16 147:22
  173:13,16
  191:4
problems
  25:17 123:24
  124:1 172:19
  177:1 191:1,
  12
process
  19:8 103:3
processes
  17:10 19:12
product
  158:6
professional
  3:2 47:3

61:11,21
140:9 141:9,
11
professionali
sm
  141:2
Professionall
y
  20:19
program
  59:25 60:4,
  7,11,20,21,
  24 61:1,10,
  12 186:5
project
  15:15 23:20
projects
  23:14
prompt
  4:24 22:20
  96:1
prompted
  42:7 49:5
  52:3 63:24
  66:25 76:20
  106:16
  130:19
proper
  104:16
properly
  189:2
properties
  11:21,24
property
  25:3
pros
  143:16
provide
  38:18 42:20
  105:3 107:3
  119:17
  180:19 189:1
provided
  44:23 103:13
provider
  158:13,23

Clay Crockett Volume I
November 21, 2024

provider's
  158:14
providers
  32:5 154:13
  156:20
psychiatric
  46:15
psychiatrist
  38:15 53:19,
  22,24 152:7,
  8,25 153:4
psychological
ly
  90:24
psychologist
  38:15 54:2
Public
  3:2
pulled
  155:2
punched
  54:18
purchase
  19:10 86:4,
  11,12
purchased
  59:16
purchases
  97:25
purchasing
  59:10
purpose
  183:13,16
push
  175:19
put
  22:17,21
  23:22 54:24
  103:13
  104:20
  106:23
  107:15 114:1
  137:8 163:9
  172:17
  194:14
putting
  23:20 24:5

Q

qualification
s
  160:11
question
  3:20 4:5,13,
  18,19 8:10
  17:15,25
  54:11 55:1,
  3,14 60:8
  80:5 94:22
  97:1 103:16
  106:19 108:1
  110:5,9,18
  119:1,13
  122:17,18
  132:10,12
  146:7 152:17
  170:5 181:25
questioning
  81:21
questions
  51:16 56:11
  89:3 94:5
  96:3 175:12,
  15 180:5,21
  181:13,15,16
  182:10
  184:23,25
  197:9
quick
  56:24 195:17
quicker
  19:14
quickly
  19:2 115:7
  145:16
  170:25
quit
  58:17
quite
  140:2 184:13
quitting
  152:6

quote
  59:7

R

radiologist
  30:8
rain
  104:25
Raise
  3:6
ran
  34:8
rarely
  22:13
rate
  194:16,20
ratios
  18:24
reach
  19:14 73:5
  91:6 152:25
reached
  120:24 152:6
  153:2
reaching
  153:3
react
  170:25
read
  4:23 30:8
  57:18 67:3
  81:13 124:15
  167:23
  197:11,13
reading
  107:12 108:2
ready
  56:22 58:6
  92:21 107:24
real
  165:12
realized
  66:6
reason
  13:22 14:25
  22:19 25:15

28:7,20
32:19,23
33:8,13
37:8,19,25
38:3 40:20
44:18 53:24
55:15,16
74:5 76:25
92:2 96:24,
25 97:15,16
99:7,9 100:5
103:19
111:23,24
112:10 127:1
129:2 136:4
142:2 188:17
reasonable
  27:14 77:22
reasons
  17:7 28:13
  46:22 74:7
reassurance
  153:15
reassuring
  153:11
recall
  22:2 28:11
  29:6 30:16,
  19 32:3,7,15
  35:4 36:6,
  17,21 37:4,6
  41:9 42:4
  43:18 44:20
  45:7 52:1
  53:5 54:3,20
  56:2 67:15
  69:10 75:18
  76:1,16
  77:11 79:14
  81:1 82:6,8,
  13,16 83:6
  84:15 85:22
  87:6 88:10,
  12 96:15,18
  97:4 98:1,18
  99:12
  100:10,14
  101:16 110:8

Clay Crockett Volume I
November 21, 2024

116:22,25
118:21,22
119:7 120:25
124:9
126:14,16
127:21
128:18,19
130:6,8,12,
15 133:5,19
135:17
137:17
146:17,24
149:4 150:20
153:17
154:3,14
155:2,5,11,
12 156:24
157:1,14,15
158:13
167:25
181:14,15
184:25
190:18
195:18
**recalling**
190:17
**receipt**
190:7
**receipts**
18:14
**receivable**
18:17 19:13,
20
**receive**
57:9
**received**
52:20 127:25
140:1
**recent**
41:11 177:23
**recently**
46:14 53:20
91:25 92:9
192:15
**recess**
56:20 88:23
149:15

**recheck**
94:20
**recognition**
60:12
**recognize**
108:15,24
115:2
**recollection**
50:8 104:3
118:8 128:3
129:5,15
132:12 133:7
190:24
**recommendatio
n**
138:2,10,18
139:1
**recommended**
52:7 138:4,
6,14,15
142:2
**recommending**
155:12
**record**
3:17 5:5
81:8 88:6
140:25
151:12 180:4
**recorded**
4:10
**records**
45:3,9
98:10,23
99:5,15
128:7,23
129:3 136:1
142:11
144:21,24
150:24 152:1
155:4,17
156:23 163:9
178:7,11,14,
16,20
**recount**
94:18 95:6
**recovering**
59:19

**recovery**
60:3,15,18
61:1 64:14
65:3,5,11,
18,21 72:1
**recreational**
63:5
**red**
95:3 98:7
128:24
138:24
**redness**
137:1
**reduces**
48:8
**refer**
156:23
**reference**
81:21 176:19
**referenced**
152:8
**referral**
180:9,19
**referred**
30:6 154:6,
19
**referring**
153:6 164:4,
11
**reflected**
140:20
**reflexes**
170:24
**refresh**
129:5
**regained**
114:8
**regard**
12:9 112:11
**regarding**
23:7
**regimented**
39:16
**regional**
14:11
**regular**
25:5 31:5

194:10
**regularity**
175:24
**regularly**
57:23 69:21
185:17
**rehab**
71:21
**rejected**
139:3
**relapse**
59:4,7,9,12
**relapsing**
64:17
**related**
19:25 20:2
29:9 31:20
53:12 61:22
62:5,7 69:9
73:25 74:24
105:10
106:22
133:19 157:3
169:22
193:11
195:23
**relates**
140:11
**relation**
6:12
**relationship**
17:6 70:11
168:2
**relative**
177:20
**relax**
48:5 62:8
107:11
**released**
156:17
**reliability**
167:24
**relied**
106:11
**relieve**
52:6

**rely**
172:16,20
196:12
**remain**
60:6 138:7
164:10
**remainder**
98:11 129:6
138:8
**remaining**
19:5
**remember**
4:24 9:6
32:9,11,12
44:25 51:6
53:16 55:13,
20 57:5
68:23 82:11
83:4 88:14,
16 100:20,25
101:2 102:1
118:14
119:21,23
120:13,16,
20,21 122:22
129:9 132:23
141:25 142:5
143:1 146:18
147:25
152:15
153:1,3,20
155:22,25
157:19
161:12,13,15
162:14,16,17
164:16
165:15,16,21
166:6,7,11
167:13
172:7,8
173:21
176:20 179:3
190:21,22
191:2,10,11
192:4
193:23,25
196:25

**remembers**
158:12
**remind**
173:1
**reminder**
191:23
**reminds**
172:21
**remove**
148:7 193:2
**rendered**
36:14
**Renew**
16:7,23
**renewed**
179:9
**rent**
11:19
**repair**
37:11,12,19
**Repeat**
119:13
**repeatedly**
172:22
**repeating**
132:7,8,9,
15,17,20
**repercussions**
64:22
**rephrase**
5:9
**replaced**
133:8 186:2
**replacing**
186:8
**report**
15:18 19:18
81:11,16
96:24 97:14
99:8 100:6
138:1
**reported**
136:12
**reporter**
3:2,6 4:11
175:17
186:13

**reporting**
20:17
**reports**
19:19
**represent**
111:13,21
112:8
**representatio
n**
3:25
**request**
119:20
**requesting**
167:3
**required**
168:12 169:2
176:6 180:6,
13 193:2
**requirement**
8:18
**requires**
18:9
**research**
30:21 50:24
77:8,10
106:9
**researched**
67:2 169:8
**researching**
77:12
**resigned**
16:19
**resolution**
163:7,18,24
**resolve**
35:22 139:19
146:20
**resolved**
32:14 92:7,8
115:12
162:20
177:23
**resort**
82:22,23,24
83:11,15
**respond**
165:9

**responding**
47:6
**response**
134:23 148:5
182:10
**responsible**
186:16 187:2
**rest**
62:17
**restate**
106:19
**resting**
130:5
**restroom**
5:15
**result**
167:21
193:7,18
**results**
30:7 57:19
156:7
**resume**
20:16
**retired**
53:9
**retook**
9:3
**retriggered**
145:17
**return**
79:4 130:17
131:10,25
135:18
146:2,14
151:3 165:1
**returned**
98:24 99:16
136:2,11
147:2 150:23
164:9
**review**
94:4 140:24
**reviewed**
155:4,7
**rid**
49:20 72:20
195:1,4

**riding**
33:22 34:3
**right**
3:6 4:19
6:1,18 7:24
9:8,11
10:12,19
13:24 20:5,6
23:18 24:24
30:23 31:12
37:5,9 40:2,
23 64:8
65:15 78:3,
10 81:7
82:17 88:9
89:2,10
90:11 94:6,9
95:10 99:5,
17 103:3
105:6 108:23
109:17 110:3
113:8,11,15
124:10,14
126:18
128:8,10
130:13
134:24
136:23
138:1,17
140:16,17,
18,21 142:4
143:5,6
145:20
146:11
149:19,20,25
150:3,15
151:7 158:18
160:8 163:16
164:17
165:23 167:2
168:23 173:2
174:7 176:2,
9,12 177:22
179:17,23
180:2,14,20,
25 181:3,10
182:4,15,16,
18 183:4,11,
24 184:4,17,

19,21 185:5,
13,18
186:10,25
187:13,19
188:2,5
190:10,15,
16,20 191:21
194:6 197:11
**ringing**
114:5
**rise**
183:4 189:6,
14,15
**road**
64:22
**role**
15:11 16:9,
21 17:1 19:7
64:4 118:10,
17 196:11
**room**
23:19 28:20,
23 37:8,9
68:11,13,14,
16 77:22
82:11 129:14
**Roughly**
71:18
**rounding**
12:1
**routine**
27:10,21
28:17,19
31:23 39:16
87:8
**routinely**
147:18
**Royal**
75:7,22 76:4
**rules**
4:2
**run**
179:7 192:16
**rural**
90:14
**rush**
89:19,20

**rust**
189:7,10
**rusted**
105:1

---

**S**

**S-A-T-H-A-N-
A-D-A-N**
154:3
**S-L-E-C-H-T-
I-C-K-Y**
35:3
**S-U-M-A-T-H-
I-R-A**
154:2
**safe**
104:13 105:3
107:3
188:14,18
189:1
**sail**
82:9 93:23
96:23 100:4
101:17
128:22
189:20
**salary**
14:19,20
**Sam**
155:6,19
156:5,13,21
157:4 161:19
162:25
163:11,16,23
164:7,23
165:4,24
168:4,24
171:9 180:5
**Sam's**
161:25
**sat**
84:21,23
101:4 103:17
104:1,4
105:5 109:3
114:8 178:21

188:19
**satisfied**
20:19
**Saturday**
179:21
180:25
**Savannah**
173:23
**save**
107:9
**saving**
141:4
**saying**
4:16 45:18
60:13 65:6
80:21 95:12
102:20 104:6
114:23 119:7
120:8 125:20
126:13
127:16,25
132:17 136:3
137:13
141:25 146:9
155:8,25
161:12,15,16
162:17 166:6
191:9
**says**
54:14 125:4,
12 127:13
150:14
151:16
152:5,10
162:21 163:5
165:4 166:25
176:25 180:6
**scale**
194:14,19
**scan**
150:3
**scanned**
163:9
**scar**
107:22
162:24

**scenario**
59:16

**scene**
115:11
118:6,13,23
119:18 120:2

**schedule**
27:13 39:19
66:20 67:5,6
68:13 73:18
74:23 76:20
77:5 88:1
96:7 155:18

**scheduled**
39:13,15
72:5 73:19
79:3 96:21
97:7 98:20
99:14 100:13
144:10
151:21
159:5,8
160:18
171:12

**scheduling**
41:2 170:2

**school**
7:1,2,14,15
8:16 10:6
13:5,6
172:24 173:6

**schooling**
8:1

**science**
174:11

**score**
162:16

**scored**
162:6,9

**scrape**
116:13 122:7

**scraped**
113:12

**screaming**
134:18,20

**screen**
41:25 194:12

**screening**
29:8

**screws**
33:18

**sea**
67:21 68:1,3
80:18,22,24
81:1,4 88:8
93:11 96:21
100:13

**search**
43:11,12,13
66:25 167:14

**searched**
66:19

**searches**
167:12,15

**season**
177:21

**second**
14:13 49:8
55:18 69:10,
11 89:21
96:20
108:24,25
109:1 126:3,
16 131:11
151:8 153:10
154:2 156:5,
6,12,22
160:17 165:3

**seconds**
115:6
165:18,22

**secretary**
20:8

**section**
123:23
124:19

**security**
111:15
118:17
119:22

**see**
4:5 5:2
18:25 24:1
27:5,13,20

29:10 30:1,
15 31:19
32:20,23
33:12 34:5
35:6,7 36:8,
9 39:3,4,17,
18 40:14
41:24 42:1,
25 44:25
46:21 47:12,
15,18 53:19,
21,24 58:1
66:10 67:7
72:13 84:18
86:23 93:2
94:7,10 98:8
102:7,11
107:13,14
109:13
111:16 112:6
115:24
121:12
124:20,24
126:1,14
140:18,19
144:18
150:16
151:18
152:11
153:12,25
154:12,23
156:16
162:7,20
165:5 166:4,
6,14 174:2,
6,9 178:20
180:10
183:5,7
185:23
187:15 188:3
189:7,10,13
190:1

**seeing**
27:10 29:6
32:12 38:8,
10,11,20,23,
24 39:1
47:13 50:1
52:18 61:11

92:2 159:9,
10,21,22

**seek**
34:25 38:3
49:6 53:11
55:7 76:5,7
119:10,14
138:20 139:2
142:19
143:8,21
144:9,12
145:2

**seeking**
35:19 41:20
49:13 52:17
138:11
139:11
167:19

**sending**
158:10

**sense**
6:4 23:16
26:9 62:7
116:10 135:4
137:5 144:18
145:20
147:15 161:2
170:13

**senses**
132:2

**sensitivity**
131:5 134:12
137:24 147:9
148:10
171:23
192:7,8

**sentence**
153:10

**separate**
22:17,18,19
28:5,6

**September**
65:24 66:1

**serious**
122:5 135:11
181:3,4

**seriously**

91:23

**serve**
89:18

**served**
90:21

**service**
17:4

**Services**
16:8

**session**
4:6 39:14,
20,22,24

**sessions**
39:5,15
40:17 42:10,
12,14,16
43:17 44:7,
24 72:11

**set**
23:17 27:19
93:11 188:5

**settled**
82:12

**setup**
12:20 79:20
108:18
188:6,7

**seven**
10:10,17
100:11 126:5
194:19

**several**
9:7 59:16,17
73:13 75:3
91:14,16
92:13 108:20

**severe**
55:4 114:6
139:21

**severity**
155:25

**shade**
103:11 107:6

**shakes**
190:6

**shape**
20:6 113:2

**share**
20:6 23:2
100:25

**shared**
109:25
172:19

**ship**
54:22 66:3,
8,13,18,22
67:18 68:3,
11 69:5
75:2,18,25
76:5 77:1,6,
15,16,23
80:11 81:18
82:2,7,13
84:5,13
85:1,4,19
88:8,15
93:11 95:3,8
96:17,20
97:3,7,15,18
98:6,16,19,
24 99:6,11,
14,16
100:13,15,21
101:24
104:14 105:3
107:3 108:17
115:16,17
117:23
118:10
120:14 121:5
134:15
138:15 140:1
143:4,9,21
146:1 175:21
179:13,15,21
180:1,2
181:8
184:11,15,
16,17 189:1,
2,4

**ship's**
66:20 111:14
119:22 126:1
139:5 142:9
143:6

**ships**
67:4 106:4
187:8

**shirt**
116:23

**shirtless**
116:23

**shop**
102:7

**shore**
67:25

**short-term**
12:22 32:14
148:25 149:6
172:3

**show**
27:3 73:22
153:15
172:25

**showed**
155:8

**showing**
190:8

**shown**
178:6

**shows**
77:23 129:8
162:23 166:2
183:1

**shuttle**
78:25

**sick**
64:19,20
80:18,22
81:1

**sickness**
28:17,19
80:24 81:5

**side**
47:5 50:22
94:6 113:11,
15 160:5

**sign**
93:23 96:22
100:3 101:17
128:22 139:4
189:20

**signature**
124:4 139:7,
10

**significant**
64:8 135:3
162:5,13

**signs**
104:18

**silent**
31:12

**similar**
23:1 83:11
85:5 108:18

**similarities**
16:24

**single**
10:20 11:2
95:7

**singularly**
70:21,24

**sinus**
28:16

**sir**
79:5 98:15
111:13 112:6
126:22
175:12

**siren**
192:22

**sister**
16:7 75:9

**sit**
8:7,24 45:19
54:4 95:6
101:3 102:18
103:14
104:19
105:25 107:5
117:2 118:2
188:10,11,15

**sitting**
101:14,23
102:4,13,16,
20 103:4
108:2,22
109:4,17
110:4 116:3,

4 117:8
121:20
**sittings**
193:3
**situation**
34:10 60:23
61:10 72:4
144:18
147:12
148:8,12
191:20
196:20
**situational**
177:18
**situations**
28:19 92:20
165:21 172:2
193:1
**size**
25:5
**skid**
185:23
186:1,8
**skill**
23:17
**skin**
137:12
**Slechticky**
35:2
**sleep**
57:7,8,13,
18,20 58:1,2
62:11 193:5,
6,9,11,13,14
**sleeping**
87:22
**slide**
121:16,17,24
**slides**
83:17
**slightly**
87:14 139:17
**slip**
59:4
**slow**
5:9 186:13

**slower**
195:20
**small**
9:12 10:16
**smallest**
81:12
**smell**
170:13,22
**smoke**
63:7
**Snapchat**
22:3
**soaked**
116:11,17
**sober**
60:6 65:9
**sobriety**
64:16
**social**
13:1 21:14
62:20 193:1
**sodas**
94:24
**soft**
190:5
**software**
17:10 19:9
**solution**
12:22 153:9
**solving**
173:13
**somebody's**
73:6
**sooner**
102:22
**sort**
13:25 33:1
38:4,8 40:4
49:2 53:12
55:11 56:8
58:8 59:23
63:11 79:25
80:8 92:15
106:9 109:14
112:17 171:3
**sought**
40:3

**sound**
45:11 99:17
128:8 131:5
134:12
137:25
147:10,13
148:2,10
171:23
193:21
196:18,19
**sounded**
134:20
**sounds**
30:23 46:3
63:16 99:18
128:10
135:11
142:15
**Southern**
129:1
**Southwest**
79:16
**speak**
8:10 26:10
49:16 61:8
63:18,19
90:13 92:21
172:2 177:22
**speaking**
153:4
**specialist**
29:1,2,6
**specialists**
27:9 30:2,15
**specialty**
29:5 160:11
**specific**
8:19 85:7
88:18 95:2
100:19,22
104:3 110:18
133:1 134:13
138:10
146:17 149:3
**specifically**
16:16 17:12
26:15 29:15

31:20,22
33:25 35:15
47:6 64:12
65:10,22
66:14 75:25
77:12,17
84:15 88:12
93:3 95:6,
15,25 110:19
111:3 115:19
119:9 120:13
121:21
122:17
123:23
132:15
133:20
134:25
136:13
141:22
155:24
159:19
162:14 172:4
173:21
**specificity**
135:2
**specifics**
53:7 67:17
82:16 132:23
148:19,20
**speed**
34:9 114:2
**spell**
6:24 7:3
154:1
**spend**
6:2 7:8
40:17 42:10
**spent**
143:5
**split**
14:12,22
17:1
**spoken**
106:21
164:23
**sponsor**
70:8,9,11,13

sponsored
  70:12
sponsorship
  70:10
sport
  13:17
sports
  13:15
spot
  101:3 107:20
  117:10
stabilizer
  52:9
stable
  127:14
stack
  135:23
staff
  111:15
stages
  60:3
staircase
  103:18,19
  104:9 105:10
  108:17,19
  133:2,6,20
  182:25
  183:2,5,18,
  23 184:4,19
  185:4,18,24
  186:17
  187:3,7,10,
  14,16,17,21,
  24 188:1
  189:11
stairs
  90:9 104:17,
  24 106:5
  184:8
stairway
  105:24 111:1
stairwell
  84:7,8,25
  85:12,15
  103:23
  104:4,9
  105:19,22

106:2,18,23
110:23,24
111:6 112:9
118:20 133:3
stairwells
  85:4,16
stamp
  138:24
Stand
  168:21
  169:17,20
standing
  148:1
stapled
  93:19
start
  25:7 38:7,
  20,23 55:4
  58:6 74:15
  135:10
started
  16:1,16
  25:15 38:24
  39:1 46:7
  78:20 92:2
  132:7 177:24
starting
  94:10 131:2
state
  3:3,17 77:22
  174:20
stated
  124:23
statement
  95:9 112:22
  126:15
  140:11
statements
  18:15
  118:19,22,24
  119:5 132:10
states
  21:9 124:22
stating
  125:18
  127:18,20

status
  162:6,10
stay
  21:21 60:11
  87:14 130:4
  138:4,6
  182:6
stayed
  72:16
staying
  29:8 65:9
step
  20:18 60:12,
  13 183:17
  189:14
steps
  60:4 145:20
  159:13
  161:1,2
  183:1,5
  185:11 189:6
stitches
  55:10
stones
  37:15
stood
  68:25
stop
  5:16,21,24
  62:12 64:18,
  25 116:9
  125:5
stopped
  58:20 163:7
story
  11:2,3,6
  26:14 119:3
strategic
  15:12
street
  123:15
  192:21
strength
  51:4
strike
  30:12 68:18
  117:15

128:11
177:10
striking
  6:17
strip
  185:23
  186:1,8
strive
  60:16
structure
  73:12 90:20
struggle
  173:13
stuck
  34:11
student
  44:24
studies
  37:24
study
  57:18 58:2
studying
  9:21
stuff
  6:7 9:15
  12:2 23:2
  57:2 83:21
  109:13
stunned
  114:21
style
  5:18
subject
  23:5,7 28:8
  30:14 31:20,
  24 32:4,19,
  24 33:12
  37:23 38:4
  57:4 61:23
  69:18 75:1,
  21,23 76:19
  84:6,9,12,20
  85:13 94:1
  100:15
  103:24
  167:11
  173:18

182:25 193:7
**subjective**
162:4
**submitted**
133:16
**substantially**
120:16
**suddenly**
114:25
**suffer**
32:8 34:13
171:16
**suffered**
30:22 52:15
54:23 55:5
81:4
**suffering**
31:25 175:6
**suggested**
60:5 168:5
**suggesting**
103:21
126:19,21
**suicidal**
12:14 91:6,
25 92:11
93:6
**suicide**
91:11,19
**Sumathira**
154:1
**summarize**
105:6
**summarized**
165:24
**summary**
81:17 93:24
136:9 171:15
172:13 191:3
**summer**
25:8 64:15
65:4,10,24
76:22,23
**sun**
104:25
**Sunday**
71:14 179:21

180:25
**Sunnymeade**
6:10 10:20
**supervisor**
19:23
**supervisors**
186:20
**supplies**
80:6,8
**support**
17:19 70:3
73:8,11,15,
25 74:9,24
197:4
**supports**
13:5
**supposed**
141:4 164:14
**sure**
4:1,11,19
13:6 14:4
18:18 19:15
24:12 26:12
27:8 28:9
30:11 34:8
40:10 43:5,
25 44:5
45:17 55:3
56:9,19
63:20 77:21
85:9 86:3
88:21 91:5
106:20 119:6
120:7 132:5
146:7
148:20,24
155:3,4
164:15
170:17
171:18 172:1
174:16 175:7
177:17
178:17 191:8
192:6
**surgeries**
37:16
**surgery**
37:13

**surgical**
37:12
**surrounding**
70:2
**sustained**
176:8 193:19
195:12
**swear**
3:8
**sweating**
193:9
**swelling**
116:5,7
137:2,6
**swerved**
34:10
**swim**
83:9
**switch**
8:16
**swollen**
107:20
137:13,15
**sworn**
3:13
**symptom**
134:23 135:4
**symptomatic**
29:19
**symptoms**
25:19 29:21
31:13 47:3
49:6 92:3
107:23 122:7
130:21,22
131:7,16
132:6,18,20
134:10
135:22,23
137:20 138:5
139:15 140:8
143:13
145:6,9
147:8 148:14
154:21,22
158:5,24,25
160:13

163:6,13
171:16 175:5
181:6 190:14
**syndrome**
162:2
**systems**
17:19

---

**T**

**tag**
118:7
**take**
5:14 7:11
15:6 24:22
31:6,7,8
33:6 40:23
41:10 46:4
50:14,15
51:11,12,13,
18 56:18,19
74:16 78:24
80:14 88:20,
22 93:5 94:3
133:13,18,25
146:19
149:10,17
173:3 176:3
194:23,25
195:1,2,4
197:15
**taken**
3:1 50:11
57:1 111:14
179:19
196:1,2,6,8,
10,13
**takes**
12:13
**taking**
24:14,15
46:7,11 48:6
50:9,13,25
51:8 52:13
133:19
163:8,19
164:8,9,17
179:4 195:3,

7,8

**talk**
4:8 26:10
38:19 89:17
159:19
160:13 172:6
195:23

**talked**
23:11 37:5,
10 49:11
52:4 92:25
95:21 97:8
137:24
153:9,20
155:24
166:16
172:9,15
173:8
190:17,21
191:2,10,17
192:7 193:25
196:7

**talking**
4:15 24:13
47:5 55:9,23
58:6 78:10
91:12 92:13
93:10,12
116:11
132:24
134:16 146:8
147:14
162:16
193:21

**talks**
47:2

**tape**
104:19

**task**
149:13

**taxes**
15:9

**Taylor**
38:11,13
46:20,22
47:19,21
50:2

**team**
17:16 18:16
19:17,24,25

**tear**
183:23
184:18
185:12

**Tech**
8:20

**tele-health**
41:15

**Telemed**
159:15

**telemedicine**
44:9 159:16

**tell**
17:16 26:15
33:14,24
64:9 65:23
69:12
102:23,24
103:22
104:18
107:1,23
108:15 111:4
113:4 122:17
123:4 130:19
137:20
155:19
158:20 161:8
162:9,12
163:3,16
165:23
166:1,8
168:11 175:7

**telling**
68:2 91:19
121:19
143:19
149:17 170:7

**temperature**
141:15

**ten**
28:21,22
29:3 36:8,9
37:21 52:24
100:5 112:15
176:13

194:15

**Tennessee**
6:11 7:12
8:4,19 9:22
10:3,15 11:4
33:4 36:12
44:12 57:17
144:9,22

**term**
65:12,13
70:7 71:25
141:8

**terms**
16:13 53:7
65:2 182:9
196:21

**test**
113:2 156:7
165:10,12
166:3 171:2,
4,6

**tested**
166:3

**testified**
3:13 158:12

**testify**
51:15 191:6,
12

**testifying**
170:2

**testimony**
3:8 131:9
147:1,3
153:22,24
189:23

**testing**
55:23,25
56:7,10
112:16
141:13,14,16
152:11,16
165:5 166:8
169:7,8,21,
22 170:11,
12,14,18,22,
23

**tests**

171:7,12

**Texas**
145:23
146:22

**thank**
85:17 108:5
175:12
176:20 197:9

**Thanks**
6:1

**theater**
192:16

**therapeutic**
59:23

**therapist**
12:16 38:8,
14 40:5,12
41:23 43:18
44:25 152:7,
25 153:6

**therapy**
38:18,19
46:23 58:8

**thing**
20:18 36:4
55:17 62:10
72:14,22
83:1 86:23
90:16 100:24
116:17
152:20 175:2
179:10
196:10

**things**
18:25 22:17
24:9,22
48:10,20,23
49:2 58:21
61:9 73:18
77:13,21
89:1 91:2
109:20
124:17
132:24 133:1
135:24
139:20
140:19
145:18

Clay Crockett Volume I
November 21, 2024

147:6,21 165:13 166:5 172:15,20 173:3,15 177:22 178:2 182:4 193:11

**think**
5:22 8:12 26:9 43:16 48:23 55:25 60:8,22 62:19 66:19 67:1 70:7 78:10 81:13 91:10,21 94:23 96:5 98:20 103:20 108:20 111:7 112:18 115:6 118:15 121:7 135:9 140:15 141:1,9 152:23 155:21 158:4 164:4,14 165:11 168:14 175:10 180:13 181:2 186:4 191:17,22

**thinking**
89:13 173:14

**third**
109:11 152:4

**thorough**
172:17

**thought**
92:14 93:6 122:6 143:22 148:4 174:21 182:4

**thoughts**
91:11,18 92:1,11 162:4

**thousands**
184:14

**threatening**
66:8

**three**
9:2 24:2 68:5 73:16 74:1,3 75:6,20 76:3 84:3 96:19 108:13 110:1,7 118:14,23 169:12 171:22 194:8 195:8

**Tiktok**
21:25 22:5,7

**time**
4:15 9:1 11:17 17:8 20:4 22:16 23:12 27:15 29:14 32:2 35:8,19 36:22 40:14 41:19 42:2 43:23 45:11,15 51:21 52:23,24 53:3 57:24 58:3 62:3,24 66:20 67:17,24 68:13,17 69:12,16,17,18 70:5 71:24 72:17 73:15,19,21,24 84:12,13 85:1,2,19 86:14 87:9,16 88:6,10,12 89:8,24 90:21 91:22 92:19 93:12,13 94:3,9 101:6,7,9 102:22,25 107:12 110:23 111:3,6

114:11,14,16,18 115:4,10 116:2,24 117:11,12 120:23 121:20 122:1,6 123:18 125:4,10,15 126:3,4,16,17,25 128:4,15 129:12 130:5,16 131:9,10,11,17,20,24 133:5,6 134:3,7,24 135:16,18 136:14,16 137:14,17 140:21 141:7 142:24 143:1,3,21 146:8,17,21 147:2,25 148:14,22 150:21 151:3 152:3 154:11 156:20,22 157:5 162:20 164:6 167:11,16 171:5,8 173:15 177:3,7,19,20,21 180:7,16,23 182:9 184:15 186:7 187:21,23 191:14

**timely**
18:18,20

**times**
21:22 28:10,11 36:5 37:14 48:5 73:13 81:17 91:25 94:7

106:4 111:1 114:11 129:11 171:22 176:13 191:9 194:8 195:6,8

**tinkerer**
23:13

**tired**
64:19,20 194:11

**tissue**
162:24

**title**
16:2 70:4

**tobacco**
63:11

**today**
4:21 45:19 46:11 50:14 54:4 59:22 95:6 106:1,16 107:22 116:19 117:2 118:2 133:15 140:17 148:21 164:18 171:17,20 172:24 173:1,6 175:6 178:21 192:14

**told**
21:1 37:5 49:17 58:11 95:18 97:8 98:20 99:19 123:6 129:17,25 137:22 140:7,20 141:18 161:14 164:7 169:1 188:10,11

Clay Crockett Volume I
November 21, 2024

| | | | |
|---|---|---|---|
| **tolerable** | **trauma** | **truth** | 42:15 43:16 |
| 163:21 | 54:23 55:6 | 3:9,10 | 44:16,17,21 |
| **tolerate** | 90:23 | **try** | 50:14,22 |
| 130:25 | **travel** | 4:7 5:18 9:3 | 56:24 62:5, |
| **tomorrow** | 120:2,9 | 41:10 49:24 | 10,16,23 |
| 159:8,16,22 | **traveled** | 58:22 62:8 | 67:21 72:15 |
| 160:6 171:14 | 120:15 | 66:9 | 74:7 87:7 |
| **tomorrow's** | **tread** | **trying** | 88:7 89:8 |
| 159:11 | 183:3 185:23 | 21:21 41:9 | 92:20 93:10 |
| **tonic** | **treat** | 72:20 85:6,7 | 109:2 118:17 |
| 59:13 | 154:17 | 90:14 93:12 | 121:9,10,25 |
| **top** | 164:13 | 102:3 | 125:19 |
| 29:8 82:8 | **treated** | 114:22,23 | 133:19 149:5 |
| 107:19 | 140:2,8 | 128:19 132:6 | 150:14 |
| 118:15 | 174:10 | 134:15 140:6 | 165:12 166:5 |
| 121:16,17 | **treatment** | 159:20 | 172:6 173:21 |
| 135:24 | 35:20 36:13 | 176:20 | 176:16 182:4 |
| **total** | 39:12 41:20 | **Tuesday** | 188:4 |
| 42:10 44:7 | 49:12 52:17 | 73:20 | **Tylenol** |
| 68:5 115:13 | 53:12 55:7 | **tuning** | 57:2 147:6 |
| 118:14 | 161:3,5,6 | 19:11 | 176:4 195:1, |
| 133:18 | 180:22,23,25 | **turkey** | 7 |
| 174:24 175:1 | **triage** | 58:18 | **type** |
| **totally** | 124:19,23 | **turn** | 12:23 18:10 |
| 28:5 114:4 | **trial** | 109:10 | 28:19 29:18 |
| **touch** | 170:3 | 126:5,22 | 31:13 33:7, |
| 112:20 | **triggered** | 127:4 128:21 | 18 38:3,8, |
| **touched** | 148:13 | 136:6 138:23 | 12,17 40:9 |
| 91:3 | **triggering** | **turned** | 48:15 54:10, |
| **towel** | 192:13 | 68:21 69:1 | 23 55:5,10, |
| 116:9,11,16, | **trim** | **Turning** | 22,24 56:3, |
| 19 | 24:15 | 180:4 | 7,14 57:2 |
| **town** | **trimming** | **twice** | 58:7 59:23 |
| 10:11,12 | 24:24 | 27:11,21 | 62:14 63:4 |
| 75:11 83:6 | **trip** | 69:23 141:8 | 71:21 72:22 |
| **towns** | 78:8 119:23 | 148:4 194:10 | 73:17 86:19 |
| 6:17 10:16 | 128:20 | **twitter** | 90:22 99:20 |
| **track** | 143:14 | 21:18,23 | 106:3 112:16 |
| 8:11,14 | 174:11,21,24 | 22:9,10 | 118:16 149:7 |
| **trained** | 178:24 | **two** | 166:9 171:2 |
| 90:12 | **truck** | 6:14 11:1,2, | 197:14 |
| **training** | 192:21 | 3,6 14:13 | **types** |
| 14:2 90:17 | **true** | 15:1 19:19, | 22:15 27:6 |
| 166:17 | 46:2 54:16 | 25 24:17 | 36:3 49:20 |
| **transcript** | **trusted** | 25:14 35:21 | **typically** |
| 4:12,24 | 105:2 | 37:14,18 | 5:21 87:17 |
| 197:11 | | 39:4,17,18 | |

## U

**Uber**
78:24 79:1, 21
**Uh-huh**
40:13 44:15
68:12 76:24
88:3 91:17
94:12 95:24
102:9 113:16
129:22
138:13 143:7
151:19
157:10,12
160:14 175:3
**ultimate**
60:17
**ultimately**
169:6
**unable**
64:18 113:25
148:24
**underneath**
84:7,8
103:18
**understand**
7:23 14:7
41:12 50:9
51:16 57:6
60:8,9,25
62:5 63:14
66:4 70:4
84:6 120:7
146:9 159:20
182:2,20
**understanding**
45:25 52:12
60:12 82:4,5
86:8,10 91:5
95:22
104:12,15
106:10
117:14
122:20
160:17,19,22
182:7

**understood**
5:10 152:18
**unfortunate**
196:20
**United**
21:9
**units**
14:13
**University**
7:15 8:3
9:21 180:9
**unlike**
172:10
**unpacked**
82:12
**unprofessional**
61:22
**unquote**
59:7
**unrelated**
132:25
**unsightly**
85:11
**unsure**
114:25 126:4
**unusual**
32:1 85:11
104:5 106:2
**upbringing**
7:8
**upset**
90:23
**urge**
74:15
**urgent**
27:17 28:3,
8,18 37:7
**UT**
8:5,6
**Utah**
173:24
174:18,20
175:4

## V

**V.A.**
12:10
**vacation**
76:12 87:9,
23 174:12
**vacations**
173:17,20,25
174:15
**Valor**
76:2,4,10
**value**
196:10
**Vanderbilt**
169:10,14
180:9
**varies**
156:2
**various**
15:10 17:2,7
18:24 147:21
**Vegas**
174:23
**vendors**
18:19
**Venlafaxine**
50:15,21
80:14
**verge**
48:16
**versa**
4:4
**versus**
16:22 20:11
177:16
**vertigo**
32:8,9
**vessel**
142:12,13
**veterans**
12:11
**vice**
4:3
**vicinity**

84:21
**video**
42:23 43:2
**virtual**
158:2,17
159:23
**virtually**
69:25 157:17
158:3 160:10
**virtue**
104:4 113:22
**visible**
189:10
**vision**
125:13,24
170:13,22
**visit**
128:2 151:3,
6,8,17,21
154:11,24
155:9,18
156:5,6,12,
16,18 157:22
158:22
159:3,7,8,
11,16,23
160:9,18
161:21 165:1
166:2,12
168:17,23
171:9
**visits**
31:23 73:3
159:5
**visual**
136:18
**visually**
105:8
**vodka**
58:16 59:16
70:16
**voice**
42:23
**volume**
90:16
134:17,21

**voluntarily**
16:19
**volunteer**
89:6,25 90:7
**vomit**
116:2 130:24
139:18
**vomited**
125:17
134:25
135:12
136:13
137:23
**vomiting**
125:13 127:6
131:1 135:10
162:3 179:1,
17
**vulnerable**
70:6

**W**

**W-E-N-A-S-O-
G-A**
89:10
**W-H-Y-B-R-E-W**
15:23
**W-R-I-G-H-T**
40:8
**wage**
197:6
**wait**
23:22 135:21
143:22
154:22
169:12
**waited**
169:6
**waive**
197:11
**wake**
87:17 193:15
**waking**
88:2
**walk**
71:6 91:5

119:2
127:23,24
195:19
**walk-in**
27:17
**walked**
120:15
124:23 125:1
127:14
**walking**
110:22 111:5
192:21
195:24
**wall**
23:22 34:24
120:4,16
**want**
4:18 5:5,24
26:16 56:23
62:17 64:24
77:20 84:8
88:20,25
93:14 106:13
119:1,5
121:4 122:23
124:15
126:12
151:13
158:20
171:18 175:6
189:25
192:25
194:1,2
**wanted**
80:16
112:18,21
141:17
**warn**
189:3
**warning**
104:18
**wash**
192:18,19
**watch**
22:8 82:9
**watching**
104:23

**water**
9:10 83:17
101:8 121:3,
6,8,16,17,24
**way**
4:6,8 17:11
19:14 26:13
29:19 30:13
50:12 51:16
55:5 65:6
66:8 70:25
75:5 89:15
94:14 95:12,
15 105:2
107:16 111:4
113:2,20
119:2 120:5,
14 135:22
139:15 140:5
143:2 194:8,
21
**ways**
63:20
**weaker**
61:7
**weakness**
70:16 120:6
131:3
**wear**
183:23
184:18
185:12
**wearing**
34:15 116:23
**weeds**
24:25
**week**
25:13 39:23,
25 69:11,23
73:20 74:4,6
87:10,16
153:11 157:7
168:19
169:22
171:22 191:9
194:8 195:6,
8

**weekend**
87:12,19
**weekends**
87:15
**weeks**
25:14 39:4,
17,18 42:15
73:16 74:1,3
172:12 191:2
**weighed**
143:14,15
**weighs**
112:14,15
**weird**
103:16
**well-being**
48:19
**Wellbutrin**
50:18,22
52:9,13
**wellness**
151:17,21
**Wenasoga**
89:9
**went**
7:2,15 8:16
22:24 30:4,6
35:12 36:9,
23,24 53:20
57:13 58:19
67:23 69:13
71:18 72:24
75:9 77:20
82:8 84:13
90:17 92:4,6
93:2 114:7
122:7 128:14
130:14
131:12 133:4
135:25
144:19
145:13 146:4
147:19,20,25
153:25 167:4
168:19
169:14 170:9
173:8,23,24
174:8 189:21

192:15
**west**
6:14 33:2,3
**whatsoever**
33:10 141:14
**white**
42:21
**Whitney**
179:8
**Whybrew**
15:23
**widow**
23:21
**wife**
11:8,23
64:4,9 67:9,
11 71:2
72:10 77:9
78:1,6 81:1
86:6,15 96:9
97:21 101:4,
12 109:18
110:2 115:2
117:18,20
121:1,20
122:1,9
129:12
130:13 132:7
134:16
135:15
149:1,7
164:22,23
172:18 191:5
196:12
**wind**
62:23 104:25
**window**
23:21,22
24:5
**wine**
86:24 102:10
**wing**
29:23
**witness**
3:11 117:21
122:19 134:6
135:14 144:1

160:22 161:5
167:9 168:14
169:4
181:10,23
182:12,20
184:1,21
185:7,15,20
186:4,12,19,
25 187:19
189:10,18
190:12
**wonder**
173:7
**word**
44:16 50:21
63:14 155:22
**words**
20:22 31:16
40:24 44:17
45:18 51:4,
19 56:13
60:19 65:1
71:2 72:20
96:8 102:17
104:2 114:10
123:4 140:19
162:14
165:15,16,19
173:14
195:14
**wore**
131:16
**work**
9:5,8,12
10:7 12:6
17:16,22
19:14,17
23:15 24:11,
17 26:24
27:1,3 46:25
51:18 52:5
55:4 74:7,22
89:4,24
149:10,12,
18,22 152:12
158:6 173:2
195:16

**worked**
9:12 10:15
13:2 20:17
**worker**
13:1
**workers'**
21:5
**working**
10:11 18:6,
17 20:15
90:1 152:6,
14
**workings**
17:9
**works**
10:2 12:7,8,
10,11 41:3
46:20 72:14
86:9 101:8
121:8
**world**
71:23
**worried**
24:9 33:9
48:11,17,21,
24
**worries**
48:15
**worry**
48:12,18
196:21
**worrying**
48:4,9,18
49:10
**worse**
25:19 120:15
122:7 130:21
131:5,17
143:12,13
145:6,9
154:21 197:1
**worst**
131:8
**wound**
136:25
137:2,15,16
140:19

**wow**
30:18
**wrap**
56:24
**wrecks**
90:19
**Wright**
40:6,9,15,16
41:7,14,15
179:8
**write**
80:16
178:10,13
191:18
**written**
126:7 136:9
140:5,15
150:16
171:2,4,6
178:16
**wrong**
4:18 95:13
106:17
125:8,21,22
127:10,17
150:18
152:24
186:17 187:3
**wrote**
151:14
166:15

---

**X**

---

**XR**
50:10

---

**Y**

---

**yard**
23:15 24:11
**yeah**
3:22 16:6
18:15 19:6
20:12,18
26:6 27:8
41:12 42:1

43:1 50:17
64:14 68:12
69:21 71:18
72:15,18
76:13,17,18
83:15 86:3
87:25 90:11
92:16 108:21
109:1 111:20
114:9,21
115:20 121:7
133:11
139:19 140:2
143:1 144:25
146:4 147:9
149:24
157:14 160:5
161:18
164:24 165:9
167:4,9
168:14
172:13,23
173:6 174:7
176:13
177:17 183:9
193:20
195:13,23

**year**
7:5,21
14:22,23
15:3 16:1,
17,18 19:1
27:11,21
29:16 32:11,
12 35:9
38:24 39:2
44:6 47:13
59:8 169:6
173:23
176:20

**years**
10:10,18
11:15 13:3
16:12 24:2
28:21,22
29:3,13
36:8,9 37:21
52:24 68:23

75:4 76:17
89:12 91:15,
16 92:4,6,9,
13 176:13,16

**yellow**
109:14,23

**yoga**
49:23

---

**Z**

---

**zap**
24:10

**zero**
194:15